Julius W. HOBSON, individually and on behalf of Jean Marie Hobson and Julius W. Hobson, Jr., et al., Plaintiffs,

v.

Carl F. HANSEN, Superintendent of Schools of the District of Columbia, the Board of Education of the District of Columbia et al., Defendants.

Civ. A. No. 82-66.

United States District Court
District of Columbia.

June 19, 1967.

See also D.C., 265 F.Supp. 902.

William M. Kunstler, Jerry D. Anker and Herbert O. Reid, Sr., Washington, D. C., for plaintiffs.

Charles T. Duncan, Corp. Counsel for District of Columbia, Matthew J. Mullaney, Jr. and John A. Earnest, Asst. Corp. Counsel, and James M. Cashman and Robert R. Redmon, Asst. Corp. Counsel at time of trial, for defendants.

J. SKELLY WRIGHT, Circuit Judge * :

### SUMMARY

In Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), the Supreme Court held that the District of Columbia's racially segregated public school system violated the due process clause of the Fifth Amendment. The present litigation, brought in behalf of Negro as well as poor children generally in the District's public schools, tests the current compliance of those schools with the principles announced in *Bolling*, its companion case, Brown v. Board of

* Sitting by designation pursuant to 28 U.S.C. § 291(c).

Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and their progeny. The basic question presented is whether the defendants, the Superintendent of Schools and the members of the Board of Education, in the operation of the public school system here, unconstitutionally deprive the District's Negro and poor public school children of their right to equal educational opportunity with the District's white and more affluent public school children. This court concludes that they do.

In support of this conclusion the court makes the following principal findings of fact:

1. Racially and socially homogeneous schools damage the minds and spirit of all children who attend them—the Negro, the white, the poor and the affluent— and block the attainment of the broader goals of democratic education, whether the segregation occurs by law or by fact.

2. The scholastic achievement of the disadvantaged child, Negro and white, is strongly related to the racial and socioeconomic composition of the student body of his school. A racially and socially integrated school environment increases the scholastic achievement of the disadvantaged child of whatever race.

3. The Board of Education, which is the statutory head of the public schools in the District, is appointed pursuant to a quota system which, until 1962, for over half a century had limited the Negro membership of the nine-man Board to three. Since 1962 the Negro quota on the Board has been four, one less than a majority. The city of Washington, which is the District of Columbia, presently has a population over 60% Negro and a public school population over 90% Negro.

4. Adherence to the neighborhood school policy by the School Board effectively segregates the Negro and the poor children from the white and the more affluent children in most of the District's public schools. This neighborhood school policy is relaxed by the Board through the use of optional zones for the purpose of allowing white children, usually affluent white children, "trapped" in a Negro school district, to "escape" to a "white" or more nearly white school, thus making the economic and racial segregation of the public school children more complete than it would otherwise be under a strict neighborhood school assignment plan.

5. The teachers and principals in the public schools are assigned so that generally the race of the faculty is the same as the race of the children. Thus most of the schools can be identified as "Negro" or "white," not only by reference to the predominant race of the children attending, but by the predominant race of the faculty as well. The heaviest concentration of Negro faculty, usually 100%, is in the Negro ghetto schools.

6. The median annual per pupil expenditure ($292) in the predominantly (85–100%) Negro elementary schools in the District of Columbia has been a flat $100 below the median annual per pupil expenditure for its predominantly (85–100%) white schools ($392).

7. Generally the "white" schools are underpopulated while the "Negro" schools generally are overcrowded. Moreover, all of the white elementary schools have kindergartens. Some Negro schools are without kindergartens entirely while other Negro schools operate kindergartens in shifts or consecutive sessions. In addition to being overcrowded and short on kindergarten space, the school buildings in the Negro slums are ancient and run down. Only recently, through the use of impact aid and other federal funds, have the Negro slum schools had sufficient textbooks for the children's use.

8. As they proceed through the Washington school system, the reading scores primarily of the Negro and poor children, but not the white and middle class, fall increasingly behind the national norm. By senior high school the discrepancy reaches several grades.

9. The track system as used in the District's public schools is a form of ability grouping in which students are divided in separate, self-contained curricula or tracks ranging from "Basic"

for the slow student to "Honors" for the gifted.

10. The aptitude tests used to assign children to the various tracks are standardized primarily on white middle class children. Since these tests do not relate to the Negro and disadvantaged child, track assignment based on such tests relegates Negro and disadvantaged children to the lower tracks from which, because of the reduced curricula and the absence of adequate remedial and compensatory education, as well as continued inappropriate testing, the chance of escape is remote.

11. Education in the lower tracks is geared to what Dr. Hansen, the creator of the track system, calls the "blue collar" student. Thus such children, so stigmatized by inappropriate aptitude testing procedures, are denied equal opportunity to obtain the white collar education available to the white and more affluent children.

Other incidental, but highly indicative, findings are as follows: a. The June 1964—December 1965 study by the Office of the Surgeon General, Army, shows that 55.3% of the 18-year-olds from the District of Columbia failed the Armed Services mental test, a higher percentage than any of the 50 states. b. The average per pupil expenditure in the District's public schools is only slightly below the national average. The 1964–65 Bureau of the Census Report on Governmental Finances shows, however, that the District of Columbia spends less per capita on education generally than all states except Arkansas and Tennessee. c. The same report shows that the District of Columbia spends more per capita on police protection than all states without exception. In fact, the District of Columbia spends more than double any state other than Nevada, New York, New Jersey and California. The inferences, including those bearing on the relationship of the quality of education to crime, which arise from these findings are obvious. Indeed, the National Crime Commission's Task Force Report: Juvenile Delinquency and Youth Crime indicates that the very deficiencies in the District's public school system noted by the record in this case—prejudging, through inappropriate testing, the learning abilities of the disadvantaged child as inferior to the white middle class child; placing the child in lower tracks for reduced education based on such tests, thus implementing the self-fulfilling prophecy phenomenon inherent in such misjudgments; placing inferior teachers in slum schools; continuing racial and economic segregation of pupils; providing textbooks unrelated to the lives of disadvantaged children; inadequate remedial programs for offsetting initial psychological and social difficulties of the disadvantaged child— all have contributed to the increase in crime, particularly juvenile crime.

In sum, all of the evidence in this case tends to show that the Washington school system is a monument to the cynicism of the power structure which governs the voteless capital of the greatest country on earth.

### Remedy

To correct the racial and economic discrimination found in the operation of the District of Columbia public school system, the court has issued a decree attached to its opinion ordering: 1. An injunction against racial and economic discrimination in the public school system here. 2. Abolition of the track system. 3. Abolition of the optional zones. 4. Transportation for volunteering children in overcrowded school districts east of Rock Creek Park to underpopulated schools west of the Park. 5. The defendants, by October 2, 1967, to file for approval by the court a plan for pupil assignment eliminating the racial and economic discrimination found to exist in the operation of the Washington public school system. 6. Substantial integration of the faculty of each school beginning with the school year 1967–68. 7. The defendants, by October 2, 1967, to file for approval by the court a teacher assignment plan fully integrating the faculty of each school.

The United States is invited to intervene in these proceedings to assist in implementing the decree, to suggest changes in the decree, and to take whatever other steps it deems appropriate in the interest of public education in the District of Columbia.

## FINDINGS OF FACT

### I. STUDENT SEGREGATION

A. *De Jure Segregation and Bolling v. Sharpe.*

Until 1954 the public schools in the District of Columbia were racially segregated by law.[1] The school system was divided up into Division I (white) and Division II (Negro), each with its own elementary and junior and senior high schools, each with teaching and administrative personnel of the one race only. The two Divisions were capped at the top by a single Superintendent. A few administrative committees also cut across Division lines.

The Negro schools, though entirely disjointed from Division I, were denied the consolation of equality which the separate-but-equal doctrine had promised. In 1949 the monumental Strayer Report[2] thoroughly documented the comparative inferiority of Division II: its classrooms were considerably more crowded, its buildings older and shabbier, its curricula narrower, its counseling services less adequate, its supplies more scarce.[3]

The next year our Court of Appeals upheld the constitutionality of the District's segregated school system, Judge Edgerton dissenting. Carr v. Corning, 86 U.S.App.D.C. 173, 182 F.2d 14 (1950). Only months later, however, the Supreme Court issued decisions which clearly threatened the viability of the separate-but-equal doctrine as it applied to public school education. Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950); McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950). Heedful that this doctrine was in its twilight, in the early fifties the school administration began readying itself for desegregation should that be decreed. Participating in these explorations was Dr. Carl F. Hansen, then in charge of Division I elementary schools and of the curriculum for all

---

1. Excluded from the first public schools in the Washington area when they opened their doors in 1805, *see* C. GREEN, WASHINGTON: VILLAGE AND CAPITAL 1800–1875, at 43 (1962), Negroes here won their first opportunity for a tax-supported education in 1862, when Congress directed the cities of Washington and Georgetown to set aside 10% of the taxes on *Negro* property for support of the primary school education of Negro children. Act of May 21, 1862, 12 STAT. 407. Enactment of this measure climaxed a momentous year which first saw Congress abolish the traces of slavery in the District, then the municipal repeal of the local black codes and curfew. *See* C. GREEN, *supra*, at 274–275. But even in so enlightened a time it was apparently unthinkable that any white citizen should be expected to pay through taxation for Negro education. In the next 92 years Congress never in terms dictated that dual, segregated schools should be maintained; but the progression of school legislation enacted during those years did very clearly rest on a congressional assumption that segregation would continue. *See* Carr v. Corning, 86 U.S.App.D.C. 173, 176–178, 182 F.2d 14, 17–19 (1950).

2. Pursuant to a specific congressional request, in 1948 a team of investigators headed by Professor George Strayer of Columbia University began an exhaustive study of the District public schools. Their research issued in a 980-page report released in 1949.

3. Carr v. Corning, *supra* Note 1, 86 U.S. App.D.C. at 186–189, 182 F.2d at 27–30 (Edgerton, J., dissenting); Ex. A–16, pp. 47, 48, 316, 318, 701. The court will provide citations to the transcript (Tr.) and the exhibits (Ex.) when indulging in direct quotation and on other occasions when the court feels that cites will be an aid to the parties in later proceedings, in this court or on appeal. These citations do not profess completeness; redundancy is intentionally avoided, and the court may have omitted other cites which the parties may feel support, or undercut, its findings. The record, of course, is the final and exclusive arbiter. Lettered exhibits (*e. g.*, Ex. A–16) are those introduced by plaintiffs; defendants' exhibits have numbers only.

schools, and since 1958 the Superintendent of Schools.

In 1950 seven Negro students, of whom Spottswood T. Bolling was alphabetically the first, filed suit in federal court seeking admission to Sousa Junior High, a Division I school. On May 19, 1954, in Bolling v. Sharpe, 347 U.S. 497, 73 S.Ct. 693, the companion case to Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, the Supreme Court ruled that segregation in Washington's schools was incompatible with the due process clause of the Fifth Amendment. For the argument on remedy Bolling and Brown were consolidated. A year and two weeks after Brown I, the Court in Brown II, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), issued its famous decree of "all deliberate speed" and, noting that "[s]ubstantial progress has been made in the District," supra at 299, 75 S.Ct. at 756, remanded Bolling to the District of Columbia federal district court. A month later, whether because by that time plaintiffs had all graduated from the District's schools or for other reasons, the Bolling action was dismissed.

B. *The Board's Desegregation Plan.*

1. As the Board of Education correctly understood, the Bolling decision affected the constitutional rights not of the complainants alone but of the entire Negro community in the District. Accordingly, within the week after Bolling and Brown I, the Board of Education released a plan for desegregation, one drawn up tentatively by the school administration the year before, widely known as the Corning Plan after the then Superintendent. By the opening of school in September 1955 it was in full effect.

As for placement of students, the plan embraced and asserted a policy, with modifications, of neighborhood schools. That is, geographical boundaries were traced around each school, the school somewhere near the center of the defined area; with the significant exceptions noted below in Sections I—D—3 and I—E of these findings, students attending public school and residing within each enclosure were required to go to the school inside that enclosure. (Tr. 135). Elementary school districts were kept compact enough so that most youngsters could easily walk to the schools from their homes, usually a distance of less than half a mile. (Tr. 3728, 3730.) Junior high school zones were of greater size—several elementary schools "feeding" into one junior high—and senior high zones were more inclusive still.[4]

2. Neighborhood elementary schools have undeniable advantages. Neither school nor parents need bear any transportation expenses, since the school is within walking distance of home. For the same reason, the safety hazards and the expense of time involved in getting from home to school are held at a minimum; also, students may conveniently return home for lunch, and, with no school bus to catch, may linger after school with school work or after-school activities. Locating schools within the neighborhoods facilitates a closer relationship between school and parents, and gives the student a chance to make friends during the school day with the children of his own age who live near his home. (Tr. 3120–3121; 4047–4049; 5031–5035; 6091–6094, 6194–6196.)

For junior and senior high schools, however, the relevant "neighborhoods" so expand that the advantages said to accrue with neighborhood schools in great part attenuate. (*See* Tr. 198.) As shown above, those advantages primarily depend on a neighborhood school only a reasonable walk from home; and the maps of school zone lines in the city make it clear that most Washington secondary school students must rely on

---

4. The Strayer Report makes it appear that before 1954 each of the two Divisions cleaved to something resembling a neighborhood school policy. Many distortions, however, were obviously at work. Areas very thinly populated by one race posed a challenge to "neighborhood" segregated schools the Board's resolution of which is not clear. All three Negro high schools in 1949 were located within a few blocks of each other, near where Dunbar now stands.

some form of transportation in getting to and from school.

### C. *Washington Residential Patterns.*

Adoption of a neighborhood policy for student assignment inevitably impresses the racial residential patterns within the city on the schools with dramatic consequences. This section of the findings, drawing on evidence scattered through the exhibits, will try to sketch those patterns in the large. Below, to begin, are figures graphing the gradual displacement of whites by Negroes in the city and in its schools.

| Year | Per Cent Negro City | Per Cent Negro School |
|------|-----|-----|
| 1900 | 32% | |
| 1930 | 27% | 32% |
| 1940 | 28% | 39% |
| 1950 | 35% | 50.1% |
| 1953 | 40% | 56.8% |
| 1960 | 55% | 79.7% |
| 1965 | 61+% | 89.4% |
| 1966 | | 90.2% |

(Ex. V–13; Ex. 7; Ex. 26; Ex. 146.)

Washington's white families, then, are increasingly few in number; further their residences are heavily concentrated in one area of the city, the area west of Rock Creek Park [5]—the western fourth, approximately, of the truncated District diamond. The Park is a verdant curtain which draws through the city. It has long been true that virtually every residence west of the Park is white.[6] It is now true that east of the Park the city

is very heavily Negro.[7] Twenty-seven years ago whites constituted at least a one-third minority in every neighborhood in the city. (Ex. A–16, pp. 310–314). But the rapid white out-migration from Washington into the Virginia and Maryland suburbs ever since 1948, the year of peak white population, has evidently depleted the supply of whites in many areas.

By the time of Bolling v. Sharpe, segregated residential patterns blighted the city. Since then the conditions have worsened. White families have deserted the Northeast, and the white population has greatly thinned in the high Northwest and in the quadrant of the city south and east of the Anacostia River. It is a painful irony that in the very decade in which society has intensified its efforts in facing up to the race question, residential segregation in Washington has become yet more complete.

Many whites still do live east of the Park, especially in the corridor between the Park and Parkway and 16th Street, including the fashionable DuPont Circle area, and in the socially variegated Capitol Hill area. But they enroll few children in the public school system, some because they are unattached and the others because, though married, they either are without children of public school age or place their children in private schools.[8]

### D. *Segregation 1954–1967.*

Adoption of a neighborhood school policy by Washington school officials in 1954 marked a thorough and commenda-

---

5. The court defines Rock Creek Park to include the section alongside the Parkway south of the Zoo leading toward the Potomac River. Local usage varies on this question. In that section the Park, while still a natural barrier between east and west, is easily forded at several crossings.

6. Except for the lower Georgetown area, which apparently as late as 1940 was heavily Negro. *See* E. GRIER, UNDERSTANDING WASHINGTON'S CHANGING POPULATION 16–17 (1961).

7. "* * * It is common knowledge in Washington that the local real estate in-

dustry had decided [*circa* 1950], whether tacitly or formally, that the neighborhoods east of the park would be freely open to Negro expansion, whereas those on the west would remain reserved for whites. A few Negroes broke across the barrier, but in the main the line held." G. GRIER & E. GRIER, EQUALITY AND BEYOND 29 (1966).

8. It is possible that many white students in these areas through one channel or another manage transfer into white schools west of the Park.

bly rapid abandonment of the formally segregated school structure of the preceding century. Nevertheless, it cannot be gainsaid that these officials were doubtless aware that its adoption would lead to a school system still considerably segregated in fact.[9] There is no direct evidence that they intended this result; on the question of intent, *see* Section F–5 below. But the tendency toward segregation they accentuated by establishing various special student-assignment exceptions to the neighborhood principle—"optional" zones, an "optional feature," and a psychological upset provision (these will be individually discussed below)— all calculated to release many white students from any obligation to attend their neighborhood school if that school should be predominantly Negro. The degree of actual integration which the neighborhood school policy, so qualified, in fact achieved in the years immediately following *Bolling* the record does not clearly show; all we know is that in 1954–55 27% of all Washington's schools were 100% of one race or another; a year later this figure was 17%. (Ex. 7, p. 49.) Dr. Hansen's track system, instituted in the high schools in 1956 and extended downward to the

junior high and elementary schools in 1959, had the tendency of resegregating the races within the individual school.[10]

In 1958–59, an elementary school racial count uncovered the following information:

1958–59

| Per Cent Negro | Number of Elementary Schools |
|---|---|
| 90–100% | 68 |
| 80–90% | 10 |
| 70–80% | 7 |
| 60–70% | 6 |
| 50–60% | 3 |
| 40–50% | 1 |
| 30–40% | 1 |
| 20–30% | 2 |
| 10–20% | 1 |
| 0–10% | 18 |

(Ex. 8, p. 9.)

Beginning with the school year 1962–63 the record is profuse with detail. Here is the racial breakdown of all the schools, first for that year and then for the 1966–67 school year just drawing to a close.[11]

Elementary Schools

| Per Cent Negro Pupils | Number of Schools | |
|---|---|---|
| | 1962–63 | 1966–67 |
| 85–100% | 94 | 109 |
| 67–85% | 11 | 9 |
| 33–67% [12] | 4 | 4 |
| 15–33% | 3 | 4 |
| 0–15% | 17 | 9 |

9. In these findings and throughout the opinion of law "segregation" will denote the state of racial separateness in the schools, regardless of cause. For . expressing the degree of segregation in Washington's schools, the court will call a school "predominantly" Negro (or white) if 85% or more of its students are of that race. This cut-off point is relevant to evidence adduced by the parties respecting the state of segregation beyond which the educational and social advantages attached to integration disappear.

10. The track system and its racial implications are analyzed in these findings below.

11. All information in these findings on the racial composition of the schools is drawn from the P series of exhibits and also Exhibit 146.

12. Notice that the middle category has twice the breadth of the others.

### Junior High Schools

| Per Cent Negro Pupils | Number of Schools | |
|---|---|---|
| | 1962–63 | 1966–67 |
| 85–100% | 17 | 22 |
| 67–85% | 2 | 3 |
| 33–67% | 1 | 1 |
| 15–33% | 2 | 0 |
| 0–15% | 1 | 1 |

### Senior High Schools

| Per Cent Negro Pupils | Number of Schools | |
|---|---|---|
| 85–100% | 6 | 8 |
| 67–85% | 0 | 1 |
| 33–67% | 3 | 1 |
| 15–33% | 1 | 0 |
| 0–15% | 1 | 1 |

In 1962–63, of the 13 elementary schools west of the Park, 12 were predominantly (85–100%) white. (The last, Jackson, was 83% white.) The five other predominantly white schools were on the other side of the Anacostia River. This year (1966–67) every one of 11 predominantly white schools at the three levels (9 + 1 + 1) is west of the Park, and so are all four 67–85% white schools. The only schools west of the Park which are *not* predominantly white are Western High and Gordon Junior High, both in the 33–67% class.

#### E. *Efforts to Correct De Facto Segregation.*

At this juncture it becomes relevant to inquire into the efforts the school administration has undertaken, if any, to lessen the massive actual segregation which these figures reveal.

1. One witness, a school system engineer, testified that since 1962 the school system has ventured on a limited policy of integration, although one generally confined within the neighborhood principle. (Tr. 3609–3615, 3660–3668, 3725–3726, 3758–3760.) This policy, as he defined it, takes effect when more than a trivial number of whites happen to live in neighborhoods in which, for reasons unrelated to race, schools are due to be built. The substance of the alleged policy is that in these circumstances the new schools will be carefully placed within the neighborhoods so that their white enrollment when they open will be as high as possible. The hope is that the attractiveness of the new school will fasten the white families to the neighborhood, and perhaps lure other white families in; the witness' claim was that this integration factor is sometimes as important a factor as cost in settling on the location of a new school.

The witness conceded that the policy had never been clearly articulated, or embodied in a written memorandum, or even approved by the School Board, originating instead with Dr. Hansen. And other evidence verifies that this testimony that integration is considered in locating school sites is simply untrue. In September 1964, two years after he supposedly announced this policy, Dr. Hansen notified the Board that integration was ignored in the placement of new schools, that to do otherwise would be futile (given the rapid racial transitions in mixed neighborhoods) and "bad educational planning." (Ex. 36(c), p. 23.)

2. An instance of the school system's concern for student integration is the

WISE program, discussed in these findings at III–H–6 below. Now still in the planning stage, WISE is designed to upgrade the secondary schools in the southern half of the region west of the Park, in the hope that these school improvements will stabilize this presently integrated neighborhood. Financially the program will depend exclusively on federal grants under impact aid or other national statutes.

3. Two exceptions which the school administration has carved from its neighborhood policy may in operation be achieving slight integration; if this results, however, it is fortuitous, for the school administration disavows here any intention to integrate.

a. The first of these exceptions is that youngsters with mental or emotional disabilities, most of them Negro, through the years have been bused at public expense from their homes into special instructional classes meeting in approximately 35 elementary schools throughout the city. (Tr. 139, 2256–2257.) This past year slightly more than 100 such students, half of them Negro, were so deposited in the schools west of the Park. (Ex. 146.) At the receiving schools, of course, these disabled students are segregated into special classrooms set aside for their use and generally separated from the regular student body of the school.

b. A child attending a school overcrowded to a point well above stated capacity may be allowed to transfer to certain underutilized schools designated "open." (*See* Tr. 125, 136, 183, 2257, 2879; Ex. A–35(c), pp. 18–19, 36; Ex. N–9.) Since none of the 11 "open" schools in 1965–66 was predominantly (85–100%) Negro, the open school policy evokes the possibility of integration, although this is no part of the purpose of the school administration, which apparently looks forward to ending the transfers as soon as adequate facilities can be erected in the now overcrowded areas. Further, there are inhibitions on the right to transfer. The students are, first, responsible for furnishing their own transportation. At least this has been true until a year ago, and the recent departure establishing busing is apparently limited to situations where the regular school is overcrowded to the extreme point of requiring shifts or consecutive half-day sessions. (*See* Defendants' Proposed Findings, p. B–10.) Of course, the failure to provide transportation in effect biases the open-school policy in favor of families fortunate enough economically to shoulder transportation expenses. It is unclear, moreover, whether, once the conditions of under- and overcrowding are satisfied, the student's right to transfer is absolute, or whether clearance on academic or other grounds must be secured from or renewed by some school official. For whatever reason, many and in some cases most of the students transferring into the predominantly white schools west of the Park are white students who would otherwise have attended schools with higher Negro concentrations.[13]

4. The attitude toward curing segregation on the part of the school administration is adequately exposed by the circumstances surrounding Dr. Hansen's report to the Board in 1964. In June of that year the Washington Urban League presented a report on school segregation to the Board of Education in open meeting. This Urban League submission (Ex. A–36(b)) urged the Board, first, to declare officially that actual integration is one of its policy objectives, and, next, to create a permanent advisory committee on integration; finally, it spelled out concrete if limited steps which

---

13. For example, in 1965–66, 49 students transferred into Oyster elementary school; school records show that only 25 students in the school that year were Negro. Even if *none* of these 25 lived within the Oyster zone, a doubtful assumption, it still follows that 24 of the 49 transfer-ring students were white. These white students must have been from schools not themselves predominantly white, inasmuch as none of the 85–100% white schools were overcrowded enough to transfer out of.

the Board could take in the direction of integration. These included busing Negroes into underutilized predominantly (85–100%) white schools, making rather slight amendments in certain secondary school zones (in one instance merely rotating the Cardozo zone, now a north-south rectangle, 90 degrees), abolishing several optional zones (defined below), and establishing three fourth- through sixth-grade educational centers in lower Georgetown, Mount Pleasant and the upper Northwest, each one serving an area now parcelled out among three elementary schools.

The Board profusely thanked the Urban League for its civic interest and requested Dr. Hansen to analyze its several proposals. Dr. Hansen's evaluation (Ex. A–36(c)), turned in to the Board on September 1, 1964, denied that "segregation," even *de facto segregation,*" was the right word for Washington's schools,[14] insisted that the Board's 1954 policy statement on ending *de jure* segregation sufficed in its content as a statement of racial policy (Ex. A–35(a), p. 45), argued that the League's suggestions were "evil in principle" and probably unconstitutional insofar as they inclined toward color consciousness rather than color blindness on the part of the school system, and condemned them for entailing or auguring "abandonment" of the neighborhood school policy, his administration's commitment to which he vigorously reaffirmed. The Board of Education, after receiving a reply brief by the Urban League (Ex. A–36(d)) pointing out that Dr. Hansen had not come to grips with many of its specif-

ic recommendations,[15] took no action. (Tr. 1437–1439.)

5. From all the evidence, including the Urban League episode and the collapse upon analysis of the professed integration policies respecting school placement, the court is forced to the conclusion that the school administration's response to the fact and dilemma of segregation has been primarily characterized—at its best—by indifference and inaction. School officials have refused to install actual integration as an objective for administration policy, or even to recognize that in the District segregation is a major problem. Over the years they have expressed little interest in and done nothing about locating schools on the borders of white and Negro communities, or busing students from east of the Park into the underutilized schools west of that divide to achieve integration, or building schools in the Park accessible from east and west alike, or Princeton planning contiguous schools,[16] or establishing large educational complexes drawing students from throughout the city; its present $300,000,000 six-year plan for expansion and construction envisages none of these alternatives. (Tr. 3713–3715, 3724.) Many of these ideas, indeed, have apparently never been considered. (*See* Tr. 2974, 2977, 3749.) Dr. Hansen, for example, although he has himself examined the literature on educational parks, has not ordered any studies undertaken *re* their local usefulness, nor has he broached the subject with the Board, or even with his own staff, at least until this suit got under way.[17] (Tr. 179–182, 975, 3669–3670.)

---

14. He apparently would have accepted "racial imbalance."

15. His statement failed to discuss the specific boundary line changes the Urban League had suggested. It answered the recommendation for tri-grade, tri-school mini-parks mainly by debunking a far different New York proposal for far more comprehensive parks.

16. The court is aware of press reports to the effect that a three-school "pairing" experiment is under way in the Southwest. For reasons they know best,

defendants introduced no evidence respecting this experiment at trial, telling the court instead that their basic practice has been neighborhood schools without deviation. Under these circumstances, the court has no alternative but to ignore these reports.

17. After two months of trial, one public school official testified that educational parks had been discussed in a staff meeting "yesterday." (Tr. 3670; *compare* Tr. 3711.)

The truth may be that school officials have given up on integration primarily because they have noted the low number of whites in the schools in recent years. But so long as so many of the remaining white pupils continue to be sent to 85–100% white schools, the possibilities for integration have hardly been exhausted.

F. *School Administration Policies Encouraging Segregation.*

The next step is to focus attention on those additional school administration departures from the neighborhood school system which come wrapped in racial implications and bear directly on the question of the school administration's racial intent. These fall under four headings.

1. Beginning after *Bolling,* individual whites who were seriously upset by the prospect of integration were suffered on an individual basis to transfer to white schools, in the teeth of the 1954 Board order ruling expressly to the contrary. (Ex. 7, p. 44; *see* p. 46.) And apparently professions of psychological upset were accepted at face value without investigation of their authenticity. (*See* Tr. 3068–3069, 3119.) The record is unclear as to whether this practice has been discontinued; the court notes one report that it was still functioning *circa* 1960.[18]

2. Under the so-called "optional feature" of the school system's desegregation plan, students registered in one school at the time of *Bolling* were allowed, if that school stayed underenrolled, to remain there until graduation instead of attending their neighborhood school; indeed unless the student requested transfer to his neighborhood school he apparently continued in the school he had been attending. (Ex. 7, p. 46.) While this feature had some affirmative value in minimizing the disruption in students' lives occasioned by desegregation, another of its obvious functions was to let white students living in heavily Negro neighborhoods stay in their still predominantly white, though beyond the neighborhood, schools. The feature expired no later than 1960, since by then all students had graduated from their 1953 schools.[19]

3. Two years ago the school administration revised the tentative borders drawn around the new Rabaut Junior High (which finally opened last fall) admittedly in order to accommodate an organization called Neighbors, Inc. (Tr. 2790–2818.) Neighbors, Inc. represents a community that is centered around Takoma Elementary School, which until very recently was thoroughly integrated. The organization protested the original line because it would have sliced the Takoma district in two, dividing the white Takoma studentry up between Paul and Rabaut Junior Highs, in each of which they would be engulfed by a large Negro majority, rather than concentrating the whites in Paul alone.

4. *Optional zones.* Sometimes, the administration has replaced hard and fast geographical school boundaries with what it calls "optional zones."

a. *Crestwood and Kalorama Triangle zones.* As an illustration, presently every student living in the integrated Crestwood area between 16th Street and the Park north of Piney Branch Parkway may choose to attend either predominantly (85–100%) Negro MacFarland Junior High, the neighborhood school only a few blocks to the east, or integrated (33–67%) Gordon, far away on the other side of the Park. Similarly, the older brother may enroll at either Roosevelt (predominantly Negro), his nearby neighborhood high school (adjoining MacFarland), or Western (integrated) or Wilson (predominantly white), each close to two miles to the west. The young student living in that area has an option between Powell Ele-

---

18. C. Green, The Secret City 330 (1967).

19. Confirmation on the expiration date is provided by Osborne & Bennett, *Eliminating Educational Segregation in the Nation's Capital—1951–1955,* in the March 1956 Annals of the American Academy of Political and Social Science, pp. 98, 102–103.

mentary School (predominantly Negro), in his neighborhood a short walk away, and Hearst (predominantly white), at a distance of 10 minutes by car just off Wisconsin Avenue. (Tr. 3053–3054; Ex. N–1, p. 27.)

Directly south of Crestwood, in the Kalorama Triangle area, optional zones afford the student a choice between Cardozo High and Western, and between Banneker Junior High and Gordon. His natural "neighborhood" schools are plainly Cardozo and Banneker, both predominantly Negro.

All these zones [20] were marked out when the school lines were drawn anew in the wake of *Bolling*. (Tr. 2957.) At that time all the schools in question were operating at less than capacity. (Tr. 2845–2846.) Despite this evidence, an assistant school superintendent maintained at first on the stand that the purpose behind creation of these zones was to relieve overcrowding at the schools within the territory of which the zones naturally fell. (Tr. 2859, 2862.) The next day the witness retracted this explanation, confessing that the primary original purpose for the zones was to afford whites the opportunity to avert attendance at the Negro schools to which they were otherwise destined. (Tr. 2956–2958, 2978.) [21] The court accepts this explanation. And while claiming that presently the zones also function to lessen overcrowding at the schools just east of 16th Street, the witness did not assert that the racial purpose for these zones has vanished (Tr. 2977–2985), and the court has no reason so to find.

b. *Dunbar zone.* Elsewhere in Washington optional zones also appear. Sometime after 1960, Washington's Southwest was given its selection between Dunbar High School, which is overwhelmingly Negro, and Ballou, then mostly white but on the other side of the Anacostia River. When Ballou became overcrowded and began reporting substantial Negro majorities, it was replaced as the optional zone alternative by Western, a less crowded and racially mixed school, although a great distance away. This school year, the 35 white students living in that zone without exception elected to attend Western, as did 19 of the 86 Negroes with residences there. (Tr. 6713.)

The school administration professes [22] to the court that its purpose here is only to allow every student in the zone, white and Negro alike, to attend a genuinely integrated school. (Tr. 2852, 2982.) Its solicitude for the Negro student's opportunity for exposure to an integrated education the court discredits. Since 1954 the administration has carved optional zones for race-oriented reasons only where significant islands of whites are found, never in neighborhoods which lack white enclaves, never, for example, in the almost exclusively Negro neighborhoods directly to the east of 14th Street feeding Shaw and Garnet-Patterson, which in fact are closer to Western High School than the Dunbar optional zone is. Further, the court can judicially note that the new Southwest, as school officials well know, is largely composed of urban-renewal affluent whites easily able to absorb the expense of transportation, and impoverished Negro families making do in public housing. Any equality here would be on a par with the majestic evenhandedness of the ordinance which Anatole France cherished. [23]

The court also discredits two administration spokesmen's claim that Western

---

**20.** Except for the addition of Wilson to the high school zone in 1965.

**21.** This confession explicitly related to the Crestwood zones; the court assumes that it applies also to the Kalorama Triangle zones, created at the same time (1954) for obviously the same purpose.

**22.** This profession followed the collapse of its earlier intimation that this zone too primarily dealt with overcrowding. (Tr. 2661.)

**23.** "The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread." Quoted in Griffin v. People of State of Illinois, 351 U.S. 12, 23, 76 S.Ct. 585, 593, 100 L.Ed. 891 (1956) (Frankfurter, J., concurring).

replaced Ballou as one of the optional zone schools only because Ballou became overcrowded. (Tr. 548–549, 2661, 2982–2983.) As Ballou's enrollment increased, so did its percentage of Negroes in attendance (now 85%); since the conceded function of this optional zone is to provide access to an integrated secondary school, race as well as (if not rather than) overcrowding must have induced the substitution.

c. *Junior high zones.* Two junior high school optional zones—between Paul and Backus and between Francis and Gordon—were created after formal desegregation, again so that the white student could choose to attend a distant school with a considerable white percentage rather than the overwhelmingly Negro school in his neighborhood. (Tr. 2865–2867, 2985.) Both zones were recently abolished, although in neither instance because the school administration had at last rejected this line of social reasoning. Rather, it was the opening of Rabaut Junior High this fall which spelled the end of the old Paul-Backus zone, while the Francis-Gordon zone was finally integrated into Gordon to decrease overcrowding at Francis.

d. *Deal-Gordon zone.* One other optional zone eased the withdrawal of students from an integrated junior high (Gordon) into the city's one predominantly white junior high school, Deal. (*See* Tr. 152–171, 2858.) Beginning back in the 1940's when both were Division I white high schools, an optional zone lay between Wilson and Western Senior Highs. At that time Deal fed into Wilson, Gordon into Western; these are today's arrangements also. The Wilson-Western optional zone until 1963 fell entirely within Gordon's province. Parents in the zone who preferred Wilson High School complained to Superintendent Hansen about the junior high assignment to Gordon. Ostensibly their reasoning was that their children suffered the awkwardness of having to ac- quire wholly new classmates when they graduated from Gordon into Wilson, and that families were inconvenienced by having children simultaneously attending Gordon and Wilson, at opposite directions from the zone itself. In 1963 the Superintendent, in response to these complaints, converted the zone from compulsory Gordon to Gordon-Deal optional territory. Two years later, admittedly because a civil rights group publicly argued that the zone parents were principally seeking a white school, the Superintendent changed directions, not only returning the junior high optional zone to the Gordon district, but merging the senior high zone into the exclusively Western district.

Although, the Superintendent testified, the 1963 change was an "unwise decision because of the racial overtones," "The racial overtones," he said, "are interjected into this by others." (Tr. 165, 166.) The zone parents' pre-1963 professed non-racial grievances do, however, seem disingenuous, since the inconvenience they cited they had invited upon themselves by choosing Wilson rather than Western High School for their older children. Further, that the Superintendent granted such relief upon the civil rights group's protest evidently reflected his concession that one apparent intent of the zone parents was segregatory. Accordingly, the court finds that the underlying motive of at least some of the zone parents, not unappreciated by the Superintendent, lay in their preference for the greater white enrollment at Deal and Wilson.

■ 5. *Conclusion.* Once nearly complete student segregation is shown in a school system in which *de jure* segregation had formerly been the rule, when challenged the burden falls on the school board to show that the observed segregation stems from the application of racially neutral policies. In this litigation defendants have exposed and explained their neighborhood policy and shown

---

There, of course, at issue was a law forbidding activities which only the poor would want to participate in. Here, as in *Griffin*, the subject is a vital right hedged with conditions which only the successful are able to satisfy.

**418**

that this is the agent responsible for the segregation.

Spotlighting the racial purpose hidden behind the optional zones, plaintiffs invite the court to find that the seeming racial neutrality of the neighborhood school policy itself is only a front that school officials adopted and adhered to because they intended the racial segregation they knew it would produce.

The court, however, is convinced, first, that, whatever the trends in recent educational thought, in 1954 the Board of Education sincerely believed in the neighborhood school policy and the legitimate values they saw it as furthering. Accordingly, the court cannot conclude that its segregatory potential was the reason the Board inaugurated the neighborhood policy 13 years ago. Actually, the whole question of the Board's motives in 1954 spins in a kind of unreality. Undoubtedly the Board then felt that, at least for elementary schools, it had been all but ordered by the Supreme Court to install such a policy; except for the deviations caused by de jure segregation, neighborhood elementary schools were virtually the unquestioned orthodoxy throughout Northern urban education. The Supreme Court itself indicated in *Brown* II a year later that it too seemingly assumed that as a matter of course desegregating school districts would fall back upon the neighborhood school norm. 349 U.S. 297, 300–301, 75 S.Ct. 753 (1955). The court is also impressed that the Board plunged into almost immediate action, not even waiting to see whether *Brown* II might not occasion a retreat by the Court from the high ground it staked out in *Brown* I.

Nor is any idea of intentional segregation necessary to explain why the neighborhood policy has been continued in the interim between 1954 and the present. Organizational inertia and conservatism, added to what the court finds to be the continued good faith aspects in the Board's approval of the neighborhood policy, are easily adequate explanations.

■ But the fact that the Board believes in neighborhood schools for racially neutral reasons which alone suffice to explain the initiation and retention of that policy does not settle the matter; for these facts in no way cancel the possibility that the Board has concurrently favored it for racial reasons which are forbidden. If a valid purpose is in fact joined by an outright segregatory purpose, the court has no doubt that a *de jure* case has been established. On this issue, however, the burden of proof returns to plaintiffs; school board officials, having demonstrated their legitimate intentions, can hardly be asked or expected to prove the nonexistence of a secret illicit accompanying intent.

Plaintiffs' evidence in support of their accusation comes from the optional zones, the Rabaut incident, the now discontinued optional feature, and the emotional upset provision, present status unknown. All of these conspire to identify the actual attitude of the school administration—though not necessarily of the Board[24]—toward attendance by whites at predominantly Negro schools. The substance of that attitude is, simply, that whites should not be compelled to attend them.

This attitude, it must quickly be said, is not, even once converted into policy, at all an absolute. Often it comes into conflict with other school system policies, principally that of neighborhood schools. On occasion, clashes between these two forces can be averted and the two reconciled, as when a simple retracing of a line in 1965 prevented the splitting up of each half of a small white colony between two predominantly Negro junior highs. Usually, when the two do collide, it is the neighborhood policy which prevails, leaving a few white students trapped in a predominantly Negro school. But sometimes, instead, it is the neighborhood pol-

24. These incidents and practices which support the finding on attitude are on the whole much more closely linked with the school administration than with the Board.

icy which recedes, leaving in its backwash an optional zone or another stratagem.

We know then (1) that the school administration under the Superintendent is reluctant to assign white pupils to predominantly Negro schools, if only because of the pressure from influential white parents that action stirs. We also know (2) that in this school system where the very large majority of the students is Negro, the neighborhood policy succeeds in placing white students in such a way that few of them are required to attend heavily Negro schools. This evidence, the court feels, is not enough to show that in any real sense the Board of Education has adhered to the neighborhood policy with a segregatory design. However, given the two circumstances above, it is impossible not to assume that the school administration is affirmatively satisfied with the segregation which the neighborhood policy breeds.

G. *The Vices of Segregation.*

1. The court finds that actual integration of students and faculty at a school, by setting the stage for meaningful and continuous exchanges between the races, educates white and Negro students equally in the fundamentals of racial tolerance and understanding. None of the parties to this suit, indeed, oppose this formulation, and they further agree that learning to live interracially is, or in a democracy should be, a vital component in every student's educational experience. (Tr. 185, 200–201, 611–612; 3065–3069; 5074–5076; Defendants' Proposed Findings, p. B-6.)

Elementary school integration enables the very young of either race to accept each other as persons before racial attitudes and prejudices have a chance to intrude and harden (Ex. A-24, pp. 27–28) ; Negro and white children playing innocently together in the schoolyard are the primary liberating promise in a society imprisoned by racial consciousness. If stereotypic racial thinking does set in, it can best be overcome by the reciprocal racial exposure which school integration entails.[25] (Tr. 5084.)

2. The court also finds that a Negro student in a predominantly Negro school gets a formal education inferior to the academic education he would receive, and which white students receive, in a school which is integrated or predominantly white. And integration of the Negro into the white classroom need not diminish the achievement of the white students. Dr. Coles, *see* Note 25, testified that in schools whose integration he has witnessed white achievement has held steady, or even as a result of integration slightly improved. (Ex. A-24, pp. 30, 34.) Dr. Marvin Cline of Howard University reported that in the instances he has studied of Negroes bused into white schools white achievement has never declined. (Tr. 6558.) Busing of this type has been undertaken in Baltimore, *see* Note 26, and, according to defendants' witness, achievement testing has shown that the integration has had no negative effect on white performance. (Tr. 5088.)

Asked about an Office of Education report concluding that the white school offers the Negro student academically a "better educational opportunity," Dr.

---

25. Dr. Robert Coles, a child psychiatrist attached to the Harvard Medical School, who for the last six years has devoted his life to the intensive clinical study of Negro youngsters in both segregated and integrated settings in the North, East and South (*see* R. COLES, CHILDREN OF CRISIS (1967)), described a high school in Atlanta freshly integrated by two Negro girls. A while after integration, a white student picked up and returned to her a ruler which one of the girls had dropped. Discussing the incident with Dr. Coles, the boy expressed

surprise and embarrassment over his unpremeditated act of courtesy:

"Then he started noticing to me, as we were talking, the differences between the two Negro girls; that one dressed in one way, the other dressed in another way. And what he was slowly doing was making discriminations of another variety than prejudice. He was discriminating between two human beings who were Negroes in ways that he never had before."

(Ex. A-24, p. 29.)

Hansen, the only defendant to testify on this score, volunteered that he accepted that conclusion, subject only to his reservation that efforts at integration are self-defeating if white students react by withdrawing from the city public schools. (Tr. 197–198.) Dr. Hansen was corroborated by Dr. James Coleman of Johns Hopkins University, Dr. Cline, and Dr. Coles, all of whom testified that Negro students' educational achievement improves when they transfer into white or integrated educational institutions. (Tr. 880; 1770, 6558; Ex. A-24, pp. 20, 25, 33.) It might be expected that adjusting to a very new situation would inhibit the Negro students' achievement for a while; but measurable jumps sometimes, though not always, can be recorded even in the first round of testing after integration (Tr. 6560); adjustment apparently more often assumes the form of productful stress than of incapaciting trauma. (Ex. A-24, p. 22.)[26]

Their consignment to predominantly Negro schools, as Dr. George B. Brain, former superintendent of Baltimore schools and defendants' expert, indicated, causes Negroes to feel that they are being discriminated against (Tr. 5084), or, as a Negro teenager told Dr. Coles, "contained."[27] (Ex. A-24, p. 37.) It would be morally callous, and factually inaccurate, to suggest that their assumption that these schools wear "a badge of inferiority" stems solely from their free choice "to put that construction upon it." [28] It was, again, Dr. Brain who testified that the nation in abolishing Negro slavery merely released the Negro into the bondage of an informal social and economic caste system cemented together by bias and discrimination. Despite the revolution of the last 13 years, these attitudes remain distressingly pervasive forces in race relations even today. What it means to be Negro in America thus "becomes a psychological fact in [the] daily lives" of Negro children, who are the heirs and victims of these traditions of prejudice, significantly influencing their attitudes toward study and education; understandably, in their view the predominantly Negro school is "part of a history of exile and bondage." (Ex. A-24, pp. 25, 26, 37.) And Negroes read

26. The Baltimore study discussed by Dr. Brain is not contrary to this finding. In Baltimore Negro students from inner city schools have been bused and integrated into outlying white schools. The Negro students remaining in the "sending" schools have been awarded unusually small classes and an array of special enrichment services typical of compensatory education. (Tr. 5029, 5031.) On the first round of standardized testing after the relocations, the sending school students achieved higher scores than they would have received, according to statistical calculations, had the old arrangements not been disturbed. (Tr. 5088.) This improvement, ascribable to small class size and the supportive programs, has persisted now through two years. (Tr. 5089.)

Dr. Brain testified on the basis of a report—introduced into evidence by the defendants as Exhibit 101—prepared by Dr. N. N. Jaffa of the Baltimore school system, who personally evaluated the students' test results. The report makes very clear that on the standardized tests the transported students did just as well as the sending school students (Ex. 101, pp. A-175, A-176)—which indicates that they too, in their case as a result of integration, surpassed their predicted achievement levels.

The year-end school grades which teachers gave students at the sending schools were, however, higher than those received by the transported students at the white schools; this is what Dr. Brain must have had in mind when he said that the transported students did not succeed in bettering their predictions. (Tr. 5030, 5088.) But since this measure involves comparing the private judgments of different sets of teachers, it is less reliable as a weather vane of achievement than the results of standardized tests.

What the Baltimore experience does stand for is that under some circumstances compensatory education in the Negro schools can be very fruitful.

27. Dr. Coles: "I said, 'What do you mean by "contained"?' His association of containment was 'being in a can.' So I asked him what he meant by being in a can and he said, well he just meant being in a can. * * * It is a significant and powerful image to me."

28. Plessy v. Ferguson, 163 U.S. 537, 551, 16 S.Ct. 1138, 1143, 41 L.Ed. 256 (1896).

in the eyes of the white community the judgment that their schools are inferior and without status, thus confirming and reinforcing their own impressions. Particularly this is true in Washington, where the white community has clearly expressed its views on the predominantly Negro schools through the behavior of white parents and teachers who, the court finds, in large numbers have withdrawn or withheld their children from, and refused to teach in, those schools. (*E. g.*, Tr. 72, 186–187.)

In an evironment defined by such unhealthy attitudes, it should not be surprising that the predominantly Negro schools show a pronounced intrinsic tendency to slide in a pathological direction. This of course affects the schools' teachers, of whatever race, whose own demoralization and low expectations (Ex. A-24, pp. 35-36), communicated back to the children, contribute further to the schools' social disintegration in a vicious though understandable circle.

## II. Personnel Segregation and Discrimination

### A. *School Board.*

The nine members of the Washington School Board by law are appointed by the judges of Washington's federal district court. 31 D.C.Code § 101 (1961), upheld in Hobson v. Hansen, D.D.C., 265 F.Supp. 902 (1967). The legislation expressly provides that three of the nine Board members shall be women and that members shall serve for three-year terms. The judges' practice in carrying out their duties under the statute, which is silent on this question, has been to appoint Board members for staggered terms, filling three positions in each of a three-year cycle.

From 1882 on, the Board of Education, then named the Board of School Trustees, operated under an Act of Congress which expressly stated that the Board would have "nine members only (three colored)." Act of July 1, 1882, 22 STAT. 142. This racial provision was omitted from the 1900 and 1906 statutes, the latter of which, commissioning the District Court judges to appoint the Board, is the law we operate under today. Beginning in 1906, the year the present statute took effect, and with no variation for 56 years thereafter, three of the nine Board members so appointed by the court were of the Negro race. This situation endured until 1962, since which time the court has consistently maintained the level of Negro membership on the Board at four, no more or less, and, of course, one vote short of a majority. (Ex. V-6.) Absent any rebuttal or explanation of these facts, and none has been forthcoming or, indeed, can easily be imagined, this court must conclude that for well over half a century membership on the Board of Education has been governed by a precise and unyielding racial quota; five years ago the Negro quota was increased to four, but the fact of the quota itself survived. In light of the fact that well over 60% of the city's population and more than 90% of the public school enrollment are Negro, and assuming a quota system should be tolerated at all, the four-member quota gives Negroes less than proportional representation on the Board.

### B. *School Personnel Discrimination*

Following below are figures detailing the racial composition of the District public school system staff. As in Section I, again the school years represented are 1962–63 and 1966–67.

| | Per Cent Negro | |
|---|---|---|
| | 1962–63 | 1966–67 |
| Superintendent | 0% (0/1) | 0% (0/1) |
| His highest assistants | 50% (5/10) | 36% (4/11) |
| Other central officers | 46% | 61% |
| Principals and assistant principals | 56% | 69% |
| Teachers | 73% | 78% |

(Ex. M-4; Court Ex. 2.)

On this record the school administration cannot justly be accused of discriminatorily refusing to hire Negroes as teachers or to appoint Negroes to school principalships. Plaintiffs do advance the charge, though, that discrimination has insinuated into the selection of the school system's key administrative officers, relying on the fact that only four of the 12 highest rungs on the hierarchy, and none of the positions at the very summit, are filled by Negroes.

But inasmuch as at least 30% of Washington's population, and a greater share of the metropolitan area, are white, and since in hiring administrators the Board of Education can, should and does seek talent beyond local horizons in other cities' school systems (Tr. 39, 2670), these figures carry very little probative value. Also, the court is mindful that centuries of exclusion and inferior education have depressed the present supply of Negroes qualified to fill ranking administrative positions. For these reasons, the court cannot conclude that the school administration on account of race has refused to appoint or promote eligible Negro candidates to the crucial positions in the governing structure.

*C. Segregation of School Personnel.*

1. Though asserting no claim that Negro teachers are unable to gain employment in the District schools because of color, plaintiffs do insist that once hired Negro teachers are the victims of segregation in school assignments. The M-series of exhibits which affords the ammunition for this charge jumbles together teachers, counselors and librarians into one single category. This category the court christens "faculty," or sometimes merely "teachers," a fair enough substitute, since within the "faculty" teachers heavily predominate. The appropriate statistics follow below.[29]

Elementary Schools

| | | 1962–63 | | 1966–67 | |
|---|---|---|---|---|---|
| Number of Schools with Per Cent Negro Faculty | 100% | 64 | } 84 | 52 | } 91 |
| | 85–99% | 20 | | 39 | |
| | 67–85% | 7 | | 17 | |
| | 33–67% | 15 | | 10 | |
| | 15–33% | 3 | | 4 | |
| | 1–15% | 3 | } 20 | 8 | } 13 |
| | 0% | 17 | | 5 | |

Junior High Schools

| Number of Schools with Per Cent Negro Faculty | | | |
|---|---|---|---|
| | 85–100% | 12 | 16 |
| | 67–85% | 3 | 7 |
| | 33–67% | 6 | 3 |
| | 15–33% | 1 | 0 |
| | 0–15% | 1 | 1 |

---

29. All information in these findings on the race of faculties and principals at the District's schools is derived from the M-series of plaintiffs' exhibits and from Court Exhibit 2.

■■■■■■

## Senior High Schools

| Number | | | |
|---|---|---|---|
| of | 85–100% | 2 | 2 |
| Schools | 67–85% | 2 | 4 |
| with | 33–67% | 3 | 3 |
| Per Cent | 15–33% | 1 | 1 |
| Negro | 0–15% | 3 | 1 |
| Faculty | | | |

These tabulations carry dramatic and suggestive value in their own right. Of 135 elementary schools, 57—over 40%—are minus even a single emissary from the other race. Only 17 of the 135 fall within the category (67–85%) which reflects the teacher racial count for the schools as a whole; and only ten of them are eligible for the integrated 33–67% class. The truth is transparent that no concept of a random distribution of teachers is capable of accounting for or rationalizing these results.

2. The inferences of intentional teacher segregation which arise from these figures are confirmed and elaborated by the analysis below, which knits together all the data on the racial patterns of students, teachers and school principals.[30] The first three pairs of charts show the racial concentration among the faculties in the elementary, junior and senior high schools, compared with the racial characteristics of the schools' student bodies, for the school years 1962–63 and 1966–67. In the second series we see the correlation between the student racial character of the schools and the race of the principals who serve there.

a. Students and faculty.
 (1) Elementary schools.
 (a) 1962–63.

Number of Schools with Per Cent Negro Faculty

| | | 85–100% | 67–85% | 33–67% | 15–33% | 0–15% |
|---|---|---|---|---|---|---|
| Number of Schools with Per Cent Negro Students | 85–100% | 82 | 5 | 6 | 1 | |
| | 67–85% | 2 | 1 | 6 | 1 | 1 |
| | 33–67% | | 1 | 2 | | 1 |
| | 15–33% | | | 1 | | 2 |
| | 0–15% | | | | 1 | 16 * |

\* 15 of these were 0% Negro.

 (b) 1966–67.

Number of Schools with Per Cent Negro Faculty

| | | 85–100% | 67–85% | 33–67% | 15–33% | 0–15% |
|---|---|---|---|---|---|---|
| Number of Schools with Per Cent Negro Students | 85–100% | 90 * | 14 | 5 | | |
| | 67–85% | 1 | 3 | 4 | 1 | |
| | 33–67% | | | | 2 | 2 |
| | 15–33% | | | 1 | | 3 |
| | 0–15% | | | | 1 | 8 |

\* 52 of these were 100% Negro.

30. The term "principals" shall here and hereinafter include assistant principals. Elementary schools have one of these, if any; secondary schools two or three.

(2) Junior high schools.
 (a) 1962–63.

Number of Schools with Per Cent Negro Faculty

| Number of Schools with Per Cent Negro Students | 85–100% | 67–85% | 33–67% | 15–33% | 0–15% |
|---|---|---|---|---|---|
| 85–100% | 12 | 3 | 2 | | |
| 67–85% | | | 2 | | |
| 33–67% | | | | 1 | |
| 15–33% | | | 2 | | |
| 0–15% | | | | | 1 |

 (b) 1966–67.

Number of Schools with Per Cent Negro Faculty

| Number of Schools with Per Cent Negro Students | 85–100% | 67–85% | 33–67% | 15–33% | 0–15% |
|---|---|---|---|---|---|
| 85–100% | 16 | 6 | | | |
| 67–85% | | 1 | 2 | | |
| 33–67% | | | 1 | | |
| 15–33% | | | | | |
| 0–15% | | | | | 1 |

(3) Senior high schools.
 (a) 1962–63.

Number of Schools with Per Cent Negro Faculty

| Number of Schools with Per Cent Negro Students | 85–100% | 67–85% | 33–67% | 15–33% | 0–15% |
|---|---|---|---|---|---|
| 85–100% | 2 | 2 | 2 | | |
| 67–85% | | | | | |
| 33–67% | | | 1 | 2 | 1 |
| 15–33% | | | | | 1 |
| 0–15% | | | | | 1 |

 (b) 1966–67.

Number of Schools with Per Cent Negro Faculty

| Number of Schools with Per Cent Negro Students | 85–100% | 67–85% | 33–67% | 15–33% | 0–15% |
|---|---|---|---|---|---|
| 85–100% | 2 | 4 | 2 | | |
| 67–85% | | | 1 | | |
| 33–67% | | | | 1 | |
| 15–33% | | | | | |
| 0–15% | | | | | 1 |

b. Students and principals.
 (1) Elementary schools.

Number of Principals and Assistant Principals

| Number of Schools with Per Cent Negro Students | 1962–63 | | 1966–67 | |
|---|---|---|---|---|
| | Negro | White | Negro | White |
| 85–100% | 75 | 19 | 96 | 27 |
| 67–85% | 4 | 7 | 4 | 5 |
| 33–67% | 1 | 3 | | 4 |
| 15–33% | | 3 | | 4 |
| 0–15% | | 17 | | 9 |

(2) Junior high schools.

Number of Principals and Assistant Principals

| Number of Schools with Per Cent Negro Students | 1962–63 | | 1966–67 | |
|---|---|---|---|---|
| | Negro | White | Negro | White |
| 85–100% | 35 | 6 | 58 | 9 |
| 67–85% | 1 | 4 | 1 | 7 |
| 33–67% | | 3 | 1 | 2 |
| 15–33% | | 5 | | |
| 0–15% | | 3 | | 3 |

(3) Senior high schools.

| Number of Schools with Per Cent Negro Students | 1962–63 | | 1966–67 | |
|---|---|---|---|---|
| | Negro | White | Negro | White |
| 85–100% | 12 | 6 | 18 | 7 |
| 67–85% | | | 1 | 2 |
| 33–67% | 1 | 8 | 1 | 2 |
| 15–33% | | 3 | | |
| 0–15% | | 3 | | 3 |

What all these figures place beyond dispute is that to a significant if not startling degree teachers and principals have been assigned to schools where their own race mirrors the racial composition of the schools' student bodies) In a nutshell, white schools are usually paired with white faculties, Negro schools with Negro faculties; and integrated schools have integrated faculties.

Thus, for example, of the 109 predominantly (85–100%) Negro elementary schools in the District today, 90 have predominantly Negro faculties; of the others, all but five have faculties within the 67–85% range. Every school more than one-third white currently is assigned a faculty more than one-third white; at all but one of the 13 elementary schools that are more than two-thirds white the faculty is at least two-thirds white also. And perhaps the most provocative fact is that four years ago 15 of 17 predominantly white schools had *100%* white faculties. The mathematical possibility of this concentration of the relatively few white teachers in the school system's relatively few white schools happening by chance defies calculation by methods available to mere laymen.

The pupil-teacher-principal racial correlations which are distilled from these tables do not, to be sure, work out with invariable precision as to every school; but even the deviations can be accounted for to a great extent in terms themselves consistent with these correlations. School student bodies, for example, often swiftly jump from 40% to 75% Negro, or from 75% to 95%; therefore, even if the race of the faculty does respond to that of the student body, given the constraints on teacher transfer and the finite number of yearly retirements, a lag in time of a few years should be expected before the faculty accomplishes the corresponding racial change. This time lag is responsible for many of the deviations noted above. Only 19 of the 109 predominantly Negro schools in 1966–67 had other than predominantly Negro faculties; the Negro student enrollment at seven of these 19 had been less than 85% in 1962–63, and for each of these seven the number of Negroes on the faculty grew markedly during the four-year interval. Evidently these faculties are in the process of catching up, racially. Others of the 19 may well have had substantial white enrollment prior to 1962.

Moreover, since 22% of all teachers, but merely 9.2% of the students, are white, at all grade levels we should expect some tendency, even if the correlations hold, for faculties to have slightly higher white percentages than the student bod-

ies. A glance at the tables verifies that this tendency is apparent in the elementary schools and rather pronounced in the senior highs, where a typical school faculty is one category less Negro than the student body. It can be predicted that a like statistical inclination will be at work with respect to school principals, since a full 31% of them presently are white. Indeed, the facts show that any school with as many as 15% whites is more likely than not to have a white principal; and in schools more than one-third white, white principals are virtually the rule.

Finally, of the 19 predominantly Negro elementary schools without correspondingly Negro faculties, the court has stumbled on the fact that 14 of these serve relatively affluent neighborhoods, i. e., where median family income in 1960 exceeded $6,000. Of the 27 elementary schools both affluent and predominantly Negro only 13 have predominantly Negro faculties. (*See* Ex. F–2.)

3. *Teacher Placement Policies.*

■ When the raw data disclose personnel segregation as pervasive as this in a formerly *de jure* school system, and so thoroughly matched on a school-by-school basis with the racial make-up of the studentry, the burden falls on the school administration to clear the record by showing at a minimum that racially neutral policies are responsible for this result. The burden shifts from plaintiffs in large part because the figures themselves are persuasive circumstantial evidence of intentional segregation, but also because only the Board and the Superintendent have full information on their own teacher-assignment policies.[31] Postponing until Section 4 the question of how principals are assigned, the court now turns to the school system's teacher placement mechanisms, insofar as defendants presented them at trial.

a. *1954–55.*

Until 1954, of course, Washington school faculties were officially segregated by law. Assessing the faculty situation after the thunderbolt of Bolling v. Sharpe, the Board of Education quickly arrived at two decisions which it publicly announced. First, for the future teacher assignments and transfers would be predicated on merit rather than race; but second, the structure of faculty segregation which then prevailed would not be disturbed. That is, teachers would remain in their present assignments unless relocated pursuant to the ordinary rules governing teacher transfer. These rules will be elucidated in Section 3-c; it suffices here to say that they exclude compelling a teacher to transfer for the sake of integration (the Superintendent feels such transfers would be "totalitarian" (Tr. 77)), and that the success even of a voluntary transfer request depends on such fortuities as a vacancy in the other school to transfer into.

■ It must have been crystal-clear from the outset that teachers would be reluctant to depart from schools where they were established and secure and brave transfer, at their own request, into institutions with faculties from which they had previously been barred because of their race. The Board's policies thus plainly entailed the entrenchment and perpetuation of the teacher segregation of the past with a minimum of change. The court finds that at least a part of today's segregation is attributable to the Board's 1954 failure to shuffle faculties and thereby undo the *de jure* segregation which had theretofore been the rule. (Tr. 2897.)

This factor's contribution to present segregation can most readily be discerned in a few of the elementary schools in the Northwest where, because of dwindling student enrollment, teachers as they

31. *See* Reece v. State of Georgia, 350 U.S. 85, 88, 76 S.Ct. 167, 100 L.Ed. 77 (1955); Chambers v. Hendersonville City Bd. of Educ., 4 Cir., 364 F.2d 189, 192 (1966); Northcross v. Board of Educ., 6 Cir., 333 F.2d 661, 663–664 (1964); Evans v. Buchanan, D.Del., 207 F.Supp. 820, 825 (1962). In Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1962), the figures were much less striking, and the challenged officials did fully explain their policies.

retire are sometimes not replaced. Elsewhere, the influence of the inertia of the pre-1954 system seems slight. Eastern, McKinley and Roosevelt, the three former Division I high schools which within a few years of 1954 became predominantly Negro, today have 22%, 25% and 30% white faculty respectively. Cardozo and Dunbar, the two old Division II schools which have never lost their predominantly Negro status, have 11% and 21% teachers white. The differences between the former three and the latter two are not great; further, it is far from clear that the whites teaching at the three are carry-overs from bygone *de jure* days; and in each of the three it is certain that at least 70% of today's faculty (*viz.*, all the Negroes) attached themselves to these schools subsequent to *Bolling*. This alone attests to the speed of teacher turnover. Indeed, other evidence corroborates that the faculty turnover rate in the District schools is high. In a single school year (1965–66), for example, the District schools employed at least 750 teachers new to this system (Ex. 35; Ex. 36); for 1948 the Strayer Report computed the turnover at 12%. (Ex. A–16, p. 53.) Because of speedy turnover, the perpetuation of the 1954 structure mathematically does not go very deep into the reasons why today's faculty racial patterns appear as they do. The court therefore turns to the evidence respecting the school system's current and recent policies for teacher placement.

b. *Integration policies.*

First should be noted defendants' insistence that for the past few years, though not before, its policy has been to exert a "maximum" and "concerted" effort to integrate school faculties. This effort allegedly has expressed itself along two fronts. White teachers are encouraged to volunteer for placement in Negro schools; and when the qualifications of hypothetical applicants for a position are exactly equal, the candidate will be preferred whose race will integrate that school's faculty. (Tr. 68, 69, 77–78, 107, 2880, 2989.) The court notes that the entire discussion of these integration policies at trial was in the context of the rules controlling teacher transfers from one school to another; it is a murky question whether these policies profess any relevance to the initial assignment of incoming teachers.

A further caveat is that the policies are couched in terms of achieving "biracial" faculties—by which the administration means simply less than 100% of one race. (*E. g.*, Tr. 73, 75.) It is evident that once token teacher integration breaches the color barrier in a school, the school administration policies slacken off or expire.

Efforts along the persuasion front, in any event, have admittedly and not surprisingly proved barren of fruit. (Tr. 68, 3013.) For all the record shows they were equally barren of effort. There was testimony at several points that the Superintendent formally asked his staff to encourage teachers to volunteer for the inner city ghetto; whether assistant superintendents or others took any systematic action on the basis of this request is another question. It may be true that the other aspect of the policy— the provision for resolving deadlocks among candidates by considering race— has led to the placement of one or two Negroes in "white" schools. (Tr. 2276; *see also* Tr. 3116–3117.) There is no evidence that under this program any Negro teachers were placed in any predominantly (85–100%) white schools or in any schools west of the Park.

c. *Teacher transfer.*

Once a teacher has been assigned to a school, his subsequent placement is governed by the rules for teacher transfer, explored in some detail at trial. Occasionally, because of personality conflicts, the opening of a new school, the need for specialized teachers, or reasons of like character, teachers are involuntarily shifted from one school to another. Other transfers are voluntary. Some of the rules covering voluntary transfer policy are clear. No tenured or "permanent" teacher may transfer into any school if its faculty is already 70% permanent or more; proper applications for

transfer will be honored in the order received.

On further standards governing treatment of transfer requests, administration spokesmen disagreed. Dr. Hansen argued that for the last four years transfer requests have met stiff resistance, winning approval only when clearly justified by considerations of health or "education." (Tr. 68–69, 2273.) Moments later he stated that his administration has approved transfers for teachers wanting to serve at schools nearer their homes—a factor of convenience unrelated to education or health. (Tr. 2276.)

Assistant Superintendent John D. Koontz then proceeded to testify that the first transfer application received for a given opening is automatically granted, unless it offends the 70% permanent teacher rule (Tr. 2896, 3022); the transferor's motives, by this account, are neither investigated nor evaluated. Mr. Koontz is the officer immediately in charge of teacher transfers in all secondary schools. (Tr. 108, 2610.) For this reason the court resolves the conflict of testimony in his favor. Furthermore, it was the Superintendent who admitted that many white teachers have transferred from Negro to white schools during the last ten years, "not always necessarily because of the difference in race." (Tr. 2275.) The court finds, as this statement certainly recognizes, that some white teachers originally assigned to Negro schools have purposefully escaped therefrom via the transfer process.

It is doubtful, however, that racially-minded transfers have been common enough to afford a complete explanation, even when coupled with the continuing influence of pre-*Bolling* teacher segregation, for the dearth of white teachers in the predominantly (85–100%) Negro schools. Moreover, there is no reason in the record to assume that Negro teachers once assigned to predominantly white schools are eager to transfer away; therefore the court is still quite in the dark as to why the faculties of so many of the predominantly white schools are or have been so impeccably unintegrated. The missing ingredient, of course, in the account so far of teacher placement is the rule or rules which control the initial placement of freshman teachers. On these rules the court now steadies its focus.

d. *Original teacher assignment.*

Once the decision is reached to employ a teaching candidate somewhere in the system, the matter returns to the assistant superintendent for elementary (or secondary) schools, who is responsible for the actual assignment. One rule recently postulated by the school administration concerning these assignments is an analogue of the 70% rule for transfers: certified teachers are placed, whenever possible, in schools with low percentages of permanent teachers.

Other than this, defendants merely assert and repeat that assignments are governed by merit and need alone. (*E. g.,* Tr. 69; Ex. L–4.) This is an unhelpful, evasive response. Annually a school system as large as ours with hundreds of vacancies each year must fill a dozen vacancies at every level, *e. g.,* fourth grade, high school math. An equal number of candidates get approved as qualified to teach in Washington's schools, at least temporarily. To say that 12 new fifth grade teachers, to return to the example above, are sorted out among the 12 elementary schools needing these teachers on the basis of merit alone is an expression pregnant with little if any meaning.

In the record the court does find a scrap or two of evidence which begin to sketch out the real assignment processes. The Pucinski Task Force [32] reported that school principals informally recruit candidates for openings in their schools,

32. A Task Force of the House Committee on Education and Labor headed by Representative Roman C. Pucinski studied the District's school system during 1965 and early 1966 through public hearings and private investigations. A Committee Print summarizes their conclusions.

the assistant superintendents then acceding to the preferences which the principals voice. (Ex. A-3, p. 44; *compare* Tr. 4041 *with* Tr. 6024.) And one of defendants' exhibits may or may not indicate that the incoming teacher's own preferences are consulted by the assistant superintendent.[33] If these preferences are consulted, it is unclear whether they are respected only if the reasons supporting them are worthy of respect, *e. g.*, that one school is an excessive distance from home even by car. (*See* Tr. 3042, 6023.) If these reasons explaining teacher preferences are not reviewed for justifiability, then the unhappy facts that many white teachers are disinclined to serve in Negro schools (Tr. 72) and that a few Negro teachers hesitate to go to white schools (Tr. 2901) assume obvious relevance, as does the responsibility of the Board and school officials for pandering to any racial prejudices of the teachers.

■ In short, defendants have not shown that policies and practices free of racial criteria have been responsible for the patterns of teacher segregation in the District; many darkened areas still are clinging to the architecture of their teacher assignment policies, and it was on defendants that the duty to illuminate these areas fell. Accordingly, the court finds that an intent to segregate has played a role in one or more of the stages of teacher assignment. As to which of those stages, there is some suggestion in the record of self-segregation on the part of the teachers. But beyond that, the court cannot forget one remarkable fact: in 1962-63, eight years after "integration," in a school system short on white students and white teachers, the faculties of 15 of 17 predominantly white schools were *100%* white. Since the record shows that many Negro teachers are quite willing to teach in white schools, absent further explanation— none was proffered—only one reasonable inference can be drawn: principals or assistant superintendents have deliber-

ately excluded Negro teachers from these positions. The patterns of teacher segregation persisting, although in a less extreme form, and no evidence having been offered of any change in policy or practice since 1962, the court concludes that elements of deliberate segregation by such officials continue. The exact proportions of the responsibility for the present teacher segregation—the locus of primary guilt: teachers, principals, or higher school officials—the court does not and need not identify.

### 4. *Placement of Principals.*

■ The factual data on principal segregation was reported in Section C-2-b above. The heart of this report was that neither in 1962-63 nor in 1966-67 was there even a single Negro principal or assistant principal in any school more than two-thirds white; this must be compared with the fact that system-wide 56% of all such school officials in 1962-63—and 69% currently—are Negro. Testimony at trial verified that none of the white elementary schools in the Northwest has had a Negro principal at any time since desegregation. (Tr. 3076.) The court now seeks the explanation for these findings. For the reasons stated in Section 3, the burden of providing this explanation, the data having made out a *prima facie* case for intentional segregation, shifts to defendants.

After Bolling v. Sharpe, no dismantling for principals of the old Division I/II structure was carried out; principals, like teachers, stayed on in their 1953 assignments until their retirement, or unless transferred or promoted pursuant to the ordinary course of school business. But, as with teachers, the turnover has been rapid enough to minimize the present impact of this fact; since 1958 there have been 85 appointments of principals and assistant principals in the secondary schools alone, including all three positions at predominantly white Wilson High School. (Tr. 2890, 2962.)

---

33. Ex. 40, p. 1. It is not certain whether the passage in question pertains to original assignment or to transfers only.

The court, in seeking the sources of present racial patterns among principals, must therefore zero in on the post-*Bolling* standards regulating principal appointment and assignment.

When a principalship falls vacant the school administration advertises for applicants. Such advertisements for the last several years have withheld the name of the school, although doubtless this information informally circulates. One advertisement may advert to several openings at the same level—say, several elementary school assistant principalships. Those who apply then run the gauntlet of interviews with an examining board which looks at "credentials, experience, this, that, and the other thing." (Tr. 2966.) The examining board submits its recommendations to the Superintendent who, after indicating his own preferences, turns the files over to the Board of Education, which must ultimately approve every appointment. If only one position is vacant, the victor in the competition gets that assignment. But if several positions are open, then, once the Board of Education identifies its several choices, the responsibility returns to the assistant superintendent for making specific assignments, matching up principal with school.

The court, regrettably, has been given scant evidence as to the criteria this officer employs in deciding on these assignments. Evidence was introduced concerning his reasoning in filling assistant principalships at Eastern, a ghetto high school, and Wilson, the overwhelmingly white high school in the Northwest. Miss Green, a Negro, had for many years been counselor at Spingarn, another ghetto school. Mrs. Carroll, white, was a tenured member of Wilson's faculty. Miss Green was assigned to Eastern rather than Wilson because of her wide experience with the problems of lower class Negro adolescents. Mrs. Carroll was kept at Wilson for reasons of her acquired feel for the problems of its white, college-bound student body. (Tr. 2972–2973, 2994–3001.) These decisions

were, as Assistant Superintendent Koontz said, "in a sense, racial * * *" with respect to the "background of a person." (Tr. 2994.)

The court at this point encounters a fork in the road. Some explanation must be found for the utter absence of Negro principals in the 67–100% white public schools—a condition which is the product of the appointments recommended by the examining board and of the assignments made by the assistant superintendent when two or more principals are appointed together. That the examining board or assistant superintendent assigns principals to schools on a racial basis is one obvious candidate. However, the Green-Carroll incident leads the court to wonder about an alternative explanation. The court is willing to assume that, for the same reason of relevant experience the school administration selected Mrs. Carroll for the Wilson post, a great number of the other official positions in the 67–100% white schools have been filled by promoting faculty members with years of teaching experience in the school in question, or transferring in someone from another white school equally middle class. If this is so, then the selection of those principals for the white schools has not been racially based in a narrow sense. But, unfortunately, it also indicates that principal assignment is a derivative of teacher assignment—which we already know to be intentionally segregatory. Since Negroes have been discriminatorily fenced out of teaching positions in white schools, it is a simple *a fortiori*, under this explanation, that they have not been eligible for the principalships in any of these schools. Because the exclusion of Negroes from administrative positions in the white schools is, under this theory, a direct product of intentional teacher segregation, it is a fit subject for constitutional criticism. This being so, it becomes unnecessary to decide whether a substantial number of principals have *not* been recruited from within the white schools for reasons of appropriate experience, and if so, whether the selection of these

principals has been guided by a practice of deliberate segregation.

## III. Equality in the Distribution of Educational Resources

Plaintiffs complain that, in dividing up the available educational wealth among the schools, the school administration has repeatedly favored white schools west of the Park, while shortchanging schools primarily attended by Negroes and especially the Negro poor. In this part of the opinion the court renders what findings are appropriate in the categories of school-resource analysis which were developed at trial. Testimony and argument focused chiefly on elementary schools, although the evidence (largely official data and reports) rather indiscriminately submitted for the court's consideration often documented the situation for secondary schools as well. When on occasion the court does not explicitly discuss junior and senior high schools, it may be presumed that for those categories no noteworthy secondary school inequalities were found.

### A. Age of Buildings.

"The age of a school building is a factor in obsolescence and generally a criterion of safety and service."[34] The chart below shows the age of elementary school buildings in the District.

| | | 1860 | 1880 | 1890 | 1900 | 1910 | 1920 | 1930 | 1940 | 1950 | 1960 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Schools with Per Cent Negro Students | 85–100% | | 3 | 10 | 13 | 16 | 7 | 12 | 9 | 14 | 13 |
| | 67–85% | | | 2 | 1 | 2 | 1 | 1 | | 1 | 1 |
| | 33–67% | | | 1 | 1 | | | | 1 | 1 | |
| | 15–33% | | 1 | 1 | 1 | | | 1 | | | |
| | 0–15% | | | | | | 1 | 4 | 4 | | |

(Ex. E–1.) Negroes, it appears, are housed in the newest but also in the oldest elementary school buildings in the city; the predominantly (85–100%) white structures were virtually all built in the late 1920's and early 1930's. A disturbing fact not evident from the chart itself is that the *slum* schools, *i. e.*, those located in areas where the median family income in 1950 fell short of $5,000,[35] have a disproportionate share of the most ancient structures; the median age of the ghetto school is almost 60 years. The comparable age for schools with predominantly Negro enrollments in middle-income or middle-class neighborhoods is only 41 years.

The high concentration of poor Negroes in the school system's oldest buildings has come about not by Board of Education design, but as one consequence of its neighborhood school policy; poor Negroes happen to live in the vicinities of the oldest usable schools. Another outgrowth of that policy is the disproportionately high concentration of Negroes

34. Ex. A–16 (Strayer Report), p. 299.

35. There were 61 schools in such income areas in 1966–67 (Ex. F–2), 60 of which were predominantly Negro. Most of these 60 were nearly if not actually 100% Negro. In 1960 the median family income for Negroes in the District was $4,800, for whites $7,692. Although Negro family income more than doubled between 1950 and 1960, that figure as a per cent of white median family income slipped from 64% to 62%. (Ex. V–9.)

The question arises of the continuing accuracy of the 1960 income data. The court does not actually know and can hardly judicially notice that major income shifts within the city have taken place since 1960. Defendants, moreover, do not question reliance on the 1960 census, and indeed appropriate its data themselves in their own exhibits. And defendants' expert witness, Dr. Roger Lennon, testified in effect that it will be sound and orthodox statistical practice to use the 1960 census figures on neighborhood income until the 1970 census supersedes them.

in schools built since 1940. New schools are erected where increased density of student population overloads existing facilities; and the areas of mushrooming population within the city in the last 25 years have mostly been overwhelmingly Negro or rapidly in process of becoming so. A large number of additions to overcrowded existing schools have been put up in recent years; these schools, for the identical reason, have highly Negro enrollments.

B. *Physical Condition and Educational Adequacy.*

Schools which have been built here in the last eight years are equipped with cafeterias and several other facilities, including auditoriums, health units and auxiliary classrooms; few of these features were known to the schools erected at earlier dates. Built sturdily 35 to 45 years ago, the schools west of the Park, although still in fine condition structurally, lack these facilities.

The school buildings which date back to 1925 or earlier typically are "eight-room buildings with very large classrooms, poor natural lighting, large cloakrooms, huge open central hallways, basement toilets, and small paved play space or no play space at all." (Ex. A–16, p. 401.) Most of them, as the figures in Section A indicated, are located in the Negro ghettos; unquestionably they, and the newer slum schools equally, are unable to escape being tarnished by the cancerous squalor which characterizes the slums.

During 1948–49 the Strayer Committee exhaustively analyzed each District school building, assigning numerical ratings for every school feature, from the topography of the site to the adequacy of the fire protection system. Its judgment was that 36 elementary schools, four junior highs and three high schools were so dilapidated or inferior that, generally, any further investment in them would be wasteful. It is a melancholy fact that 18 of the elementary schools, two junior and one senior high continue in use today as regular school buildings, as follows:

| | | Elementary | Junior High | Senior High |
|---|---|---|---|---|
| Number of Schools with Per Cent Negro Students | 85–100% | 17 | 2 | 1 |
| | 67–85% | 1 | | |
| | 33–67% | | | |
| | 15–33% | | | |
| | 0–15% | | | |

(Ex. A–33, pp. 24–26.) Of the 20 predominantly Negro schools on this list all but one are located in slum areas.

During the coming six years, under a plan adopted in August 1966, the school system will build 71 new elementary schools, or additions to older structures; and 32 other elementary school buildings will be modernized. (Ex. 75.) Many of the new buildings will go up where minor population explosions have generated the need; also, however, this six-year plan aims at junking schools whose facilities now are below a minimum level of educational tolerability. (Tr. 3605.) The Board is thus in the midst of a good faith effort to bring all the educational plants in the city up to rudimentary levels.

C. *Library Books, Libraries, Librarians.*

Until two years ago the school administration budgeted the elementary schools no money at all for the purchase of library books. Any books the schools acquired were paid for by private gifts or donated directly by the PTA or other public-spirited groups; in one instance a District elementary school was given books by a suburban school which was

enjoying a surplus. By June 1966 only 40 schools had as many as a thousand volumes on their shelves; system-wide, the average was a meager one-half book per student. No scarcities marred the predominantly white schools, however; there the median library books per student tally was a more impressive four and one-third. (Ex. H-3.) Also, the predominantly (85-100%) white high school, Wilson, had a greater number of library books per student than any other senior high; and Gordon, predominantly white, was in the upper half of the junior high rankings.

When elementary schools have managed to gather space and books enough for a viable library, the school administration has sometimes intervened and furnished a trained librarian to manage it. In 1965-66, of 133 elementary schools, 90 had libraries, exactly half of which were presided over by professional librarians. (Ex. H-4.)[36] Included in the 90 schools with libraries were all 11 predominantly white elementary schools, but only 64% of the predominantly Negro schools and 47% of the Negro schools in slum areas. A greater percentage of predominantly Negro schools than white had librarians.

Sadly, even these figures on the number of libraries somewhat exaggerate current reality; in at least 30 of the schools counted here as having libraries, the rooms so designated are plainly makeshift and inadequate, "a scrounging operation." (Tr. 6143.) There are, however, more hopeful signs for the future. Of the 45 schools without libraries in 1965-66, 26 at least had space which can be converted to library rooms in the near future. All schools built since 1950 include rooms specifically designed as libraries. Through new construction, additions and reclamation of space presently used as classrooms, the school administration says it intends to equip every elementary school with a library by 1973. And with the aid of Title II of the Elementary and Secondary Education Act of 1965, the individual schools are now annually getting half a dollar per student for library book purchase (Ex. F-7; Tr. 614); the administration has identified its ultimate goal as five books per student in each school. (Tr. 2685, 3967-3971.)

D. *School Congestion.*

The school administration has reckoned a figure for every Washington public school defining the maximum student capacity it can decently accommodate. The chart below relates the extent to which the elementary schools exceeded that capacity in 1965-66.

Enrollment as Per Cent of Capacity

| | | 60% | 70% | 80% | 90% | 100% | 110% | 120% | 130% | 140% | 150% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Schools with Per Cent Negro Student Body | 85-100% | 2 | 3 | 4 | 17 | 14 | 21 | 26 | 7 | 9 | 3 |
| | 67-85% | | | | | 2 | 1 | | 1 | | |
| | 33-67% | 2 | | | | 1 | | 2 | | 2 | 1 |
| | 15-33% | 1 | | | | 1 | 1 | | | | |
| | 0-15% | 2 | 1 | 3 | 1 | 1 | 2 | | | | |

Median

| Per Cent Negro | Per Cent Capacity |
|---|---|
| 85-100% | 115% |
| 67-85% | 105% |
| 33-67% | 112% |
| 15-33% | 102% |
| 0-15% | 77% |

36. It provides perspective to note that American Library Association minimum standards would require 300 elementary-school librarians for a school system the size of Washington's. (Ex. A-3, p. 29.)

(Ex. L–11.) In short, the disparity between the patterns of overcrowding in predominantly Negro and white schools [37] is of very striking force. Inequalities apart, the overcrowding in the predominantly (85–100%) Negro schools is of fearsome dimensions. These schools are in, as one school official volunteered, an "emergency situation." (Tr. 2823.) In practical terms, what overcrowding entails is larger classes,[38] the shoehorning of students into spaces never intended to be used as classrooms, thereby depriving the schools of the auxiliary uses for which they were designed (see Tr. 6138), and in the few worst schools, split or double sessions (see Defendants' Proposed Findings, p. B–10).

For junior high schools, the predominantly white (Deal) and the integrated (Gordon) schools each rank among the least crowded third of all junior highs. For high schools the Negro/white variation is even more prominent. Wilson, the one predominantly white high school, has been holding constant in the vicinity of only 92.3% of capacity; Western (integrated), growing slowly, now records 101.1%. The other high schools, all predominantly Negro, reach at least 108.4% (Roosevelt), leaping as high as 127.1% (Cardozo). (Ex. L–11.)

The cure for overcrowding prescribed by the Board is construction of new schools in the heavily congested areas, see Sections A and B, supra, and the provisional allowance of transfers from the buildings with the worst overcrowding into certain schools running below their student capacities designated as receiving or "open" schools for transfer purposes. See Section I–E–3–b.

E. *Quality of Faculty.*

1. *Teacher experience.*

Defendants volunteered the information, confirmed by the Task Force report, that teachers in the "older schools with stable or declining enrollments," namely, the white elementary schools west of the Park, have had significantly greater teaching experience than the faculties at the Negro elementary schools. (Ex. 51, p. 2; Ex. A–3, pp. 15–17.) Defendants, however, denigrate the significance of this attribute, picturing the young teacher fresh from the university who may predictably turn in the superior teaching performance. All this may be true, but it remains beyond denial that, other factors equal, experience is a real asset for a teacher, as it is for any professional. The Washington school system's pay scale, in proportioning salary to the number of years of teaching experience, is a testimonial to this fact. Moreover, it cannot be questioned that the initial few years of teaching make an enormous contribution to a teacher's competence. A superior percentage of teachers at the predominantly (85–100%) white schools, the Task Force report shows, have these

---

37. The slum-area 85–100% Negro schools were slightly less crowded than the predominantly Negro schools generally.

38. The figures on overcrowding thus are strong evidence of high teacher-pupil ratios in the predominantly Negro schools. Dr. Hansen, questioned by plaintiffs at trial, directly conceded that pupil-teacher ratios were higher in Negro elementary schools than in white. (Tr. 127–128.) Defendants also repeatedly argued, in the context of the per pupil expenditure issue, that for schools with small student bodies e. g., the white Northwest schools, most of which enroll less than 300 students), splendidly low teacher-pupil ratios are indeed inevitable. But paradoxically, the Board's figures, which it gave to plaintiffs, who in turn introduced them into evidence as Exhibit L–9, seem to show that as of October 1965 class size in the elementary schools bore only slight relation to the race of the student bodies. (The median ratio in the predominantly white schools was 29.8; predominantly Negro, 30.4; the margin of difference doubles if averages are used rather than medians. The *highest* median ratio was for the 67–85% white schools.) Fillmore, an elementary school west of the Park, represents this paradox in microcosm. Dr. Hansen listed it specifically as a school bound to have a very low pupil-teacher ratio; yet Exhibit L–9 rates it as 31.0, a figure discernibly above the system-wide average. The record thus is in an upside-down condition, each side sponsoring evidence hostile to its own contention.

vital first years of experience to fall back on. Consistent with their denial of the relevance of experience, defendants have no plans in the works for the mitigation of this element of imbalance.

2. *Faculty education.*

A greater number of teachers in the predominantly white than in all other elementary schools have graduate school degrees. This finding, suggested by the per pupil expenditure data, is confirmed by figures gathered by the Task Force. (Ex. A–3, pp. 15–17.)

3. *Temporary teachers.*

A temporary teacher is one whose curriculum vitae is absent one or more of the various qualifications which the Board of Education otherwise requires of its teachers. If, as has regularly happened in recent years, teacher vacancies remain unfilled after the list of certified, qualified teachers has been exhausted, the assistant superintendents are authorized to hire enough temporary teachers to staff the schools adequately. Temporary teachers differ from their certified colleagues in that they are incapable of acquiring tenure rights; further, while at first they and the certified teachers draw identical salaries, after six years their pay hits a ceiling, their tem-porary status forfeiting their right to the yearly pay increase which permanent teachers thrive on. The school administration's recent deletion of certain certification requirements will undoubtedly convert numbers of temporary teachers to permanent status.

It was the view of the Strayer Report in 1949 that "the large percentage of temporary teachers employed from year to year in the public school system of the District of Columbia presents an administrative problem of major concern, baffling in its implications." (Ex. A–16, p. 50.) Since 1949 the problem if anything has become more acute; the number of temporary teachers in the schools, increasing steadily nearly every year, rose from 14.8% in 1948 to 19.1% in 1956–57, then soared to 40.0% in 1964–65. (Ex. A–16, p. 51; Ex. L–2.) In almost 50 elementary schools last year temporary teachers comprised a majority.

What is noteworthy is that at both primary and secondary levels the predominantly (85–100%) white schools, and those schools alone, have escaped an honest share of the burden. The chart below registers the percentage of temporary teachers on elementary school staffs in 1965–66.

Per Cent Temporary Teachers 1965–66

| | | 0% | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% |
|---|---|---|---|---|---|---|---|---|---|---|
| Number of Schools with Per Cent Negro Students | 85–100% | 4 | 4 | 10 | 19 | 29 | 19 | 18 | 4 | |
| | 67–85% | | 1 | 1 | | | 1 | | 1 | |
| | 33–67% | | | 3 | 1 | | 2 | 2 | | |
| | 15–33% | | | 1 | 1 | | 1 | | | |
| | 0–15% | 3 | 2 | 4 | 2 | | | | | |

Median

| | |
|---|---|
| 85–100% Negro, and poor: | 48% |
| 85–100% Negro generally: | 43% |
| 0–15% Negro: | 20% |

(Ex. L–9; Ex. A–3.)

For junior high schools, Deal (predominantly white), with 26% temporary teachers, was by a wide margin in a better position than any other junior high; the predominantly Negro junior high schools had a median figure of 43%. As for senior highs, Wilson, the predominantly white school, had only 31% temp-

orary teachers, which is 13% below the next lowest school; the predominantly Negro high school median was near 50%. (Ex. L-9.)

The reason why this and the other teacher inequalities has come about is somewhat obscure. It apparently has something to do with teacher transfer practices, and with the fact that in recent years, when so many candidates have lacked certification, the white schools have done little hiring. There is little evidence that the school system has deliberately assigned the best faculties to the white schools, but at the same time it is not possible to say that the illegal aspects in the teacher assignment process, see Findings II-C have been without influence in the development of these inequalities.

In its only and rather belated attempt to equalize the discomfort of the temporary teacher situation, the school administration has recently ruled that tenured teachers are ineligible for transfer into schools where 70% of the faculty already have permanent status, and that there is a preference for placing incoming certified teachers at schools with few of the same.

Defendants, joined on this point by the American Federation of Teachers, amicus, argue that temporary teachers are hardly inferior to those who are certified and permanent. Certainly the sterility of many college education courses, enrollment in which is one typical certification requirement, is very well known and widely deplored, and no claim can reasonably be made that every certified teacher outperforms every one of his temporary cohorts. But it would be unduly arrogant for this court to assert that the certification qualifications have no bearing on teacher quality. Especially for a teacher in his freshman year in the schools, for example, even a mediocre college course in teaching methods and curricula may be of great help. And those teachers who flunk the written examination the District requires have little to recommend them. If the school administration itself truly believed in the irrelevancy of its qualifications, it would abolish them all.

F. *Textbooks and Supplies.*

The yearly expenditures in the schools for reference books, textbooks, and the various other school supplies run according to a uniform annual per-student figure which the school administration calculates. (Ex. F-7.) Individual school totals for a coming school year have their bases in the attendance figures at each school at the time the year before when the calculations are made, a practice which prejudices schools with expanding enrollments; textbook shortages so accruing can be met, however, by emergency textbook allocations in the course of the school year.

In 1964-65 the school administration, with money harvested from the federal impact aid program, purchased sufficient textbooks and reference material to cure deficiencies then reported by the school principals. Approximately $603,-000 was devoted in that school year to textbook purchases (Ex. I-1), with allotments included for several predominantly white schools west of the Park in seeming violation of the congressional injunction, quoted below, that impact aid spending be concentrated in the slums.

Yearly expenditures for textbooks and supplies, thus, have been standardized, and all schools measure up to certain minimum levels. These facts fall short, of course, of guaranteeing that the depth of these materials at the various schools, accumulated through the years, is equitably in balance, and the court is aware of repeated complaints in the community of the outright absence of textbooks in some schools. But if such disparities do exist, plaintiffs have failed to bring them to light.

G. *Per Pupil Expenditures.*

The figures below tabulate the median per pupil expenditure for the District elementary schools for the year 1963-64. Only expenditures from the schools' share of the congressional appropriation for the District are represented here.

That school year preceded enactment of two generous federal statutes, both of which identify slum schools as their intended beneficiaries (*see* Section H, *infra*); and the figures do not include grants received in that year under other federal aid-to-education statutes, a few of which similarly earmark the schools or projects for which they are intended. The data therefore facilitate the court's exploration of the equities in the school administration's distribution of assets among the schools in precisely those situations when the policies and purposes of distribution come squarely within its control.

| Median | 85–100% | $292 [39] |
| for | 67–85% | 292 |
| Schools | 33–67% | 273 ⎫ |
| with | | ⎬ $306 |
| Per Cent | 15–33% | 325 ⎭ |
| Negro | 0–15% | 392 |
| Students | | |

———◆———

These figures command attention, in view of our surprise that a sum as great as $100 should have separated the predominantly (85–100%) white from the predominantly Negro, indeed from virtually all the other elementary schools in the District. A review of the rankings further reveals that five of the eight highest-cost schools were predominantly white, while of the 25 cheapest schools, 23 were predominantly Negro and all 25 were more than half Negro. A quick rearrangement of the data uncovers this even more troublesome fact: the median per pupil expenditure for the 13 elementary schools west of the Park was *$424*.

Confronted with these spectacular differentials, defendants argue they are paper statistics only, unrepresentative of the educational resources actually devoted to or expended at the various schools.[40] In fact defendants do succeed in proving that a fraction of the $100

differential in 1963–64 can be accounted for by circumstances which do not betoken real inequalities in educational opportunities. Special, untypically small classes for children with physical or emotional disabilities meet in special classrooms in several of the predominantly white schools; the high expenditure for these few needy students drives the school-wide average up. Most of the higher-cost elementary schools are very small; larger schools can save on certain costs which do not vary with the size of the school—administrators' salaries, particularly—and on other important economies of scale. Further, many of the very high-cost white schools are undercrowded, operating at much less than capacity. This further elevates the per pupil expenditure for items, like heat, which remain constant for a school no matter what its degree of utilization. So wasteful in this regard are several of the

39. The predominantly Negro schools in the slums came out at $294. Since secondary school costs greatly exceed those in elementary schools, the per pupil expenditure throughout the system in 1963–64 was $452. By 1965–66 it had grown to $528 (calculated on a slightly different basis), a few dollars below the national average. (*Compare* Ex. F–5 *with* Ex. 141.)

1963–64 is the most recent year for which there are figures on the school-by-school distribution of the general congressional appropriation. The school system has not taken any readings of per pupil expenditure by schools during the last two school years.

40. The court notes that school officials from Arlington, Alexandria, and Fairfax County, Virginia, and Montgomery County, Maryland, testified that in their respective school systems there were no material variations in the per pupil expenditure tabulations from one school to another. (Tr. 579–c—579–d, 656, 680, 689.)

white schools west of the Park that last year the Government Accounting Office proposed they be phased out as classroom buildings. (Tr. 3719–3724.) The Board decided not to carry out this recommendation; instead it is cutting into the bounty of empty classrooms by converting the classrooms in a few of these schools into office space for school-system administrative officials. But in other schools rooms are vacant.

To a great extent, however, defendants' own evidence verifies that the comparative per pupil figures do refer to actual educational advantages in the high-cost schools, especially with respect to the caliber of the teaching staff. A study of the 1962–63 per pupil expenditures disclosed that the average teacher salary at the 26 most expensive elementary schools (median: $387) was $7,742, compared with $5,864 in the bottom 26 (median: $246). At defendants' invitation, the court assumes that a like differential characterized salaries between high-cost predominantly white and all other schools a year later. Teacher salary is an index summarizing several factors: years of experience; graduate degrees; permanent/temporary status. The court assumes, again at defendants' invitation, that the predominantly white schools hold a profound advantage for each of these salary determinants. But these elements point with cogent force to teacher superiority in the predominantly white schools.

Even once all these extenuations and explanations have been introduced, the court is still without confidence that the very disturbing $100 (or $132) margin has been wholly accounted for. Neither the graduate-degree nor the temporary-teacher factors can have very dramatic impact on the per pupil expenditure: the maximum salary increase to which the extra degrees entitle the teacher is $500; and only a minor number of temporary teachers has served in the schools for as many as six years, the time when the ceiling on temporary teachers' salaries sets in. While the Pucinski Task Force did indeed turn up substantial differences in years of experience for teachers in predominantly white and in other schools, it is not altogether clear that these differences are sufficiently drastic to result in so great a spread in the per pupil expenditure figures.

And other possible explanations for the differentials falter. The study of the 1962–63 figures discovered that teacher-pupil ratios that year were lower in the high-cost schools, driving per pupil expenditure upward; defendants, however, here have denied that classes are of smaller size in the predominantly white schools, and one puzzling exhibit comes to the aid of their denial. *See* Note 38 *supra*. That study also highlighted the age of the higher-cost schools, contending that maintenance costs accelerate as school buildings approach obsolescence. But this explanation cannot be resorted to here, since in the main the predominantly Negro schools are older than the structures west of the Park; and it is the poor Negroes who are shunted into the oldest buildings in the District. If any schools demand a fortune for maintenance and upkeep, it should be the likes of Shaw Junior High (1902) and Gage Elementary (1904) in the heart of the ghetto, not the buildings concededly in excellent physical shape beyond the Park divide. Yet the overall expenditures at Shaw and Gage ($279) are quite low. Gage, moreover, also has a very old building and a low enrollment, factors which inexorably lead, defendants say, to higher budgets. So have Madison, Pierce and Lenox Annex, and yet these three schools rank among the lowest ten ($248, $235, $235).

### H. *Curricula and Special Programs.*

Following below is a catalogue of courses and extraordinary services offered by the Washington public school system at one or more selected schools.

#### 1. *Kindergarten.*

Unlike many American urban school systems, the Washington schools have avoided undertaking responsibility for providing kindergarten education on a universal basis. Attendance at kinder-

garten is not compulsory (Tr. 183), or even possible on a voluntary basis unless the neighborhood elementary school has a surplus of classroom space after its first through sixth graders have been taken care of. As a matter of fact, space in the white elementary schools is liberally available; every youngster in those neighborhoods applying to enroll in kindergarten is accommodated. (Tr. 626.) But at many Negro schools there are waiting lists. (Tr. 627.) "From 1956 to 1965, 6,236 children on waiting lists for kindergarten were denied admission for lack of space." (Ex. A–3, p. 10.) 1965–66 began with 445 children inscribed on the waiting lists at the various schools, 100 of whom remained thereon through the finish of that school year. (Tr. 626.) Forty-five youngsters were excluded last September from kindergarten into two predominantly Negro elementary schools alone. (Tr. 6184–6185.) Other schools have rather unsatisfactorily evaporated their waiting lists only by shortening kindergarten class time to as little as two hours a day, then running three sessions each day consecutively. (Tr. 4068–4069.)

If oversubscription prevents a five-year-old from enrolling in his own school's kindergarten class, he may despite the neighborhood rule sign up at any other elementary school able to advertise kindergarten vacancies; but his parents apparently must supply his transportation. (Tr. 6184.)

It is not clear whether the six-year building program now in its initial stages, apart from the question of whether it will be outstripped by unpredictedly rapid population spurts, has as one of its objectives the creation of enough class space to afford every interested youngster a kindergarten experience in his neighborhood school.

2. *Honors Track.*

Only a small number of predominantly Negro elementary schools offer the Honors "Track," the highest rung in the school system's track system of ability grouping. By contrast, virtually all of the predominantly white elementary schools have Honors Tracks. These figures will be arrayed in the findings on the track system below.

3. *Model School Division.*

The most ambitious enterprise launched by the school system in this decade is the Model School Division, a geographically compact area in the Northwest embracing 25 schools, most of them in the Negro ghetto, including 13 at the elementary level. The Division is to function as a laboratory for educational experiments aimed at alleviating students' cultural and academic deficiencies; the hope is that the more successful innovations can be applied to the entire school system, or at least to all those local schools which must regularly cope with underprivileged youth. Approved by the Board of Education in 1964, the Division swung into operation in March 1965, and by fall 1965 75 projects had been initiated, including ungraded primary classes, remedial reading instruction using modern techniques, and occasional visits to the theater. A year later, however, only one of these projects had proved itself unequivocally worthwhile, an internship teacher-training program (Tr. 478–479); and the Division had run into criticism from the Pucinski Task Force, which suggested that it "to date has been, for the most part, a deplorable disappointment." (Ex. A–3, p. 70.)

The Division has been financed primarily by the Office of Economic Opportunity under Title II of the Economic Opportunity Act of 1964, 42 U.S.C. §§ 2781–2791 (1964), as amended, via the United Planning Organization, Washington's community action agency. The Economic Opportunity Act generally requires a 10% local contribution, § 2788, but that may be met by imputing the value of volunteers' services. Presently at least one of the Division's important programs is being funded under Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. §§ 241a–241l (Supp. I 1965). Additional backing has come from other titles of the 1964 Act, and also from the U. S. Office of

Juvenile Delinquency under 42 U.S.C. § 2542 (1964), the Ford Foundation, and a few generous private corporations. (Ex. 1, p. 34.)

### 4. *Impact aid programs.*

The federal impact aid legislation, 20 U.S.C. §§ 236–244 (1964), which requires no matching funds, supplies federal financial assistance to school districts whose tax base is cut into by federal ownership of local property, or which enroll large numbers of children who live on federal property. On the theory that the District of Columbia is sufficiently compensated by the public school component of the general appropriation it annually receives from Congress, until 1964 it had not been eligible for impact aid grants. In that year Congress, noting that if any school district is federally impacted Washington's is, amended the statute to include the District. 20 U.S.C. § 244(8) (Supp. I 1964). This amendment, stapled to the National Defense Education Act Amendments of 1964, was acquiesced in by the House managers at conference. They reported back to the House as follows:

> "It * * * is the opinion of the conferees that insofar as is consistent with good educational administration, these funds be used to improve the quality and standards of the educational offerings in the underprivileged attendance areas of the city."

H.Rep. 1916, 88th Cong., 2d Sess., p. 14 (1964), U. S. Code Cong. & Admin. News 1964, p. 4056.

The District's impact aid allowance, as determined by the statutory arithmetic, is $4,300,000. This the District received in full for 1965–66 and 1966–67, after having hastened to collect a quarter of this figure at the tail end of the school year 1964–65. (Ex. I–7.) The most expensive items in the portfolio of 40 programs subsidized by impact aid in 1965–66 were extra school counselors ($470,000), additional school supplies including charts and globes ($459,000), and free breakfast and other kitchen provisions.

### 5. *ESEA programs.*

The Elementary and Secondary Education Act of 1965 was the expression of a crucial new federal commitment to the vitality of public school education. Title I of that Act held out the lure of 100% federal assistance for programs which engage the "special educational needs of educationally deprived children." 20 U.S.C. § 241a (Supp. I 1965). The District's annual entitlement under the Title I formula is more than $6,350,000. (Ex. I–7; Ex. I–8.) Included for 1965-66 was $1,270,000 for "environment improvement" of slum schools, almost $1,-000,000 for efforts to identify at an early age those youngsters who in high school will be particularly "drop-out prone" (Tr. 588), and $125,000 for an early-morning curriculum of calisthenics followed by hot breakfasts for ghetto children.

### 6. *WISE.*

The southern half of the region west of Rock Creek Park is Washington's most thoroughly integrated area, both residentially and in school enrollments. The District hopes to make this area more attractive, and hence more stable, by strengthening the junior and senior high schools under a program now in gestation dubbed Washington Integrated Secondary Education, or WISE. (Tr. 462–466.) The WISE prospectus optimistically envisions "maximum community involvement," "a vital, dynamic attitude * * on the part of school administrators and staff," and freewheeling student discussion of "controversial issues." (Ex. I–6.)

The energy driving WISE will be federal grants. On the theory that slightly less than a third of the students within the WISE boundaries come from comparatively poor neighborhoods, the District applied $30,000 of impact aid funds for WISE in its planning stage. (Tr. 466–467.) If officials finally determine that impact aid can properly be applied to WISE, it will provide all the financing when WISE at last begins its career in earnest; if unavailable, the school administration will turn to Title III of ESEA, 20 U.S.C. §§ 841–848

(Supp. I 1965) (innovative projects; not limited to slum schools) or other federal sources. (Ex. N–11; Tr. 462, 2659.)

### 7. *Miscellany.*

There are additional federal statutes which bestow benefits on some but less than all of Washington's schools. Under the special milk program, 7 U.S.C. § 1446 (1964), for example, milk is distributed daily at low cost in schools serving low-income areas. And the schools won an $85,000 grant from the Office of Education for experiments dealing with the problems growing out of desegregation. Beyond all these federal programs stand a number of projects sponsored by PTA's or various private benefactors which likewise are selective among schools in their impact. As one instance, the Eugene Meyer Foundation, to which the community certainly owes its gratitude, has financed a cluster of enterprises under the rubric Urban Service Corps. Drawing in volunteers from the affected communities, these programs provide children in certain underprivileged schools with an array of academic, cultural and athletic opportunities. (Ex. 1, pp. 1–32.)

Finally, according to the Board's publication INNOVATIONS IN INSTRUCTION (Ex. 1), there is a handful of programs each operating in one or a few schools, the cost of which the Board of Education itself defrays out of its share of the District's congressional appropriation. At Cardozo High School, for example, 60 students have participated in career training and placement sessions. Jefferson Junior High is currently experimenting rather successfully with its curricula and with new methods of class and school organization.

### I. *Individual Schools in Transition.*

Defendants focus attention on five elementary schools which switched from white to Negro majorities between 1962–63 and 1965–66, offering data in support of the argument that the educational resources devoted to these schools increased over these years, or at least that the schools held their own. These schools are Congress Heights (from 4% Negro to 53%), Shepherd (from 18% to 53%), Takoma (from 49% to 65%), Draper (from 49% to 91%), and Hendley (from 40% to 91%). The court's caution is alerted by the fact that defendants have omitted to mention or introduce figures for three other schools in which Negroes captured the majority between these years: Randle Highlands (from 11% to 58%), Ketchem (from 9% to 58%), and Jackson (from 16% to 59%).

Even for the schools they select, defendants have failed to show that their racial transitions have been unaccompanied by any restraints on their receipt of educational resources, except for *library books* where the increase in their number of volumes was very substantial. In four of the five schools, the number of certified teachers improved over the course of these years; but in every one of the five the number of temporary teachers also went up. (Ex. 21.) It is very doubtful that the overall increment for the five of one librarian and two counselors is anything but representative of like increases in the Washington schools during this period system-wide. Finally, between 1962–63 and 1964–65 the per pupil expenditure at these five schools increased by an average of $14. (Ex. 23.) But between 1963–64 and 1964–65 (the only years for which the requisite figures are available), two of the three schools not mentioned by defendants incurred losses in the per pupil expenditure figure. (Ex. F–1; Ex. F–8.) And what is more conclusive is that during these years the average expenditure per student throughout all the schools advanced nearly $30. (Ex. F–5.)

### J. *Conclusion.*

The collapse, however, of defendants' argument above entails no significant consequences. What the demonstration was apparently intended to repel was the idea that the Negro schools have been deliberately and discriminatorily deprived of supplies by school officials. This, indeed, is one aspect of plaintiffs' argument. But it is not one which the court can accept. The causes of the inequal-

ities are relatively objective and impersonal. School officials can be faulted, but for another reason: that in the face of these inequalities they have sometimes shown little concern. It is one thing, to be precise, when crowded residential conditions shut Negro children, and them alone, out of kindergarten in the nearby schools; it is something else when school officials acquiesce in the situation once it arises by standing passively by, circulating promises of more adequate school buildings years hence.

## IV. THE TRACK SYSTEM

The District of Columbia school system employs a form of ability grouping commonly known as the track system, by which students at the elementary and secondary level are placed in tracks or curriculum levels according to the school's assessment of each student's ability to learn. Plaintiffs have alleged that the track system—either by intent or by effect—unconstitutionally discriminates against the Negro and the poor. In support of this claim they—and the defendants in meeting it—have introduced a massive array of testimonial and documentary evidence. The court will first turn its attention to the beginnings of the track system before moving on to a discussion of the evidence concerning the present-day operation of ability grouping in the District.

A. *Origin.*

The track system was approved for introduction into the Washington school system by the Board of Education in 1956, just two years after the desegregation decision in Bolling v. Sharpe. As Superintendent Hansen has conceded, "to describe the origin of the four-track system without reference to desegregation in the District of Columbia Public Schools would be to by-pass one of the most significant causes of its being. Desegregation was a precipitant of the four-track development in the District's

high schools * * *." [41] Plaintiffs, citing this concession and certain observable segregatory effects of the track system, have claimed that the principal motivation behind the system was and is to resegregate the races in violation of the *Bolling* decision. Defendants have denied this, arguing that the track system is and always has been a legitimate pedagogical method of providing maximum educational opportunity for children of widely ranging ability levels; and that any racial effect is but an innocent and unavoidable coincidence of ability grouping.

There is evidence which on its face supports defendants' claim that racial considerations were irrelevant to the decision to adopt the track system. Yet, as in certain other administrative decisions where defendants have purported to act without regard to race, the taint of segregation hangs heavy over their actions. Although Dr. Hansen has maintained that the origins of the four-track curriculum "clearly precede the event of desegregation," [42] there is no escaping the fact that the track system was specifically a response to problems created by the sudden commingling of numerous educationally retarded Negro students with the better educated white students.

On May 17, 1954, the day Bolling v. Sharpe was handed down, there were 44,897 white students (43%) and 59,963 Negro students (57%) in the District schools. By the following September 73% of the schools were—in varying degree—racially mixed. Until that time no one was aware of the overall achievement level of the Negro students because achievement scores had not been reported on a city-wide basis in the old Division II (Negro) schools. However, soon after integration Dr. Hansen, then Assistant Superintendent in charge of senior high schools, began to receive "reports of very serious retardation in

41. C. HANSEN, FOUR-TRACK CURRICULUM FOR TODAY'S HIGH SCHOOLS 7–8 (1964) (Ex. B–11, hereinafter also cited as HAN- SEN). *See generally* Tr. 207–227, 234– 237, 239–240, 368–382.

42. HANSEN 8.

achievement in the basic skills * *." [43] The results of a reading and arithmetic achievement test taken by tenth grade students early in 1955 and for the first time reported on a city-wide basis confirmed the reports: (1) Both reading and arithmetic scores ranged from second to beyond twelfth grade; (2) nearly 25% of the students were at or below sixth grade level in reading, and 44% were at or below sixth grade level in arithmetic.[44] The low achievers were predominantly from the Division II schools. (Tr. 381.) It was the discovery of this large number of academically retarded Negro children in the school system that led to the institution of the track system.

Given these unhappy consequences of "separate but equal" education, Superintendent Hansen cannot be faulted for moving in 1955 to treat the casualties of *de jure* segregation. The court is persuaded that Dr. Hansen personally was then and is now motivated by a desire to respond—according to his own philosophy—to an educational crisis in the District school system. On the other hand, the court cannot ignore the fact that until 1954 the District schools were by direction of law operated on a segregated basis. It cannot ignore the fact that of all the possible forms of ability grouping,[45] the one that won acceptance in the District was the one that—with the exception of completely separate schools—involves the greatest amount of physical separation by grouping students in wholly distinct, homogeneous curriculum levels. It cannot ignore that the immediate and known effect of this separation would be to insulate the more academically developed white student from his less fortunate black schoolmate,

thus minimizing the impact of integration; nor can the court ignore the fact that this same cushioning effect remains evident even today. Therefore, although the track system cannot be dismissed as nothing more than a subterfuge by which defendants are attempting to avoid the mandate of Bolling v. Sharpe, neither can it be said that the evidence shows racial considerations to be absolutely irrelevant to its adoption and absolutely irrelevant in its continued administration. To this extent the track system is tainted.[46]

The court does not, however, rest its decision on a finding of intended racial discrimination. Apart from such intentional aspects, the effects of the track system must be held to be a violation of plaintiffs' constitutional rights. (*See* Opinion of Law.) As the evidence in this case makes painfully clear, ability grouping as presently practiced in the District of Columbia school system is a denial of equal educational opportunity to the poor and a majority of the Negroes attending school in the nation's capital, a denial that contravenes not only the guarantees of the Fifth Amendment but also the fundamental premise of the track system itself. What follows, then, is a discussion of that evidence—an examination of the track system: in theory and in reality.

B. *Track Theory.*

Basic to an understanding of the conflict between the parties in this lawsuit is an appreciation of the theory that motivates the track system as it operates in the District school system. The most comprehensive statement of that theory can be found in Dr. Hansen's book, FOUR TRACK CURRICULUM FOR TODAY'S HIGH SCHOOLS, published in 1964.[47] Although

43. *Id.* at 12.

44. *Id.* at 12–13.

45. *See, e. g.,* Anderson, *Organizing Groups for Instruction,* in INDIVIDUALIZING INSTRUCTION 239 (1962) (Sixty-first Yearbook of the National Society for the Study of Education); Guggenheim, *Grouping and Pupil Progress,* in NEW FRONTIERS IN EDUCATION 179 (1962).

46. This taint has haunted the track system since its inception, many refusing to believe the plan has other than racist motives. *See* HANSEN 69, 138.

47. *See* Note 41 *supra.* Actually, only by reading this book in its entirety can one get the full flavor of the philosophy of the track system.

Dr. Hansen disclaims full responsibility for creating the track system, a reading of his book leaves no doubt that it was his firm guiding hand that shaped that system in its essential characteristics.[48] Thus, as principal architect of the track system and as Superintendent of Schools, Dr. Hansen presumably can be looked to as the authoritative spokesman on the subject.

*Purpose and philosophy.* Dr. Hansen believes that the comprehensive high school (and the school system generally) must be systematically organized and structured to provide differing levels of education for students with widely differing levels of academic ability. This is the purpose of the track system. In expressing the track system's philosophy Dr. Hansen has said, "Every pupil in the school system must have the maximum opportunity for self-development and this can best be brought about by adjusting curriculum offerings to different levels of need and ability as the pupil moves through the stages of education and growth in our schools." (Ex. 9, C–16: *How We Are Meeting Individual Differences.*) And he has identified as the two objectives on which the track system is founded: "(1) The realization of the doctrine of equality of education and (2) The attainment of quality education." [49]

*Student types.* Within the student body Dr. Hansen sees generally four types of students: the intellectually gifted, the above-average, the average, and the retarded. He assumes that each of these types of students has a maximum level of academic capability and, most importantly, that that level of ability can be accurately ascertained. The duty of the school is to identify these students and provide a curriculum commensurate with their respective abilities. Dr. Hansen contends that the traditional school curriculum—including the usual two-level method of ability grouping—does a disservice to those at either end of the ability spectrum.

The gifted student is not challenged, so that he becomes bored, lazy, and perhaps performs far below his academic potential; his intellectual talents are a wasted resource. The remedy lies in discovering the gifted student, placing him with others of his own kind, thereby stimulating him through this select association as well as a rigorous, demanding curriculum to develop his intellectual talent.[50] Indeed, "the academically capable student should be required as a public necessity to take the academically challenging honors curriculum." [51]

On the other hand, continues Dr. Hansen, the retarded or "stupid" student typically has been forced to struggle through a curriculum he cannot possibly master and only imperfectly comprehends. Typically he is slow to learn and soon falls behind in class; he repeatedly fails, sometimes repeating a grade again and again; he becomes isolated, frustrated, depressed, and—if he does not drop out before graduation—graduates with a virtually useless education. Here the remedy is seen ·as separating out the retarded student, directing him into a special curriculum geared to his limited abilities and designed to give him a useful "basic" education—one which

48. *See generally* HANSEN chs. 1, 3. During 1955, a working committee composed of high school principals and other school personnel worked with Dr. Hansen, then Assistant Superintendent in charge of senior high schools, in developing the track system (*ibid.*; Tr. 226, 376–377). The plan was finally approved in 1956 and introduced into the tenth grade classes that year; in 1957–58 the track system was extended to the eleventh and twelfth grades; and by 1959 had been adopted in the elementary and junior high schools. (Tr. 226–227, 377.)

49. HANSEN 50. Elsewhere he has expressed as the school system's goals those set by the President's Commission on National Goals in 1960: "To guard the rights of the *individual.* To ensure his development. To enlarge his opportunity." (Ex. 9, C–16.) (Emphasis in original.)

50. HANSEN 161–163.

51. *Id.* at 166.

makes no pretense of equalling traditionally taught curricula.[52]

In short, Hansen views the traditional school curriculum as doing too little for some students and expecting too much of others. As for the latter type, whom Dr. Hansen characterizes as "the blue-collar student," going to school—a "white-collar occupation"—can be an artificial experience.

"Twelve years of white-collar experience is unrealistic preparation for the young man or woman who will suddenly make the change into work clothes for jobs in kitchens, stockrooms, street maintenance or building construction.

\* \* \* \* \* \* \*

"One reason [for education's failure to meet the needs of the blue-collar student] \* \* \* is that it is at best an environment artificially created for the education of the young. From the beginning of his career in school, the child enjoys the comforts of a protected and unrealistic environment. Most of the Nation's classrooms are insulated from reality. To many students what happens in the classroom has little connection with what happens outside the classroom.

"Another reason \* \* \* is that the school environment excludes most of the sterner discipline of the work-a-day world. \* \* \* "[53]

*Tracking.* In order to tailor the educational process to the level appropriate to each student, Dr. Hansen adopted the track system. Each track is intended to be a separate and self-contained curriculum, with the educational content ranging from the very basic to the very advanced according to the track level. In the elementary and junior high schools three levels are used: Basic or Special Academic[54] (retarded students), General (average and above-average), and Honors (gifted). In the senior high

school a fourth level is added: the Regular Track, a college-preparatory track intended to accommodate the above-average student.

The significant feature of the track system in this regard is its emphasis on the ability of the student. A student's course of instruction depends upon what the school system decides he is capable of handling. "It took a while for everybody on the [working] committee to understand that *ability was to be the primary key to the placement in a curriculum sequence, and that this factor, not the subject-matter emphasis, was one of the unique characteristics of the four-track system.*"[55]

*Flexibility.* Dr. Hansen, while assuming that some students can be educated to their maximum potential in one of the four curricula, also anticipates that not all students will neatly or permanently fit into a track. Thus a second important assumption underlying the track system is that tracking will be a flexible process. Flexibility encompasses two things: First, although a student today may demonstrate an ability level which calls, for example, for placement in the General Track, a constant and continuing effort must be made to assure that he is at his true ability level. This calls for instruction directed toward correcting any remediable educational problems which account for the student's present poor performance; and it calls for close analysis and counselling to determine whether these remediable deficiencies exist and when they have been sufficiently corrected. When the latter is determined, the student is to be upgraded to the next higher track. Second, even though a student may not be in a position to make an across-the-board move from one track to another, his ability level may be such that he needs to take courses in two track levels on a subject-by-subject basis. This process, known as cross-tracking, is critical: it

---

52. *Id.* at 131–135.

53. *Id.* at 76–77.

54. The lowest track was designated "Basic" until 1965 when the more neutral term "Special Academic" was adopted.

55. HANSEN 44. (Emphasis in original.)

is the mechanism the system relies upon to assure that students whose ability levels vary according to particular subjects are not thwarted in developing their strong areas because their weak areas result in their being placed in a lower curriculum level. It also serves as a way of selectively raising the intensity of instruction on a subject-matter basis as a part of the process of gradually upgrading a student.

*Fundamental assumptions.* To summarize, the track system's approach is twofold. The separate curriculum levels are for some the maximum education their abilities permit them to achieve. For others, a track is supposed to be a temporary assignment during which a student's special problems are identified and remedied in whatever way possible. The express assumptions of this approach are three: *First,* a child's maximum educational potential can and will be accurately ascertained. *Second,* tracking will enhance the prospects for correcting a child's remediable educational deficiencies. *Third,* tracking must be flexible so as to provide an individually tailored education for students who cannot be pigeon-holed in a single curriculum.

C. *The Tracks.*

1. *Honors.*

*Purpose.* The Honors Track is for the gifted student, its purpose being to provide him with an enriched, accelerated curriculum and to stimulate scholarship by placing him with similarly gifted students. (Ex. 9, C–16; Ex. B–11, pp. 162–163.)

*Criteria.* Elementary school children are eligible for Honors classes upon "recommendation by the principal and teacher, based upon the pupil's school record and physical maturity with achievement at least one year beyond national norms in reading and arithmetic * * *." (Ex. 9, C–16.)

At the junior high school level the student is judged in terms of the following: "1. Scholastic ability; 2. History and good study habits; 3. Emotional and physical stability; 4. Achievement-test scores above grade level in English and mathematics; 5. Interest in being in the Honors Track; 6. Approval of parents and principal." (*Ibid.*)

For senior high school the criteria are as follows:

"The student is admitted to this curriculum only on his own election and only if he is eligible. Eligibility for the honors curriculum requires the following: (a) demonstrated ability to do difficult academic work as shown by previous academic record; (b) ability to read two or more grades above grade level; (c) achievement test scores in the upper quartile in standardized tests in language and mathematics; (d) mental ability indicated to be in the upper quartile; (e) emotional and physical stamina for difficult work; (f) demonstrated enthusiasm for honors placement; and (g) the written approval of parents or guardians.

"If a student shows a general aptitude for honors placement, he may be programmed in the curriculum even if he is deficient in up to two of the foregoing prerequisites." (Ex. B–11, p. 52.) [56]

*Structure.* Honors classes do not begin until the fourth grade. (Tr. 242.) At that time an eligible student may be placed in a separate Honors class at his own school, if there are enough other eligible students to warrant setting aside classroom space and assigning a teach-

56. In another section of his book Dr. Hansen notes that originally an IQ of 115 was a cutoff point for Honors, but experience required greater flexibility. (Ex. B–11, p. 163.) An interesting contrast is another version of Honors criteria, attributed to Assistant Superintendent Koontz, in a 1961 Curriculum Handbook published for District high school students by the D. C. Congress of Parents and Teachers and approved by the school system. (Tr. 350.) There the IQ requirement was stated as 130 or above, although it was noted that this requirement could be relaxed. (Ex. G–1, p. 4.)

er. (Tr. 6189.) If there are not, apparently an Honors group might be organized within the regular classroom (Ex. 9, C–16)—although this would seem to be contrary to the concept of having wholly separate curricula. More commonly, the student has to transfer to the nearest school having an Honors class to obtain such instruction. (Tr. 6121, 6189–6190.)

*Curriculum.* In elementary school the Honors curriculum is an accelerated and enriched version of the standard curriculum. (Tr. 4032–4034; Ex. 9, C–16; Ex. 95.) The same is generally true for the junior high school; in addition, some senior high school subjects are offered to ninth graders. (Ex. 9, C–16.)

In senior high school the content of the various curriculum levels is significantly different, as are graduation requirements. To graduate from the senior high school Honors Track the student must complete 18 Carnegie units,[57] 16 of which are required and 1½ elective. The required subject areas are English (4 units), mathematics (Algebra I and II, and plane geometry; 3 units), foreign language (4 units), social studies (ancient-medieval history, U. S. history, and U. S. government; 2½ units), and science (biology, chemistry and physics; 3 units). (Ex. B–11, p. 60.) There is a wide selection of electives, including many advanced academic subjects. (Ex. G–1, pp. 3–13.)

### 2. *Regular.*

*Purpose.* This is a college preparatory track, found only at the senior high school level. It "provides the hard-core of academic offerings normally required for college entrance." (Ex. 9, C–16.) According to Dr. Hansen, it merely continues the advanced curriculum found in all high schools having a two-level curriculum sequence (*i. e.*, college preparatory and terminal) (Ex. B–11, pp. 35–183), although he suggests embodying it in a track level tends to enhance its prestige and effectiveness in stimulating scholarship. (*Id.* at 41.)

*Criteria.* To qualify for the Regular Track the student must have:

" * * * (a) demonstrated ability to do academic work successfully as indicated by the student's scholastic record; (b) ability to read at grade level or above; (c) achievement scores in standardized tests at or above grade level in language and mathematics; (d) mental ability at or above high normal; (e) physical and emotional stamina to undertake a demanding program of studies; (f) interest in doing college preparatory work; and (g) written approval of parents or guardians." (Ex. B–11, p. 52.)

Another version of these requirements includes the statement that the student must have "generally, high normal IQ, or above * * *." (Ex. G–1, p. 14.)

*Curriculum.* Sixteen Carnegie units must be completed to graduate from the Regular Track. Of these, 10½ are in these required subjects: English (4 units), foreign language (2 units), mathematics (algebra, geometry; 2 units), science (biology, chemistry or physics; 1 unit), and social studies (U. S. history, U. S. government; 1½ units). (Ex. B–11, pp. 60, 62.) As in the case of the Honors curriculum, offered electives include a number of advanced academic subjects. (Ex. G–1, pp. 13–23.)

### 3. *General.*

*Purpose.* At the elementary and junior high school levels the General curriculum serves the bulk of the students, excepting only those considered bright enough for Honors or slow enough for Special Academic. (Tr. 233–234; Ex. 9, C–16.)

At the senior high school level, however, the nature of the General Track becomes more specific. It is expressly a curriculum "designed to serve students of normal intelligence levels who plan to go to work immediately upon graduation." (Ex. 9, C–16.)

*Curriculum.* For elementary and junior high schools the General curriculum

---

57. One Carnegie unit is given for each subject taken five days a week for one academic year.

is simply a normal primary or secondary program. (Tr. 4033–4034; Ex. 9, C–16; Ex. 95.) However, given the fairly broad range of ability levels in the General Track, there is subgrouping of students so as to narrow the range of differences; thus there may be a slow General group and a fast General group. (*See* Ex. 9, C–16.)

In senior high school, in keeping with its terminal nature, the pure General curriculum is vocationally oriented. (Ex. G–1, pp. 26–38; Ex. 9, C–16; Ex. B–11, pp. 63–67.) Students who desire a college preparatory curriculum must, for the most part, elect courses from the Regular Track, but may do so only if qualified for the more advanced instruction. (Ex. B–11, pp. 63–65.) (*See* Section E, *infra.*) Sixteen Carnegie units are required for graduation, 7½ of them in these required subjects: English (4 units), mathematics (general mathematics, business arithmetic, or—if qualified—algebra; 1 unit), science (descriptive biology; 1 unit), social studies (U. S. history, U. S. government; 1½ units). (Ex. B–11, p. 64.)

### 4. *Special Academic (Basic).*

*Purpose.* The Special Academic Track is for those students who have been variously described as "slow learners," "retarded," "academically retarded," "retarded slow learners," or "stupid." (Tr. 233, 400–401; Ex. B–11, pp. 37, 46, 48, 131–132.) Its purposes are to provide a useful education for students whose limited abilities prevent them from successfully participating in the normal curriculum; and to give remedial instruction in the basic subjects—especially reading and arithmetic—to those students who can eventually qualify for upgrading to the General curriculum. (Ex. B–11, pp. 48, 67; Ex. 9, C–16.)

*Criteria.* In general, the criteria for Special Academic Track placement are inability to keep up with the normal curriculum, emotionally disturbed behavior, an IQ of 75 or below, and substandard performance on achievement tests. (Tr. 233, 257, 323.)

In junior high "in order to be transferred from Basic to General Track, *in general* the student must be functioning at no more than 2 years below grade level in reading and arithmetic. * * * In cases where the pupil does not meet this standard BUT there is evidence of diligence, recent growth, and good study habits in the fundamental skills, the student may be given trial placement in the General Track." (Ex. 9, C–16.) (Emphasis in original.)

In senior high school Special Academic placement is recommended when

"(a) a student is functioning three or more years below grade level as shown by achievement tests (at sixth grade or below in reading and mathematics in the ninth grade); (b) his preceding academic record shows him to be unable to cope at a minimum level with traditional content in language and mathematics; (c) his teachers believe him to be in need of placement in the basic track; (d) his mental retardation is indicated by an I.Q. index of 75 or below." (Ex. B–11, pp. 52–53.)

Dr. Hansen has said that "academic retardation in this curriculum is severe, particularly in reading." (*Id.* at 67.)

School policy used to be that students identified as belonging in the Special Academic Track were mandatorily required to enroll in that curriculum. "Admission to the upper three curricula should be selective. The student who is ineligible because of low achievement should not be admitted to the traditional high school program." (Ex. B–11, p. 48.) This policy, followed in elementary and junior high schools as well as in the high schools, was amended in the fall of 1965 to require parental consent for Special Academic placement. Most parents, however, acquiesce in the school's recommendation. (Tr. 321–323.)

*Structure.* Elementary school children may be placed in the Special Academic Track as early as the first grade, although most wind up there after an attempt at the normal first and perhaps second grade curriculum. Some schools

place all Special Academic children in one class, so that youngsters ranging from first to sixth grade age levels may be taught in the same classroom; actually, the age spread may be even greater since Special Academic students who do not progress academically to a point where they can be promoted into the junior high school level remain in elementary school until they pass their thirteenth birthday. Other schools divide the track into two groups, the primary Special Academic (grade levels one through three) and the intermediate Special Academic (grade levels four through six), thus reducing the age spread. (Tr. 1049–1051, 6209–6217; Ex. 9, C–16.)

At least at the elementary school level, Special Academic classes are ungraded. A child's grade level equivalent is ascertained from his scores on standardized or informal achievement tests. Whereas the child in the General curriculum can usually be expected to progress at the rate of one grade level per year, the Special Academic student typically will progress at a much slower rate. For those who continue to learn at this slower rate, the Special Academic Track will be a permanent assignment until such time as the child passes his thirteenth birthday and is moved on into the junior high school Special Academic Track. (Tr. 6209–6214; Ex. A–33, p. 34, No. 9.) It is not clear whether classes are ungraded in the secondary schools.

A major distinction of the Special Academic Track is that classes are to be kept relatively small, the usual pupil-teacher ratio being about 18 or 20 to one. (Tr. 4039, 6105.) This is to enable more individualized attention than is possible in a larger class.

Dr. Hansen has indicated that teachers in the Special Academic Track need to be specially prepared to deal with the

special problems that characterize slow learners. (Ex. B–11, pp. 141–148.)[58] The great majority of those teaching in the Special Academic Track, however, either have had no formal training in special education or have had very little. (Tr. 912–913; Ex. A–11, Ex. A–12.) About half of the teachers are nontenure, or temporary. (Tr. 539F.)

*Curriculum.* The Special Academic curriculum at the elementary and junior high school level can be characterized as a highly simplified, slower-paced version of the standard curriculum. The concepts taught are simpler; the vocabulary is easier, the words being less complex and fewer in number; instructional materials may be simplified versions of materials used in the normal classroom,[59] the effort being made to keep pace with the child's age-level interests while at the same time reducing subject content to his grade-level ability. There is an emphasis on "basic" subjects—reading, English, and arithmetic. (Tr. 6105–6115; Ex. 105–116; Ex. 9, C–16.)

At the senior high school level, in addition to carrying forward the simplified course content, the curriculum focuses on preparing the student for a variety of low-skill vocations. (Ex. B–11, ch. 8; Ex. 9, C–16.) Graduation requirements in the Special Academic Track are 16 Carnegie units, 9½ in these required subjects: English (4 units), mathematics (arithmetic; 2 units), science (basic science; 1 unit), social studies (social studies, U. S. history, and U. S. government; 2½ units), business education (basic business; 1 unit). The elective courses are in such areas as home economics, shop (all at the low-skills level), or business-related functions (typing, filing, office machine operation, etc.). (Ex. B–11, pp. 67–68; Ex. G–1, pp. 43–50.)

58. "[High school teachers in the Special Academic Track] must be selected for their preparation for teaching an elementary level curriculum to students of high school age." (Ex. B–11, p. 37.)

59. The only materials described with any precision or entered into evidence are those used in the Scott Montgomery and Morse elementary schools; the court assumes these are in general fairly typical. (Tr. 6207–6209.) In at least two respects, however, these schools enjoy materials or programs not typical of other schools. (Tr. 6157; Ex. 1, p. 41 (films); Tr. 6180 (field trips).)

### 5. *Junior Primary.*

The Junior Primary is an ability-grouped class intermediate between kindergarten and first grade. Its purpose is to bring children up to a level of readiness for normal first grade instruction, the usual problem being inadequate preparation in reading-readiness skills. Some students in Junior Primary have not had kindergarten training (many Negro children do not attend kindergarten because of lack of space; [60] other children simply are not enrolled by parents); others are slow learners who have not fully developed in kindergarten.

A decision as to whether a child requires Junior Primary placement is based on his score on a standard aptitude test and the teacher's judgment. For those students who have not had kindergarten, however, the test score would have to be the controlling factor since the child would not have had any prior contact with the school and thus would not be known to a teacher.

Of those who go into Junior Primary, some advance directly into the second grade, but most go into regular first grade after spending a year or less in the special class. And for some children Junior Primary is simply preliminary to placement in the Special Academic Track. (Tr. 229–231; 4030, 4069–4070; 6095–6097, 6183–6186; Ex. 9, C–16.)

TABLE A

ELEMENTARY SCHOOLS

| School Year | Basic Track | | General Track | | Regular Track | | Honors Track | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | No. | % | No. | % | No. | % | No. | % | |
| 1962–1963 | 2,839 | 3.3 | 69,908 | 95.0 | | | 1,269 | 1.7 | 74,016 |
| 1963–1964 | 2,876 | 3.8 | Unknown * | | | | Unknown | | 75,807 |
| 1964–1965 | 2,984 | 3.9 | 72,971 | 94.6 | | | 1,196 | 1.5 | 77,151 |
| 1965–1966 | 2,495 | 3.1 | 75,762 | 95.1 | | | 1,382 | 1.8 | 79,639 |
| 1966–1967 | 1,919 | 2.4 | Unknown | | | | Unknown | | 81,513 |

JUNIOR HIGH SCHOOLS

| School Year | Basic Track | | General Track | | Regular Track | | Honors Track | | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1959–1960 | 2,569 | 11.9 | 18,068 | 83.3 | | | 1,045 | 4.8 | 21,682 |
| 1960–1961 | 3,124 | 13.0 | 19,455 | 81.1 | | | 1,419 | 5.9 | 23,998 |
| 1961–1962 | 3,457 | 13.1 | 21,356 | 80.9 | | | 1,570 | 6.0 | 26,383 |
| 1962–1963 | 4,218 | 15.0 | 22,215 | 78.9 | | | 1,722 | 6.1 | 28,155 |
| 1963–1964 | 4,499 | 15.5 | 22,758 | 78.3 | | | 1,793 | 6.2 | 29,050 |
| 1964–1965 | 4,209 | 14.4 | 23,253 | 79.5 | | | 1,799 | 6.1 | 29,261 |
| 1965–1966 | 2,767 | 9.5 | 24,181 | 84.9 | | | 1,585 | 5.6 | 28,533 |
| 1966–1967 | 2,193 | 6.9 | Unknown | | | | Unknown | | 29,182 |

SENIOR HIGH SCHOOLS

| School Year | Basic Track | | General Track | | Regular Track | | Honors Track | | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1958–1959 | 3,026 | 22.6 | 5,575 | 41.7 | 3,884 | 29.0 | 892 | 6.7 | 13,377 |
| 1959–1960 | 2,904 | 22.0 | 5,594 | 42.4 | 3,795 | 28.8 | 900 | 6.8 | 13,193 |
| 1960–1961 | 2,321 | 18.3 | 5,572 | 44.1 | 3,780 | 29.9 | 969 | 7.7 | 12,642 |
| 1961–1962 | 2,074 | 16.1 | 5,692 | 44.2 | 4,002 | 31.1 | 1,106 | 8.6 | 12,874 |
| 1962–1963 | 1,799 | 12.6 | 6,455 | 45.3 | 4,856 | 34.0 | 1,155 | 8.1 | 14,265 |
| 1963–1964 | 1,760 | 10.8 | 7,812 | 48.0 | 5,628 | 34.6 | 1,075 | 6.6 | 16,275 |
| 1964–1965 | 1,629 | 9.0 | 8,941 | 49.6 | 6,426 | 35.6 | 1,035 | 5.8 | 18,031 |
| 1965–1966 | 1,451 | 7.9 | 9,355 | 50.5 | 6,710 | 36.2 | 1,007 | 5.4 | 18,523 |
| 1966–1967 | Unknown | | Unknown | | Unknown | . | Unknown | | 18,858 |

(Tr. 1030; Ex. 146; Ex. B–4; Ex. B–16; Ex. C–15; Ex. P–5; Ex. P–6.)

---

60. *See* Section F, *infra.*

\* Data not available.

D. *Track Distribution.*

Table A, *supra*, summarizes the available data regarding the distribution, past and present, of District students among the various tracks in the elementary and secondary schools. This Table will be cited with regard to particular findings where relevant.

Plaintiffs have relied strongly on the empirical evidence regarding the distribution of students to prove how the effect of the track system is to discriminate against the lower class and the Negro students, who constitute a majority of the student population in the District public schools. Defendants have acknowledged that enrollment in the tracks is related to the socio-economic status of a student, but they deny that any racial bias is operating. The court will review the evidence on both counts.

1. *Socio-economic and racial patterns.*

The following Tables summarize the available data giving the distribution of students among the various tracks at the secondary school level, the data being for the school years 1964–65 and 1965–66.[61]

TABLE B

Senior High School

| School | Nbhd median income (00) | | % Negro enrollment | % S.Ac. (Basic) | % Gen'l | % Reg. (Coll.Prep.) | % Honors |
|---|---|---|---|---|---|---|---|
| Dunbar | $3.9 | 1964 | 99.8% | 16.7% | 68.1% | 15.6% | None* |
| | | 1965 | 99.6 | 9.8 | 72.5 | 17.7 | None* |
| Cardozo | 4.4 | 1964 | 99.5 | 18.2 | 56.4 | 22.4 | 3.0% |
| | | 1965 | 99.6 | 12.0 | 64.5 | 20.2 | 3.3 |
| Eastern | 4.9 | 1964 | 99.0 | 12.0 | 55.5 | 28.6 | 3.9 |
| | | 1965 | 99.5 | 10.4 | 54.4 | 33.4 | 1.8 |
| Spingarn | 4.9 | 1964 | 100.0 | 12.0 | 73.5 | 13.6 | 0.9 |
| | | 1965 | 100.0 | 13.4 | 74.5 | 11.4 | 0.7 |
| McKinley | 5.2 | 1964 | 99.0 | 4.9 | 39.9 | 49.2 | 6.0 |
| | | 1965 | 99.5 | 4.3 | 39.6 | 48.3 | 7.8 |
| Ballou | 5.2 | 1964 | 64.0 | 7.4 | 53.7 | 34.3 | 4.6 |
| | | 1965 | 76.0 | 9.9 | 52.7 | 33.9 | 3.5 |
| Anacostia | 6.0** | 1964 | 61.0 | 6.5 | 54.5 | 34.8 | 4.2 |
| | | 1965 | 74.0 | 7.9 | 55.1 | 33.2 | 3.8 |
| Roosevelt | 6.0 | 1964 | 98.5 | 5.5 | 57.2 | 32.9 | 4.4 |
| | | 1965 | 99.4 | 4.7 | 57.7 | 34.4 | 3.2 |
| Coolidge | 7.6 | 1964 | 82.0 | 5.1 | 31.6 | 52.5 | 10.8 |
| | | 1965 | 90.0 | 3.8 | 33.5 | 52.5 | 10.2 |
| Western | 8.6 | 1964 | 42.7 | 6.6 | 34.6 | 46.1 | 12.7 |
| | | 1965 | 52.5 | 7.4 | 32.7 | 47.7 | 12.2 |
| Wilson | 10.4 | 1964 | 2.3 | None*** | 7.8 | 75.1 | 17.1 |
| | | 1965 | 6.3 | None*** | 8.1 | 80.0 | 11.9 |

---

61. Sources relied upon for both Tables are: Ex. B–4; Ex. B–12, pp. 315–316; Ex. B–16; Ex. F–3; Ex. P–4; Ex. P–5; Ex. V–2. Schools have been listed according to median income levels.

* Dunbar High School has not offered an Honors curriculum since at least 1961. (Ex. B–3.)

** According to plaintiffs' Exhibit F–3, based on 1960 census data, Anacostia High School serves a neighborhood whose median annual income is between $6,000 and $6,999. However, in plaintiffs' Exhibit B–12, p. 315 (and Ex. V–2 based thereon), the median income is shown as $4,627. This discrepancy is unexplained; however, since the rest of the figures found in Ex. B–12 accord with those in Ex. F–3, the court has adhered to the latter but has placed the income level at the lower end of the indicated range—*i. e.*, $6,000.

*** Wilson High school has not had a Special Academic Track since at least 1961. (Ex. B–3.)

TABLE C

Junior High Schools

| School | Nbhd median income (00) | % Negro enroll-ment* | | % S.Ac. (Basic) | % Gen'l | % Honors |
|---|---|---|---|---|---|---|
| Terrell | $3.5 | 99.5% | 1964 | 17.4% | 82.6% | None |
| | | | 1965 | 13.7 | 86.3 | None |
| Shaw | 3.5 | 99.5 | 1964 | 36.0 | 64.0 | None |
| | | | 1965 | 28.1 | 71.9 | None |
| Stuart | 4.5 | 94.5 | 1964 | 25.3 | 74.7 | None |
| | | | 1965 | 22.0 | 78.0 | None |
| Randall | 4.5 | 97.5 | 1964 | 22.7 | 77.3 | None |
| | | | 1965 | 18.3 | 81.7 | None |
| Miller | 4.5 | 100.0 | 1964 | 12.3 | 80.3 | 7.4 |
| | | | 1965 | 7.0 | 85.7 | 7.3 |
| Garnet-Patterson | 4.5 | 99.9 | 1964 | 21.8 | 78.2 | None |
| | | | 1965 | 15.3 | 84.7 | None |
| Francis | 4.5 | 95.0 | 1964 | 21.1 | 78.9 | None |
| | | | 1965 | 15.1 | 84.9 | None |
| Evans | 4.5 | 100.0 | 1964 | 18.6 | 81.4 | None |
| | | | 1965 | 16.3 | 83.7 | None |
| Eliot | 4.5 | 99.1 | 1964 | 13.3 | 82.1 | 4.6 |
| | | | 1965 | 5.8 | 89.1 | 5.1 |
| Browne | 4.5 | 99.9 | 1964 | 25.1 | 72.9 | 2.0 |
| | | | 1965 | 7.8 | 92.2 | None |
| Banneker | 4.5 | 99.5 | 1964 | 13.6 | 83.0 | 2.0 |
| | | | 1965 | 15.5 | 80.8 | 3.7 |
| Sousa | 5.5 | 97.0 | 1964 | 16.3 | 79.3 | 4.4 |
| | | | 1965 | 3.4 | 95.5 | 1.1 |
| Langley | 5.5 | 99.2 | 1964 | 10.2 | 89.8 | None |
| | | | 1965 | 6.9 | 93.1 | None |
| Kramer | 5.5 | 54.5 | 1964 | 9.9 | 84.0 | 6.1 |
| | | 69.1 | 1965 | 7.4 | 86.8 | 5.8 |
| Hine | 5.5 | 95.4 | 1964 | 14.1 | 85.9 | None |
| | | | 1965 | 4.1 | 95.9 | None |
| Douglass | 5.5 | 99.0 | 1964 | 23.3 | 76.7 | None |
| | | | 1965 | 8.6 | 91.4 | None |
| Woodson | 6.5 | 99.9 | 1964 | 12.1 | 86.5 | 1.4 |
| | | | 1965 | 13.0 | 87.0 | None |
| MacFarland | 6.5 | 99.2 | 1964 | 6.9 | 88.3 | 4.8 |
| | | | 1965 | 6.3 | 88.6 | 5.1 |
| Hart | 6.5 | 55.7 | 1964 | 6.6 | 84.7 | 8.7 |
| | | 74.0 | 1965 | 4.1 | 90.0 | 5.9 |
| Paul | 7.5 | 83.0 | 1964 | 5.5 | 78.1 | 16.4 |
| | | 88.1 | 1965 | 3.3 | 83.5 | 13.2 |
| Taft | 8.5 | 98.0 | 1964 | 8.5 | 83.9 | 7.6 |
| | | | 1965 | 10.0 | 83.4 | 6.6 |
| Backus | 8.5 | 96.0 | 1964 | 5.9 | 86.9 | 7.2 |
| | | | 1965 | 4.8 | 88.7 | 6.5 |
| Gordon | 9.5 | 41.5 | 1964 | 4.3 | 80.7 | 15.0 |
| | | 48.0 | 1965 | 3.4 | 84.3 | 12.3 |
| Deal | 10.5 | 1.0 | 1964 | 2.5 | 56.5 | 41.0 |
| | | 1.3 | 1965 | None | 56.0 | 44.0 |
| Jefferson | (unknown) | 80.0 | 1964 | 8.5 | 61.8 | 29.7 |
| | | 81.0 | 1965 | 4.2 | 65.7 | 30.1 |

* Figures are for 1964; where enrollment changed significantly both 1964 and 1965 figures are given.

a. *Socio-economic correlation.* Defendants have admitted that, as a general rule, the per cent of students in a given track will correspond to the income level of the neighborhood served by that school. The higher the median income level, the greater the per cent of students who will be found in the higher tracks.[62] This general proposition has its exceptions. However, the exceptions fall within the middle-range schools where small variations can produce pronounced differences in relative position.

*Senior high schools.*

(1) Dunbar High School, the school serving the lowest income neighborhood ($3,000–$3,999 median), has not had an Honors Track since at least 1961. And, although it has had a Regular (college preparatory) Track during that period, the evidence shows Dunbar to have had the second lowest number of students in that curriculum in 1964 and 1965 (15.2% and 17.7% respectively). The only school with fewer students in college preparatory curricula (Regular and Honors) was Spingarn High, an all-Negro (100%), low-income ($4,000–$4,999) school having 14.5% in the Regular or Honors Tracks (13.6% and 0.9% respectively) in 1964 and 12.1% (11.4% and 0.7%) in 1965.

(2) Wilson, the only high school serving the highest median income level ($10,000–$10,999), and having the fewest Negro students (2.3% in 1964; 6.3% in 1965), has not had a Special Academic Track since at least 1961. For both years over 90% of the students at Wilson were in the advanced curricula, the bulk of them in the Regular Track (75.1% in 1964; 80.0% in 1965), and a high percentage in Honors (17.1% and 11.9% respectively).

(3) Grouping the high schools into three economic levels—high ($7,000–$10,999), middle ($5,000–$6,999) and low ($3,000–$4,999)—the correlation between track placement and income is exact.

TABLE D

| Income Level | Number of Schools | Per Cent Students in Special Academic and General Tracks | |
|---|---|---|---|
| | | 1964 | 1965 |
| High | 3 | 7.8 — 34.6% | 8.1 — 40.1% |
| Middle | 4 | 44.8 — 62.7 | 43.9 — 63.0 |
| Low | 4 | 67.5 — 85.5 | 64.8 — 87.9 |

*Junior high schools.*

The economic correlations found in the senior high schools are also found, generally, in the junior high schools.

(1) There were 25 junior high schools in 1964 and 1965. Of the 25, all offered a Special Academic Track in 1964; in 1965 one did not: Deal Junior High, serving the highest income level ($10,000–$10,999). In 1964, 15 (60%) offered an Honors Track; in 1965 this dropped to 12, or less than 50%. Of those *without* an Honors Track in 1964, seven (70%) were in the low income group (11 schools) and three (30%) were in the middle income group (eight schools[63]); all five of the high-income-group schools had Honors Tracks. For 1965, nine of the 13 non-Honors Track

---

62. "The per cent of the student body of a given school in a given curriculum corresponds to the income level of the neighborhood served by that school. That is, generally, the higher the income level of the area served by the school, the higher the per cent of the student body of that school in the advanced curriculums."

Defendants' Proposed Findings, p. F–15. *See also* pp. F–15 to F–21, for defendants' analysis of the enrollment patterns in the secondary and elementary schools with regard to income correlations.

63. The income level for Jefferson is unknown and will be shown separately in the economic breakdowns.

schools were low income schools (69%); the other four (31%) were in the middle income range.

(2) The per cent of students in either the Special Academic or Honors Tracks does not show an exact correlation with income level. But, as a general matter, the enrollment range in the Honors Track does reflect a definite *upward* trend the higher the income level; conversely, Special Academic enrollment *decreases* as income level goes higher.

TABLE E

| Income Level | % in Special Academic 1964 | 1965 | % in Honors 1964 | 1965 |
|---|---|---|---|---|
| High | 2.5 – 8.5% | 0.0 – 10.0% | 41.0 – 7.2% | 44.0 – 6.5% |
| Middle | 6.6 – 23.3 | 4.1 – 13.0 | 8.7 – 0.0 | 5.9 – 0.0 |
| Low | 12.3 – 36.0 | 5.8 – 28.1 | 7.4 – 0.0 | 7.3 – 0.0 |
| (Jefferson: | 8.5 | 4.2 | 29.7 | 30.1 ) |

---

*Elementary schools.*

The correlation continues at the elementary school level as indicated by Table F.

TABLE F [64]

Per Cent Elementary Schools with Honors Tracks (1965)

| Median Income Range | No. Schools | No. with Honors Tracks | Per Cent |
|---|---|---|---|
| Under $3,000 – $4,999 | 60 | 3 | 5.0 |
| $5,000 – $6,999 | 40 | 6 | 15.0 |
| $7,000 – $10,999 | 22 | 14 | 63.6 |
| $11,000 and over | 8 | 6 | 75.0 |
| Total | 130 | 29 | 22.2 |

(Ex. F–2; Ex. B–4; *see* Defendants' Proposed Findings, p. F–19.)

---

\* \* \* \* \* \*

From all of the above data it is clear that a student's chance of being enrolled in one of the more advanced tracks is directly related to his socio-economic background. The reason for this correlation will be examined in some detail in Section F, *infra*. Suffice it to say here that the relationship is founded on the fact that academic achievement is strongly influenced by the kind of environment a child is born into and in which he spends his childhood and early youth—his home, his community and his school. Income level happens to be a shorthand way of identifying those backgrounds that are more or less conducive to becoming a successful student.

b. *Racial correlation.* Defendants have gone to some pains to establish that everything about a student's education under the track system can be explained by nonracial considerations. However, as even a hurried glance at the data just reviewed makes plain, for a majority of District schools and school children race and economics are intertwined: when one talks of poverty or low income levels one inevitably talks mostly about the Negro. This is evidenced by the most recent census data for the District of Columbia (1960) which shows the median annual income level to be $5,993 for all families; but for white families the median is $7,692 whereas for Negro families it is $4,800. At

64. *Compare* Table G, *infra*.

least 50% of the Negro population can therefore be placed within a poverty range. (Ex. 124.)

Further evidence of the relationship between income and race can be seen in the following data.

*Senior high schools.*

(1) Of the 11 senior high schools, eight (72.6%) serve neighborhoods with income levels of $6,000 or below, the average being $4,000. The per cent Negro enrollment in those schools, using the 1965 figures, ranged from a low of 74.0% to a high of 100.0%; the average was 93.5%.

(2) The two schools with a significant number of white students enrolled are Wilson (93.7%) and Western (47.5%). The median income level of Wilson is $10,374; of Western, $8,649.

(3) The court has already compared the enrollment patterns of Wilson with Dunbar and Spingarn, both low income Negro schools. It is also instructive to note that Wilson, the only predominantly white school, had all but 8% of its students in the Regular and Honors Tracks in 1964 and 1965; no other school was even close to that. The school that was closest was Coolidge High School, a predominantly (90.0%) Negro school serving a neighborhood with the third highest income level in the system ($7,650); but despite its relative affluence Coolidge nonetheless had almost 40% of its students in the lower, non-college preparatory tracks. (*See generally* Table B.)

*Junior high schools.*

(1) Of the 24 junior high schools whose income level is known, 16 were at or below the $6,000 mark, the average being about $4,700. In 1965 the per cent Negro enrollment in those schools ranged from 63.5% to 100.0%; the average was 96.5%.

(2) In 1964 there were six schools [65] having from 99.0% to 17.0% white enrollment; all six had Honors Tracks (whereas 40% of the schools did not). At least two of those schools were in the middle income range (one at $5,000–$5,999 and one at $6,000–$6,999; in addition, Jefferson was among the six schools and presumably fell within the middle range). There were six other middle income schools,[66] all having virtually all-Negro student bodies (the range going from 95.4% Negro to 99.9%); only three of them had Honors Tracks. And in 1965, this number dropped to two.

*Elementary schools.*

Table G shows the distribution of track offerings in the elementary schools in 1965 according to the racial characteristic of the schools. As the Table makes clear, income and race tend to coincide.

TABLE G

| Per Cent Negro Enrollment | Average Income Level (00) | Number of Schools | Having S/Ac. Track | | Having Honors Track | |
|---|---|---|---|---|---|---|
| | | | No. | % | No. | % |
| 85–100% | $ 5.0 | 108 | 88 | 81.5% | 13 | 12.0% |
| 67–85 | 5.5 | 4 | 3 | 75.0 | 2 | 50.0 |
| 33–67 | 8.1 | 7 | 3 | 72.0 | 3 | 42.0 |
| 15–33 | 7.1 | 3 | 2 | 67.0 | 2 | 67.0 |
| 0–15 | 11.4 | 11 | None | 0.0 | 9 | 82.0 |

(Ex. B–4; Ex. F–2; Ex. P–4.)

The pattern of Honors Track offerings found to exist in the junior high schools repeats in the elementary schools: the great majority of predominantly Negro schools do not provide Honors Tracks for their students. Indeed, only 16% of all Negro elementary school students were attending schools with Honors programs

65. Deal, Gordon, Hart, Jefferson, Kramer and Paul.

66. Douglas, Hine, Langley, MacFarland, Sousa and Woodson.

**456**

in 1965; on the other hand, 70% of all white students had the advanced curriculum at their schools. (Ex. V–10.)

### c. Racial distribution within track levels.

Perhaps the most striking illustration of why it is impossible to accept defendants' argument that a student's race is irrelevant to the kind of education he obtains is to be found when one examines the evidence concerning the racial breakdown of the enrollment in the Special Academic or Basic Track, the only track for which defendants maintain records according to race. As a general rule, in those schools with a significant number of both white and Negro students a higher proportion of the Negroes will go into the Special Academic Track than will the white students. This pattern is shown by the next two tables.

TABLE H [67]

| | School Year | Total School Enrollment % Negro | % White | Ratio of Negroes to Whites in Special Academic Track % Negro | % White |
|---|---|---|---|---|---|
| Elementary | 1964 | 89.5 | 10.5 | 95.0 | 5.0 |
| | 1965 | 91.0 | 9.0 | 95.0 | 5.0 |
| Junior high | 1964 | 87.6 | 12.4 | 94.7 | 5.3 |
| | 1965 | 89.5 | 10.5 | 96.4 | 3.6 [68] |

(Ex. B–4; Ex. C–15; Ex. P–4; Ex. P–5.)

Thus, at both the elementary and junior high school levels the per cent of Negroes enrolled in the lowest track exceeds their proportionate representation in the total student body; conversely, the white enrollment in the Special Academic Track is significantly lower than the proportion of whites in the total school enrollment. This is shown with greater particularity in Table I, below.

TABLE I

Racial Breakdown in the Special Academic Tracks in
Junior High Schools Having Between 17% and 80% Whites
School Years 1962–1965

| School | Year | % Whites | Spec.Ac. Track Col. 1 (W) | Col. 2 (N) | Col. 3 % W : N | Pupils in Track as % of Tot. White or Negro Enrollment Col. 4 (W) | Col. 5 (N) |
|---|---|---|---|---|---|---|---|
| Gordon | 1962–63 | 74.0% | 31 | 16 | 66.0% | 4.2% | 6.4% |
| | 1963–64 | 68.6 | 25 | 26 | 49.0 | 3.9 | 9.5 |
| | 1964–65 | 58.5 | 14 | 31 | 31.0 | 2.4 | 7.8 |
| Hart | 1962–63 | 80.0 | 28 | 25 | 53.0 | 3.1 | 12.1 |
| | 1963–64 | 66.4 | 25 | 49 | 34.0 | 3.3 | 14.0 |
| | 1964–65 | 44.3 | 18 | 75 | 19.4 | 2.9 | 10.5 |
| Jefferson | 1962–63 | 26.0 | 9 | 66 | 12.0 | 6.1 | 17.8 |
| | 1963–64 | 20.8 | 10 | 44 | 18.5 | 8.4 | 10.0 |
| | 1964–65 | 20.0 | 8 | 47 | 14.5 | 6.6 | 10.0 |
| Kramer | 1962–63 | 65.5 | 39 | 30 | 56.5 | 5.4 | 8.1 |
| | 1963–64 | 55.5 | 48 | 41 | 54.0 | 7.8 | 8.4 |
| | 1964–65 | 45.5 | 44 | 71 | 39.0 | 9.1 | 12.6 |
| Paul | 1962–63 | 24.4 | 12 | 85 | 12.4 | 3.4 | 8.2 |
| | 1963–64 | 22.5 | 5 | 57 | 8.1 | 1.9 | 6.6 |
| | 1964–65 | 17.0 | 7 | 59 | 10.6 | 3.5 | 6.3 |

(Ex. P–5; Ex. P–6; Ex. P–7.)

67. Defendants do not maintain records for senior high schools.

68. Stated otherwise, as of October 1965, 3.3% of the white students in junior high school were in the Special Academic Track whereas 10.2% of the Negroes were in that Track. (Ex. P–20.)

In these five junior high schools, the only ones with a significant biracial enrollment, the per cent of white students in the Special Academic Track was consistently lower than the per cent of whites in the total school population (*compare* Col. 1 *with* Col. 4); in all cases a higher proportion of the Negro students in these schools were in the lowest track than were the white students (*compare* Col. 5 *with* Col. 6).

Clearly, then, race cannot be considered irrelevant in the operation of the track system. Even if the effects of tracking are not racially motivated, the Negro student nonetheless is affected.

### 2. *Effects of the distribution pattern.*

The data just reviewed reveal the two important effects of the track system. First, tracking tends to separate students from one another according to socio-economic and racial status, albeit in the name of ability grouping. Second, the students attending the lower income predominantly Negro schools—a majority of District school children—typically are confined to the educational limits of the Special Academic or General Track.

a. *Class separation.* The track system is by definition a separative device, ostensibly according to students' ability levels. However, the practical effect of such a system is also to group students largely according to their socio-economic status and, to a lesser but observable degree, to their racial status. Two examples will suffice to prove the point.

(1) *Western High School.* Western is a high school serving the neighborhood with the second highest income level ($8,-649). However, the 1965 enrollments in the Special Academic and Regular Tracks did not conform to the general rule linking income with track placement—three schools (Coolidge, Roosevelt, McKinley) of lower income levels than Western having fewer students in the Special Academic Track, and two of those (Coolidge, McKinley) having more in the Regular Track.

Defendants suggest as a reason for this deviation an influx of transfer students, implicit in which is the further suggestion that these were lower income students who would tend to gravitate to the lower tracks. (Defendants' Proposed Findings, p. F–17.) Evidence shows that in 1965, 405 out-of-boundary students were enrolled in Western, representing 31% of the student body. A breakdown of Western's enrollment by median income level as of May 1966 showed the following: 29.7% of the students were from income levels below $5,000; 34.2% were from the $5,000–$6,999 level; 10.7% were from the $7,000–$8,999 level; and 25.4% were from levels $9,000 and above. (Ex. N–9; Ex. N–10.)

Accepting defendants' explanation as correct serves to strengthen the economic-correlation finding. But more significantly, it proves the segregatory effect of tracking. Thus the indigenous upper class, predominantly white, Western student body is cushioned from the full impact of a substantial influx of lower class outsiders. And given the predominance of the Negro in that class, there is a high probability that the cushioning effect is racially as well as economically related.

(2) Confirmation of the cushioning effect from a racial standpoint is found in the data presented in Tables H and I, *supra*, where it was shown that Negro students in the "integrated" schools go into the Special Academic Track in greater proportion than their white classmates. Although whites and Negroes certainly are not wholly segregated in these schools as a consequence of this, there can be no disputing that the greater the number of Negro students placed in the lower tracks, the less will be the impact of the Negro enrollment on the upper track levels. In short, there is substantial evidence that tracking tends to thin out the number of Negroes in the higher curriculum levels, thus redistributing the racial balance in integrated schools—increasing the proportion of Negroes to whites in the lower tracks and decreasing that proportion in the upper tracks.

\* \* \* \* \*

458

The reason for the track system's separative effect (and concomitant cushioning effect as well) inheres largely in the placement methods used in the District, pupils being programmed on the strength of their performances in class and on standardized aptitude tests, both of which criteria are heavily—and, as it turns out, unfairly—weighted against the disadvantaged student. (*See* Section F, *infra.*) Moreover, as will be seen shortly, once a student is separated it tends to be both permanent and complete at least insofar as classroom contacts are concerned. (*See* Section E, *infra.*)

b. *Availability of Honors programs.* As observed earlier, because of the socioeconomic and racial correlations the poorer Negro students for the most part receive the limited offerings of the General and Special Academic Tracks. But more than that, there is a total absence of any Honors programs at a substantial number of schools—almost all of them having predominantly Negro enrollments. (*See* Tables B, C and G, *supra.*)

Defendants' explanation for this absence—at least with respect to the elementary schools—is that there are not enough students with the apparent aptitude for advanced work enrolled in the individual schools to warrant organizing an Honors program. (Tr. 4067, 6189; see Ex. 9 and Ex. C–16.) For those students who do show Honors potential, the usual option given them is to transfer—at their own expense—to the closest school offering an Honors course. As a practical matter, the burden is such that many parents are forced to leave their children in their neighborhood school and the gifted Negro student stays in the General Track. (Tr. 3067, 6120–6121, 6189–6190; Ex. 9.) Presumably these children are at some disadvantage when they move on to junior high school and begin to compete with the more fortunate students—black or white—whose schools were able to provide them with the advanced course work.

At the senior high school level, the virtually all-Negro, low income Dunbar High School has gone without an Honors Track for at least the last seven years. Apparently out of the approximately 1,500 students enrolled at Dunbar each year not enough bright students have been found to justify an Honors program. There is no evidence as to whether Honors-capable students in the Dunbar zone are allowed to transfer to a school offering such a program; presumably they would be, if they could afford the time and expense of going beyond neighborhood boundaries. On the other hand, for those students not qualified for full-scale enrollment in the Honors Track but capable of and interested in selected Honors-level courses, transfer is apparently not an option. This means, of course, that the maximum education open to a Dunbar student is the standard Regular Track course of instruction; there can be no supplementing of that program with an occasional Honors course.

Both this circumstance and the broader problem of requiring transfers to obtain the best education point up a distinct inflexibility in the track system. Being committed to organizing a whole curriculum rather than individual courses at a given time in a given subject, the capital investment required in the form of potential student enrollment is much higher. Thus, while programs are to be individualized for the student there must first be enough individuals for the program. This is a distinct disadvantage for the fast developing student enrolled in a school where the student body, because of impoverished circumstances, is unable to furnish an adequate supply of candidates for a full-scale Honors program. (*See* Section F, *infra.*)

E. *Flexibility in Pupil Programming.*

The importance of flexibility to the proper operation of the track system has been adverted to earlier in this opinion. No better statement of this principle can be found than in the words of Dr. Hansen:

"When the four-track system was put into operation in 1956, the intent was not to make pigeon-holes into which pupils would be permanently

sorted like mail of different classes. The expectation was, rather, that a student's election of a curriculum sequence, or his assignment to one, would restrict his choice of subjects to a pattern of interrelated disciplines. The coordinated curriculum plan was developed to provide for flexibility when the interests of the pupils demanded it. Can a more restrictive and less individualistic curriculum plan coexist with a reasonable degree of flexibility in pupil programming?

"Experience has shown that flexibility can be and is a salient feature of the four-track plan. This outcome is not automatic. It must be insisted upon by the central administrative office as it works to set up standard practices against the natural gravitational pull toward separateness in secondary school administration. High school administrators tend toward individuality in management, resist pressures from the central administrative office, and make their schools self-contained and self-governing principalities.

"The flexibility described here is of two kinds: (1) the transfer from one track to another as conditions warrant and (2) crosstracking, that is, the elec-

tion of courses by eligible students outside their own track placement." [69]

Plaintiffs, of course, have taken issue with Dr. Hansen's conclusion that "experience has shown that flexibility can be and is a salient feature * * *" of the track system. They are joined in this view by none other than the President of the School Board, Dr. Haynes, who has stated in testimony before this court that the track system puts District School children in a "straitjacket." (Tr. 1248.) Defendants have been content to resist the charges of inflexibility by relying on a somewhat sparse statistical showing of the amount of movement between tracks —upgrading and crosstracking—that actually takes place. (Exs. 139, 140; B-1.)

These data speak for themselves: flexibility in pupil programming in the District of Columbia school system is an unkept promise.

*1. Movement Between Tracks: Upgrading.*

*a. Movement out of the Special Academic Track.*

Writing in 1964, Dr. Hansen observed:

" * * * [T]he basic curriculum has two purposes. One is to offer slow learners a curriculum from which they may graduate with honor. The other

---

69. HANSEN 188.

The following excerpts from the school system's publication describing the track system, *How We Are Meeting Individual Differences*, attest to the importance the school system attaches to the principle of flexibility, especially as it concerns those in the two lowest tracks.

For the General Track:

"Persistent talent searching is conducted among the General Track students in the hope of upgrading their academic and vocational ambition. * * *

"Provision is made for changes in the placement of children as their needs change and as achievement levels improve. Continuous evaluation, guidance and study of individual progress will ensure maximum educational opportunity. * * *

"Considerable attention is taken to insure flexibility in track assignment. As soon as a student appears capable of performing on the next higher level, he

is moved into that group. * * *"
And for the Special Academic (Basic) Track:

"Every effort is made to insure flexibility with the result that students are constantly encouraged to improve their performance to the level where they may be moved into the General Track. * * *

"Maximum effort is placed upon [sic] flexibility. Students are moved along as rapidly as they can go, with every effort being bent to ready them for entrance in the General Track after completion of the 9th grade. * * *

"Basic pupils are continuously evaluated in terms of achievement, performance, attitudes, and adjustment. When it becomes apparent that a child is misplaced and a change of program is indicated, measures are taken immediately to provide adequate and appropriate placement. * * *"
(Ex. 9, C–16.)

is to help retarded students overcome their academic deficiencies so that they will be eligible for transfer to the general or even the college preparatory tracks.

"One measure of the success of the basic curriculum is, therefore, the number of students who lift their achievement levels to the point that they can be transferred to the upper curriculum levels. * * * " [70]

So measured, the Special Academic or Basic Track is a failure. Table J plus Tables K, L, and M present in tabular form the only data defendants have been able to make available to support their contention that the track system is flexible.[71]

TABLE J [72]

Upgrading — Special Academic Track

| | Year | Total Special Academic Enrollment | Number Upgraded | Per Cent Upgraded | Per Cent Unchanged |
|---|---|---|---|---|---|
| Elementary Schools | 1962–1963 | 2839 [73] | 119 | 4.2 [73] | 95.8 |
| Junior High Schools | 1961–1962 | 3457 | 323 [74] | 9.3 | 90.7 |
| | 1962–1963 | 4218 | 347 [75] | 8.2 | 91.8 |
| | 1963–1964 | 4499 | 232 [76] | 5.2 | 94.8 |
| Senior High Schools | 1961–1962 | 2074 | 41 [77] or 176 [78] | 2.0 or 8.5 | 98.0 or 91.5 |
| | 1962–1963 | 1799 | 175 [79] | 9.7 | 90.3 |
| | 1963–1964 | 1760 | 264 | 15.0 | 85.0 |

(Tr. 315–316, 335–336, 352; Ex. A–2, pp. 316–317; Ex. B–1; Ex. B–11, pp. 154, 188; Ex. B–16.)

**70.** HANSEN 154.

**71.** Superintendent Hansen testified that principals maintain individual records of intertrack movement in their schools, but that his office staff see such information only when they request it for evaluation purposes. The most recent evaluation, as the evidence indicates, was in 1964. According to Dr. Hansen, "we think we have enough data on hand to satisfy us that there is flexibility in the operation of this program * * *." (Tr. 311.) The data to which he referred showed: (1) In the two-year period from 1961 to 1963, 119 (3.7%) of the students in the elementary Special Academic Track were upgraded (Tr. 316). *But see* Note 73, *infra.* (2) 670 (8.7%) of the students in junior high school Special Academic Track were upgraded; and overall, 1,683 junior high students (3.1% of the total enrollment) moved either up or down a track level (Tr. 335–336). (3) In the same period 351 (9.1%) of the students in the senior high Special Academic Track were upgraded; and 1,721 (6.3%) of all the senior high students were involved in upgrading or downgrading. (Tr. 352.)

**72.** Tables K, L, and M appear *infra.*

**73.** Dr. Hansen in testimony gave the total enrollment as being 2770; but this is inconsistent with the official figures as shown in Exhibit P–7. *And compare* Tr. 1030 (2810). If 2770 is used, the per cent upgraded becomes 4.3%; this is also inconsistent with Dr. Hansen's testimony, the figure he quoted being 3.7%. (Tr. 315–316.) The court adopts 4.2% as the true percentage.

**74.** This figure is an estimate obtained from comparing two sources of data. Dr. Hansen testified that for the two-year period, September 1961 to September 1963, 670 Special Academic (or Basic) students were upgraded. (Tr. 335.) Subtracting the 1962–63 figure of 347 (*see* Note 75, *infra*), the difference is 323. Given the relative similarity of the figures thus obtained for each of the two years in question, it would be an insignificant error if the court is wrong in its interpretation of the source of error in Dr. Hansen's book—the two figures would simply be reversed.

If the 1961–63 data are not broken down, the figures are: Total enrollment —7675; number upgraded—670; per cent upgraded—8.7%; per cent unchanged—91.3%. (Tr. 335; Ex. B–16.)

Despite the uncertainties as to the complete accuracy of these statistics, as noted, even the data most favorable to defendants—the 1963–64 figures for senior high schools—show only 264, or 15%, of the students in the slowest track being reassigned upward. Thus, at least 85% of those assigned to the Special Academic Track—and it appears that something over 90% is more typical—remain at the lowest achievement level. Although it cannot be said that an assignment to the Special Academic Track inevitably is permanent, neither can it be said that the chances of progressing into a more challenging curriculum are very high.

Plaintiffs have charged that this lack of movement is attributable to a complex of causes: the simplified curriculum, coupled with the absence of variety in the students' levels of ability, does not stimulate the Special Academic student; remedial training is inadequate; Special Academic teachers are not formally trained for special educational problems; teachers underestimate the potential of their students and therefore undereducate them. None of these reasons can be either isolated or proved with absolute certainty. Nonetheless, there is substantial evidence—examined in Section F, *infra*—that the cause of limited upgrading in the Special Academic Track lies more with faults to be found in the system than with the innate disabilities of the students. And certainly the results—which Dr. Hansen himself has said are an important measure of success—do not support the thesis that tracking is flexible.[80]

75. This figure is reported in Dr. Hansen's book (Ex. B–11, p. 154), but for the school year 1961–62. However, the total enrollment figure used is 4,218—which is the correct figure for 1962–63. (Ex. B–16.) This either means Dr. Hansen's book is wrong in titling the data as being for 1961–62; or that the 1962–63 enrollment figure was erroneously combined with the 1961–62 figure for upgrading. The court presumes the former: that the data in Exhibit B–11 is for 1962–63.

76. The court notes that this figure is from data which covers only the period from September 1963 through June 1964 (Ex. B–1), rather than for the full chronological period from September to the following September. *Compare* Notes 74 and 75, *supra.* There is some indication from discrepancies found in other statistics that the different reporting periods reflect a substantive distinction. *See* Notes 77 and 78, *infra.*

77. This figure is from data reported for September through June. (Ex. B–1.) *See* Note 78, *infra.*

78. This figure is the result of computations made using two sets of data. The number of students upgraded for the two-year period from September 1961 to September 1963 is 351. (Tr. 352.) The number of students upgraded during the 1962–63 school year is presumed to be 175, this being the figure reported in Exhibit B–11, but unsettled by the same discrepancy noted and resolved in Note 75, *supra.* If 175 is subtracted from 351, the difference is 176. However, this is 135 students in excess of the 41 shown for the nine-month period in Exhibit B–1. *See* Note 77, *supra.* It may be that this discrepancy is simply due to errors or conflicts in the data themselves. On the other hand, it may be that B–1, covering only the nine-month period, fails to account for upgrading accomplished during the summer interval—i. e., it may be that a student is upgraded *after* June and this move would be reflected only in data reported for the full chronological year, September to September.

79. This figure is from Exhibit B–11 and is attributed to the 1962 school year in the same manner as the comparable figure for junior high schools. *See* Notes 75 and 78, *supra.*

If the 1961–63 data are not broken down the figures are: Total enrollment—3873; number upgraded—351; per cent upgraded—9.1%; per cent unchanged—90.9%. (Tr. 352; Ex. B–16.)

80. Interestingly enough, however, Dr. Hansen characterized the 1962–63 data for the secondary schools, showing 347 (8.2%) students upgraded in junior high and 175 (9.7%) in senior high, as "a sizable number of students * * *." (HANSEN 154.) From these data he concluded: "1. The search for the more talented low-achievers continues throughout the six years of the basic curriculum in the secondary schools. *Pupils, rather than being permanently 'tracked' or pigeonholed at a low academic level, are challenged to move up the ladder of accomplishment.*

"*Those who charge that ability grouping makes the lowest group a 'dumping'*

462

b. *Overall movement between tracks.*

Tables K through M summarize the available data on overall track movement.

TABLE K

Intertrack movement in secondary schools, 1961–1963

| | Years | Total Enrollment All Tracks | Total Movement (Up or Down) | Per Cent Moved | Per Cent Unchanged |
|---|---|---|---|---|---|
| Junior High School | 1961–1963 | 54,538 | 1683 [81] | 3.1 | 96.9 |
| Senior High School | 1961–1963 | 27,139 | 1721 [82] | 6.3 | 93.7 |

(Tr. 335–336, 352; Ex. A–2, pp. 316–317.)

Table L

Intertrack movement in junior high schools, Sept. 1963 through June 1964 [83]

| Track | Enrollment | Upgraded | | Downgraded | | Per Cent Unchanged |
|---|---|---|---|---|---|---|
| | | No. | % | No. | % | |
| Special Academic | 4,499 | 232 | 5.2 | — n/a | — | 94.8 |
| General | 22,758 | 30 | 0.1 | 89 | 0.4 | 99.5 |
| Honors | 1,793 | — n/a | — | 152 | 8.5 | 91.5 |
| Total | 29,050 | 262 | 0.9 | 241 | 0.8 | 98.3 |

Table M

Intertrack movement in senior high schools
Sept. 1961 through June 1962, [84] and Sept. 1963 to Sept. 1964

| Track | Year | Enrollment | Upgraded | | Downgraded | | Per Cent Unchanged |
|---|---|---|---|---|---|---|
| | | | No. | % | No. | % | |
| Special Academic | 1961–1962 | 2,074 | 41 [85] | 2.0 | — n/a | — | 98.0 |
| | 1963–1964 | 1,760 | 264 [86] | 15.0 | — n/a | — | 85.0 |
| General | 1961–1962 | 5,692 | 57 [85] | 1.0 | 19 | 0.3 | 98.7 |
| | 1963–1964 | 7,812 | 404 | 5.2 | 143 | 1.9 | 92.9 |
| Regular | 1961–1962 | 4,002 | 15 [85] | 0.4 | 81 [87] | 2.0 | 97.6 |
| | 1963–1964 | 5,628 | 97 | 1.7 | 313 [87] | 5.6 | 92.7 |
| Honors | 1961–1962 | 1,106 | — n/a | — | 13 [88] | 1.2 | 98.8 |
| | 1963–1964 | 1,075 | — n/a | — | 132 [88] | 12.3 | 87.7 |
| Totals | 1961–1962 | 12,874 | 113 [85] | 0.9 | 113 [85] | 0.9 | 98.2 |
| | 1963–1964 | 16,275 | 765 | 4.7 | 588 | 3.6 | 91.7 |

(Ex. B–1.)

ground for the problem learners where they are forgotten and unstimulated are not conversant with the facts. * * *

"4. Transfers out of as well as into the basic curriculum attest to its flexibility. It shows that structure need not result in rigidity. * * *" (*Id.* at 154–155.) (Emphasis added.)

Apparently the fact that more than 90% of the students assigned to the slowest track did *not* move did not strike Dr. Hansen as a sign of rigidity. *Compare id.* at 188–189.

81. Of this number, 670 (40%) were Special Academic students upgraded to a higher level. Defendants could not provide a breakdown on the remaining 60%—what

tracks were involved and what portion of the movement entailed downgrading as opposed to upgrading. Dr. Hansen indicated, and other data confirm, that close to half of the intertrack movement is *downward.* (Tr. 317, 333; Ex. B–1; Tables L, M.)

To summarize, the pattern observed with respect to upgrading from the Special Academic Track is repeated in all track levels. Movement between tracks borders on the nonexistent.

In the period from September 1963 through June 1964 the total number of junior high school students upgraded was 262, or less than one per cent of the student body; and of those upgraded, almost all were Special Academic students going to the General Track. Only 30 students out of all those enrolled in General Track in the 25 junior high schools existing at that time were able to qualify for the Honors curriculum during that period. Moreover, for every student upgraded another student was downgraded to a lower track. The tendency for downgrading to counterbalance upgrading is generally consistent throughout the primary and secondary schools.[89]

At the senior high school level intertrack movement assumes even greater significance because of the dichotomy in subject matter emphasis between the two lower tracks and the upper or college preparatory tracks. Here again the pattern is one of rigidity.

Thus in the 1963–64 school year, where the figures show the highest amount of intertrack movement, almost 92% of the senior high students did not leave their assigned track. Moreover, 44% of the students who did move, moved downward.

What is most important, however, is the miniscule amount of movement from the lower tracks to the college preparatory tracks. Of the approximately 7,800 General Track students, only 404—about 5%—moved up a level, none going into the Honors curriculum. Although five Special Academic students were able to jump ahead two levels to the Regular Track, the number not moving at all remains by far predominant. In sum, then, of all the students in the two lower tracks —constituting almost 60% of the student body—only 4.8% advanced to the college preparatory curriculum.[90] And at the same time, it should be noted, 320 students—or 4.8%—from the Regular or Honors Track fell back to the lower tracks.[91]

Viewed as a whole, the evidence of overall movement between tracks conclusively demonstrates the defendants' failure to translate into practice one of the most critical tenets of the track system:

"Pupil placement in a curriculum must never be static or unchangeable. Oth-

82. Of this number, 351 (20.4%) were upgraded Special Academic students. *See* Note 81, *supra.*

83. *See* Notes 76 and 78, *supra.*

84. *Ibid.*

85. *See* note 77, *supra.* Adjusted to 176, the per cent would be 8.5%; the per cent unchanged would be 91.5%. The figures for the General, Regular, and Honors Tracks are subject to the same doubt; but there is no data from which to compute adjustments.

86. 259 (98.1%) rose to the General Track, 5 (1.9%) to the Regular Track. (4 of the 5 were in one high school.)

87. 1961–1962: 74 (91.4%) dropped to the General Track, 7 (8.6%) to the Special Academic Track.

1963–1964: 298 (95.2%) dropped to the General Track, 15 (4.8%) to the Special Academic Track.

88. 1961–1962: 11 (84.6%) dropped to the Regular Track, 2 (15.4%) to the General Track.

1963–1964: 125 (94.7%) dropped to the Regular Track, 7 (5.3%) to the General Track.

89. Dr. Hansen noted that this trend is quite clear in the elementary schools. (Tr. 317, 333.)

90. 409 students out of the 9,572 enrolled in the Special Academic and General Tracks.

91. 320 students out of the 6,703 enrolled were downgraded to either the Special Academic or General Track.

erwise, the four-track system will degenerate into a four-rut system." [92]

The tragedy has occurred.[93]

2. *Movement Between Tracks: Cross-Tracking.*

As noted above, cross-tracking is track terminology for electing courses above or below an assigned curriculum level. (Tr. 329, 2647; Ex. B-11, p. 188.) [94] The purpose of cross-tracking is to assure flexibility in meeting individual students' needs, allowing students who cannot qualify for—or who do not require or desire —full-time assignment to a higher or lower track (upgrading or downgrading) to take one or more courses at an advanced of simplified level.[95]

In practice cross-tracking of the sort described is confined to the senior high level, there being structural reasons why elementary and junior high pupils do not really "cross-track." [96] And, as will be seen, even at the senior high school level cross-tracking proves to be the exception, not the rule.

a. *Elementary schools.*

Elementary school students do not cross-track, in the technical sense of the term, because the primary school does not include an elective system of course selection. Instead children in, say, a fourth grade class will have one teacher who teaches all the fourth-grade subjects for that particular curriculum. Consequently, it is somewhat difficult for a child who requires Special Academic reading but General Track arithmetic to move freely between the two different classes; the daily teaching program of the two teachers involved would have to be coordinated.

Nonetheless, the two elementary school principals who testified did cite instances where Special Academic students have been able to spend part of their school day in a General Track class. This appears, however, to occur only when a child is deemed ready for complete upgrading to the higher track, the mixing of courses being a temporary situation so the child can be gradually phased into the more difficult curriculum. (Tr. 4040, 6210, 6216–6217.) [97]

b. *Junior high schools.*

Although Assistant Superintendent Koontz testified that present school policy allows junior high students to cross-

92. HANSEN 70.

93. It has been suggested that, if a student does not advance but rather continues to achieve at a level consistent with his track assignment, this is proof positive of the accuracy of placement. *See* HANSEN 185. But this reasoning is sheer boot-strapping, for it presumes that the student could not have done better in a different educational environment. *See generally* Section F, *infra.*

94. In testifying, Dr. Hansen asserted that all the track system adds at the secondary school level is the concept of separately identified curricula; it does not, he said, change the traditional practice of allowing students to elect part of their program. (Tr. 636.) *See* Note 95, *infra.*

95. A typical expression of the concept is the following:
"*Electives for Non-honors students.* All subjects listed for honors students are also elective to others who are qualified although not eligible for or desiring the complete honors sequence. Individualized programming is encouraged.

It makes possible the better placement of high ability students who would be excluded from fast learning groups by a policy of rigid adherence to track lines. At the same time the integrity of the honors track is maintained by requiring completion of the required subjects for graduation from it." HANSEN 61.

96. This is reflected in the fact that the only statistical evidence defendants have introduced to show the frequency of cross-tracking relates solely to the senior high schools. (Ex. 140.)

97. One principal, Mr. Dixon, implied that at his school a Special Academic Track student might regularly spend part of his day in a General Track class for some subjects even though overall upgrading was not contemplated; but the second principal, Mrs. Posey, indicated that at her school the mixed curriculum is simply a temporary trial period for testing whether the pupil is ready for total upgrading. (Tr. 6210; 4040.) At the least, it seems the practices are not uniform among the various elementary schools.

track, Superintendent Hansen acknowledged that it occurs only infrequently. (Tr. 2647; 328.) Defendants have not produced any statistical data to show exactly how much cross-tracking does occur.

The primary impediment to cross-tracking is structural. In the junior high schools students are formed into subgroups, according to ability levels, within a track under what is called the "block system." The students in each subgroup then take all the courses in the curriculum as a group, individual students rarely breaking away from the group to cross-track. (Tr. 328–330, 353.)

c. *Senior high schools.*

A senior high school student is not permitted to cross-track to a higher level —the only direction really at issue here —unless he is "eligible" or "qualified" and has obtained his principal's permission. (Tr. 329, 357; Ex. 9, C–16; Ex. B–11, pp. 42, 55, 61, 63, 188–189; Ex. G–1, p. 4.)[98] A student is qualified if, in the judgment of his teacher and principal— based on scholastic performance, aptitude and achievement test scores, IQ, attitude, and mental and physical condition —he can successfully undertake the more advanced subject matter. (Tr. 329; *cf., e.g.,* Tr. 331, 360; Ex. A–3, pp. 52, 54.)

Two other preconditions qualify freedom to cross-track. First, in order to graduate from a track the student must complete all the required courses for that track level either in subjects taught at that level or in acceptable substitutes from a higher level. (Tr. 354–357; Ex. G–1. *See* Section C, *supra.*) Electives,

therefore, are subject to some limitations. Second a student obviously cannot take an advanced course unless he has taken the prerequisite courses for that subject. Thus, for example, in order for a General Track student to be prepared to take trigonometry or calculus in the twelfth grade (taught only in the Regular and Honors Tracks), he would have to begin electing Regular Track algebra at least by the tenth grade. (*See* Ex. G–1, p. 27.) Consequently, while it may be theoretically possible for a General Track pupil to elect an advanced sequence of Regular Track courses, that election must begin early enough in his high school career or he will for all practical purposes be foreclosed. And, according to School Board President Dr. Haynes, lack of preparation is in fact a major inhibition to cross-tracking. (Tr. 1190–1194; *cf.* 2906–2907 (Assistant Superintendent Koontz).)

It is and always has been school policy to permit cross-tracking. (Tr. 648, 2647; Ex. B–11, p. 55.) Nonetheless, a study in 1959 by the League of Women Voters of the District of Columbia revealed that school principals were not uniform in allowing cross-tracking. " 'We found that some schools administer the program with a great deal of flexibility; others permit virtually none.' "[99] Although Dr. Hansen in 1964 implied that uniformity had by then been achieved,[100] the evidence in this case suggests otherwise. The following table presents in summary form the amount of cross-tracking being done by senior high school students in the respective high schools as of January 1965.

---

98. *But see* Tr. 648 where Dr. Hansen asserted that anyone is permitted to cross-track if he wants to, even if not likely to succeed.

99. Quoted in HANSEN at 189.

100. "To get standard practice in cross-tracking has been a difficult achievement." *Ibid. Cf. id.* at 188, quoted *supra* Note 69.

Table N

| School | Special Academic | | General | | Regular | | Honors | | Total % cross-track |
|---|---|---|---|---|---|---|---|---|---|
| | % of student body (A) | % cross-track (B) | (A) | (B) | (A) | (B) | (A) | (B) | |
| Anacostia | 6.5% | 2.1% | 54.5% | 24.1% | 34.8% | .8% | 4.2% | 1.7% | 13.6% |
| Ballou | 7.4 | none | 53.7 | 3.9 | 34.3 | 1.1 | 4.6 | 1.6 | 2.5 |
| Cardozo | 18.2 | 20.1 | 56.4 | 53.0 | 22.4 | 65.5 | 3.0 | 30.0 [101] | 52.1 [101] |
| Coolidge | 5.1 | 7.6 | 31.6 | 19.5 | 52.5 | 5.1 | 10.8 | 9.0 | 10.2 |
| Dunbar | 16.7 | 2.1 | 68.1 | 30.1 | 15.2 | none | none | none | 20.8 |
| Eastern | 12.0 | 10.8 | 55.5 | 40.0 | 28.6 | 15.2 | 3.9 | 7.9 | 28.0 |
| McKinley | 4.9 | none | 39.9 | 34.0 | 49.2 | .4 | 6.0 | 19.8 | 14.7 |
| Roosevelt | 5.5 | 7.1 | 57.2 | 30.8 | 32.9 | 4.4 | 4.4 | none | 19.5 |
| Spingarn | 12.0 | 10.8 | 73.5 | 46.6 | 13.6 | 4.0 | .9 | .6 | 36.3 |
| Western | 6.6 | 9.8 | 34.6 | 20.8 | 46.1 | 22.7 | 12.7 | 30.2 | 22.2 |
| Wilson | none | none | 7.8 | 22.4 | 75.1 | 31.0 | 17.1 | none | 25.0 |

(Ex. 140, Ex. B–16, Ex. P–4.)

From this it can be seen that, assuming 1965 to be representative of the present, some cross-tracking occurs at some levels in all high schools. On the other hand, the *degree* to which cross-tracking occurs in various high schools and in various tracks differs markedly. There is no evidence to explain these particular variations, whether some or all of them reflect certain principals' deviation from stated policy as in 1959; or whether some or all are due to an absence of qualification or desire for cross-tracking on the part of the respective students. Board President Haynes did testify, however, that it is commonly understood among students and teachers that the unwritten policy is *not* to permit cross-tracking. (Tr. 1068–1069B.) It appears that that belief is not without some basis in fact. Although only Ballou High could be said to approach the state of having no cross-tracking whatever, several others (Anacostia, Coolidge, and Western) appear to be even more restrictive than the norm.

The overall picture of cross-tracking in the senior high schools is set forth in Table 0 and again is based on 1965 data.

Table 0

| Track | No. Pupils in Track | % of Total Pupils | No. Cross-track | % Cross-track |
|---|---|---|---|---|
| Spec. Ac. | 1629 | 9.0% | 183 | 11.2% |
| General | 8941 | 49.6 | 2989 | 33.4 |
| Regular | 6426 | 35.6 | 909 | 14.1 |
| Honors | 1035 | 5.8 | 135 [102] | 13.0 [102] |
| TOTAL | 18,031 | 100.0% | 4216 [102] | 23.3% [102] |

(Ex. 140, Ex. B–16, Ex. P–4.)

101. Figures are estimates only due to error in Defendants' Exhibit 140, which shows Cardozo High as having 102 Honors Track students with cross-tracked programs; but official records for 1964–65 show only 54 students in Honors Track at Cardozo. (Ex. P–4.) The court has estimated that 38 (30%) of those 54 were cross-tracking.

102. Estimate only; *see* Note 101, *supra.*

As can readily be seen from these data, only a small minority of students were cross-tracking. In the Special Academic Track containing 9.0% of the District's high school students almost 89% did not take courses outside the basic curriculum. And in the General Track, in which half the students were located, two-thirds (66.2%) did no cross-tracking. Together, these two lower tracks accounted for 58.6% of the high school student body, and 70% of those students did not cross-track.

Defendants have not explained why so few students in the three lower curricula (Special Academic, General, and Regular) do any cross-tracking. However, there is substantial evidence, some of it already discussed in relation to upgrading, pointing to several reasons.

The first is that students are being denied permission to cross-track—or discouraged from seeking that permission—on the assumption that they cannot handle a more difficult assignment. As will be discussed later in this opinion, there is substantial evidence that in a good many instances these assumptions are mistaken. *See* Section F, *infra.*

Another reason, related to the first, is suggested in a report on the track system issued by the House Committee on Education and Labor after an extensive investigation of the District school system. (Ex. A-3.) The Report indicates that many students do not obtain effective, individual counseling on programs, counseling that is obviously necessary if a student is to be directed to a curricular program fitted to his needs and abilities. (Ex. A-3, pp. 52, 54.) [103] Absent this close attention, the student will remain locked into his assigned curriculum, unless the student or his parents are disposed to question the merits of that continued assignment. However, not only did Dr. Hansen acknowledge that many parents do not take an active role in planning their children's academic program (Tr. 322–326),[104] but in his book he acknowledged that the track system places the burden of proper programming more on the *school* than the parents.[105] It is evident that the school system is not wholly meeting that responsibility.

A third reason for limited cross-tracking, already noted, is the inability to qualify for the more advanced courses either for lack of the prerequisite fundamental courses or because of continuing academic deficiencies. *See* Section F, *infra.* A fourth reason, also noted above, is the substantial possibility that some school principals, or their staffs, take a very restrictive view of cross-tracking.

The data for the General Track require additional comment. First, the evidence does not reveal what per cent of the students cross-tracking from the General (and the Regular) Track were taking courses *below* their assigned track level. Therefore, even though 33.8% of the General Track students cross-tracked, they did not necessarily all move in the direction of enriching their curriculum; some unknown number undoubtedly were taking courses in the Special Academic

---

103. "It is a fact that the track system requires more careful counseling than does individual programming." HANSEN 53.

There are throughout the entire school system 237 school counselors whose function it is to assist teachers and principals in evaluating and programming students; and, at the high school level, to advise college-bound seniors. The ratio of counselors to students at the secondary level is about one to every 400 students; the indications are that this hampers adequate individual counseling. Adding to the problem is a shortage of clerical staff to assist the counselors. Of the elementary schools, almost half are without an assigned counselor. (Tr. 1600; Ex. 125; Ex. A-3, pp. 54, 66.)

104. Students' programs are sent home for parents' approval, there being a space for the parent's signature. Programs returned unsigned are construed as approvals. (Tr. 325.)

105. "Because pupils can more freely elect their own programs under the non-tracking system, the blame for bad choices can more easily be placed upon them and their parents." HANSEN 53.

curriculum.[106] Secondly, as shown by Table N, *supra,* in many schools the number of students cross-tracking from the General Track was well below the norm. Thus at Ballou High, where 54% of the student body was in the General Track (and another 7% in the Special Academic Track), only 4% of those students did any cross-tracking—96% being confined to courses taught strictly at the General Track level. At Coolidge, with 32% of the students in the General Track, only 20% cross-tracked—80% did not. At Anacostia, with 55% of the students in the General Track, 24% cross-tracked—76% did not.

The relatively low amount of cross-tracking out of the General Track becomes highly significant in light of the fact that certain academic subjects are accessible to General Track students only through cross-tracking into the Regular Track curriculum: algebra, plane and solid geometry, trigonometry, biology, physical science, chemistry, physics, and all foreign languages.[107] Moreover, in order to follow the General Track "Suggested Academic Sequence" in humanities, science or math a student must take a selection of these Regular Track courses. (Ex. G–1, pp. 26–27.)[108] This means, then, that the great majority of General Track students—who do not cross-track—finish school with no more than an elementary contract with higher math, the sciences, and none at all with foreign languages. Moreover, it should be recalled that the thrust of the General curriculum is to prepare students for going to work immediately upon graduation —which is reflected both in the course offerings and in the level of instruction. That this curriculum succeeds in *not* preparing students for further education is attested to by the fact that out of the 1,838 General Track students graduating with the June 1965 class only 34% continued their education, and only half of those were in full-time attendance in four-year colleges. (Ex. B-17, Ex. B-18, Ex. T-2.) And it is reasonable to assume that most or all of the latter were those who were able to obtain college-preparatory courses by cross-tracking into the Regular Track.

F. *Causes of Discrimination and the Collapse of Track Theory.*

Having seen how the track system in practice has become a relatively rigid form of class separation, the court now turns to a discussion of the principal causes of this result. In the preceding section some of the probable reasons for inflexibility were identified. Here the focus will be on the major institutional shortcomings that not only thrust the disadvantaged student into the lower tracks but tend to keep him there once placed. The first area of concern is the lack of kindergartens and Honors programs in certain schools; the second relates to remedial and compensatory programs for the disadvantaged and educationally handicapped student; and the third, and most important, involves the whole of the placement and testing process by which the school system decides who gets what kind of education.

1. *Kindergartens and Honors Tracks.*

*Kindergartens.* The court has elsewhere noted that, although the District

---

106. This is a reasonable inference since the only remedial reading and arithmetic courses offered are in the Special Academic curriculum. Presumably some General Track students would require these courses. (*See* Ex. G–1, p. 46; Ex. 9, C–16.)

107. Some exposure to algebra, geometry, and the various sciences is provided in the regular General Track math and science courses; however, to obtain particularized instruction the student must go to the Regular Track courses. (Ex. G–1, pp. 26–38.)

108. Of the five subject matter areas in which cross-tracking took place, 87% of the cross-tracking General Track students took courses in foreign languages, mathematics, or science categories. (Ex. 139.)

Undoubtedly it is the *necessity* for cross-tracking which accounts in large part for the relatively higher per cent of students with cross-tracked programs in the General Track as compared with students in other tracks.

does not compel kindergarten attendance, it does provide such programs on a space-available basis. What this means in actual result is that kindergartens are available in all the white elementary schools, but either not available or available only to a limited number of students in many of the predominantly Negro schools. (*See* Findings III–H, *supra.*) Because of this a vast number of young schoolchildren who, by defendants' own admission, most need educational training as early as possible are not getting it. This has two implications for the track system.

First, for these disadvantaged children a full year is going by them when they could be in school being readied for the challenges of the regular first grade curriculum. They could be learning the language and reading skills that are indispensable to their success in the whole of their academic career. Instead they are being turned away for lack of space, whereas other children are in the process of getting a full year's head start on their education. According to one of defendants' expert witnesses, that head start is of critical importance to a student's future achievement in school. (Tr. 6382–6383.) But in the context of the track system it becomes doubly important because once the students begin to be separated into tracks the level of a student's achievement largely controls the kind of education he will receive.

Compounding the first point is the immediate effect on the child who comes to school without having had kindergarten. As described in Section C, *supra*, the District tests all students prior to enrolling them in the normal first grade curriculum; those who are deficient in reading and language skills are placed in the Junior Primary class—in effect, a late-starting year of kindergarten instruction. Thus the disadvantaged Negro child, almost invariably retarded in language and reading skills and denied access to kindergarten, is sidetracked into the Junior Primary and thus loses another year on those who are able to forge ahead on schedule. Again, the risk that

this will prejudice the kind of education the student is able to qualify for in the future is substantial.

*Honors.* The disadvantaged Negro is not denied access just to kindergarten but also risks not having the Honors Track available at his school. As discussed in Section D, *supra*, this is a denial of an opportunity for advanced work that can handicap a student when he moves into junior or senior high school and begins to compete with students who have had access to Honors programs.

\* \* \* \* \* \*

It is impossible to tell with certainty how many of the low achieving students in the District are doing so because they have been handicapped by not having kindergarten or Honors instruction; to make such a determination would require follow-up studies that the school system has not made. Nevertheless, it cannot be ignored that the track system places a premium on a student's present ability to perform successfully in school and that that emphasis favors those who are given the opportunity to develop the skills needed for success—and disfavors those denied the opportunity. Consequently, the court is persuaded that the prevalence of disadvantaged Negroes in the lower tracks and the prevalence of the white and the more affluent students in the upper tracks, is to a significant extent linked to these disparities in course offerings.

2. *Remedial and compensatory education.*

One purpose of the track system is to facilitate remedial education for students who are temporarily handicapped in basic academic skills. In addition, the school system has recognized that it must provide a substantial number of its students with special compensatory education programs for there to be any real hope of their becoming qualified for the more advanced tracks. There is substantial evidence, however, that neither the remedial nor the compensatory education programs presently in existence are adequate; rather the disadvantaged student consigned to the lower track tends

simply to get the lesser education, not the push to a higher level of achievement.

a. *Remedial programs: curricular.*

*Special Academic Track.* Within the regular academic curriculum remedial training is provided primarily through the Special Academic Track. Such features as special instructional materials, reduced class size, and specific remedial courses are available only in this Track. (Tr. 4039, 6059–6062, 6105, 6107; Ex. G–1, p. 46; Ex. 9; Ex. C–16.)

Assuming that conditions prevailing in the Special Academic Track represent the optimum for intensive remedial instruction, it is clear that very few students partake of the optimum. As Table A (Section D, *supra*) shows, the per cent of students wholly enrolled in the lowest track has been relatively small over the years and, in fact, is declining. The only other way of obtaining whatever benefits may be said to accrue from Special Academic classes is for the student to be partially enrolled on a subject-matter basis by way of cross-tracking. But as has been seen in Section E, *supra*, there is not much cross-tracking—either upward or downward.

Defendants have made it quite clear that a child placed in a Special Academic class will receive a slower-paced, simplified course of instruction.

*General Track.* As indicated above, there is within the overall framework of the General Track a certain amount of further subgrouping. (*See* Section C, *supra*.) Presumably, given the commitment to homogeneity in grouping, this permits teachers to concentrate on a class of children of like ability levels; however, there is no indication that the low pupil-teacher ratio found in the Spe-

cial Academic Track prevails. Moreover, although there is testimony suggesting that special remedial programs may be adopted in the lower ability groupings in this Track—at least in elementary schools (Tr. 4072–4074)—there is no evidence of a systematized remedial program being included within the General curriculum itself. Instead, as with the Special Academic Track, the prevailing philosophy is to teach children at existing ability levels; those that indicate potential for a more advanced curriculum must be approved for cross-tracking or upgrading. (Tr. 4040.) And again, as with the Special Academic Track, evidence of such intertrack movement shows relatively few moving up. (*See* Section C, *supra*.) What has not been made clear, however, is how a student given a steady diet of simplified materials can keep up, let alone catch up, with children his own age who are proceeding in a higher curriculum at a faster pace and with a more complex subject-matter content.[109] While much has been made of the "enriched" Honors curriculum (Ex. B–11, ch. 9; Ex. 9; Ex. C–16), nothing has been said to indicate that the slow learner—who almost certainly is in some degree slow due to a disadvantaged background—is also given an enriched curriculum to stimulate him to higher achievement. (*See* Tr. 6106–6107.) Rather the pervading spirit of the Special Academic Track—captured in the General Track as well—seems to be essentially a negative one: slow the pace, teach less, and hope that what is learned will be "useful." But what the disadvantaged child needs most—by defendants' own admission—is not just instruction watered down to his present level of ability[110]; he needs stimulation, enrichment and challenge to assure

109. There is some evidence that a child will, in the process of being upgraded to the General Track, be gradually phased into the higher curriculum. (Tr. 4040, 6215–6217.) Assuming that this is the principal method by which a child is exposed to more complicated course work, as the evidence on cross-tracking and upgrading makes clear, relatively few Spe-

cial Academic students are getting other than the simplified curriculum. (*See infra*.)

110. Defendants' witness, Dr. George B. Brain, until recently Superintendent of the Baltimore, Maryland, school system and now Dean of the College of Educa-

that his present temporary handicaps do not by educational conditioning become permanent.[111] That this stimulation has not been forthcoming from the Basic curriculum is clear from the lack of upward movement from that Track. (*See* Section E, *supra.*)

b. *Special remedial and compensatory education programs.*

It is because of the high proportion of disadvantaged children in the District school system that it is imperative that special programs outside the regular school curriculum be adopted so that the disadvantaged child has a real opportunity to achieve at his maximum level of ability. (Defendants' Proposed Findings, pp. B–4 to B–7, B–13 to B–14.) [112]

Inevitably children from the lower socio-economic levels will tend to have had a very limited background conducive to developing communicative skills of the kind required for success in the normal academic curriculum. They will tend above all to be handicapped in the use of standard English, a problem aggravated in the case of ghetto Negro children. Consequently, unless these children are given intensive remedial instruction in basic skills, primarily in reading, and unless they are given the opportunity to enjoy some of life's experiences that will, by bringing them into contact with new things and concepts, stimulate verbal abilities, they will be condemned to a substandard education. In the con-

tion at Washington State University, stated it thusly:

"Q Now, Dr. Brain, you spoke in terms of, I think, the principle of compensation as far as the educational requirements of the disadvantaged are concerned. Could you indicate to me what you meant by compensation?

"A Well, compensatory education does not imply, in my definition, any watered down program of education. Rather, it implies and would mean more than just the basic elements of education that commonly would be afforded children coming from average circumstances. It means that because of certain limitations in the environment of the child and the circumstances of the child that the school must take on functions that typically would have been carried on by the home or other institutions in the community; and this means such things as, for example, providing breakfast for a hungry child, because a child who hasn't been fed and who is hungry and who is poorly clothed is not ready for an educational experience. You just don't teach a hungry, undernourished, poorly clothed child.

"So in this sense the school takes on obligations for children of poverty and of disadvantaged circumstances where it has been totally unable for the family and the child to provide those particular needs.

"Q It wouldn't mean, would it, Doctor, taking disadvantaged children and segregating them from the rest of the school population?

"A No, I would think that would be entirely uncommon in the philosophies

of American educators, at least, those who I know who work in public schools." (Tr. 5071–5072.)

111. "Because many believed that some children are victimized by social circumstances, the basic track fell into disrepute almost from the first. In wanting to educate the pupil at this level of achievement when. he entered the program, the schools encountered the possibility of undereducating pupils whose retardation was chiefly environmental." HANSEN, *supra*, at 133. While Dr. Hansen now apparently agrees with those who see some children as being victims of circumstance, he has not yet conceded the possibility of undereducation.

112. Dr. Hansen has described the problem of the disadvantaged student as follows: " * * * All too frequently these pupils grow up in an environment which severely retards their educational growth. Unfortunate thousands of them struggle against tremendous odds—inadequate family income; inadequate food, clothing and shelter; inadequate supervision, inadequate educational support; and inadequate cultural, recreational, and vocational opportunities. These inadequacies, evidenced by insufficient preparation for entry into the public schools, poor command of the English language, lack of motivation and parental support, result in poor achievement, an increasing lack of interest in the school and its programs and an excessively high number of school dropouts." (Ex. A–35.)

text of the track system, this is especially important because a child is not even given the exposure to advanced subject matter unless he can meet the qualifications set for the higher levels—*e. g.*, the Regular and Honors Track curricula, especially.

Defendants, fully aware of the importance of remedial and compensatory education and professing to be committed to developing such programs in order to assure equal educational opportunity, have attempted to show that the District is indeed possessed of a substantial number of such programs. (Defendants' Proposed Findings, pp. B–7 to B–9; C–3 to C–4; Ex. 1; Ex. 25; Ex. 27; Ex. 126.)

A review of defendants' evidence in this regard does reveal a substantial number of projects which run the gamut from physical fitness and breakfast programs, art and music programs, work-study programs, to various remedial and cultural enrichment projects. (Ex. 1; Ex. A–35; Ex. A–36; Tr. 586, 2635–2642, 2677–2687.) Most of them are of very recent vintage, many having been instituted since 1965 as a result of various federal and foundation fundings. Nonetheless, upon close examination it becomes painfully obvious that few if any of these programs have as yet been able to reach with any intensity the great number of disadvantaged children enrolled in the District schools. Because it is impossible to discuss all of the programs in detail, the court will briefly describe some of the major ones.

Before doing so, in order that the magnitude of the problem can be appreciated and the relative impact of the following programs be seen in true perspective, the following data should be noted:

(1) The total school enrollment in regular day school classes in 1965–66 school year was 126,695 students. 116,011 (91.5%) were in either the Special Academic or General Track. Although there is no way of knowing exactly how many of the students in these tracks might have been higher placed but for their disadvantaged circumstances, given the correlation between status and achievement it is fair to assume that a majority of the 116,000 would fall in this category.

(2) Since the major handicap of the disadvantaged child lies in his low reading ability, the results of the reading achievement tests given to various grade levels throughout the District in 1966 provide an estimate of how extensive and widespread is the need for remedial reading programs. The scores have been given only on a school-by-school basis. At the 11th grade level, six of the 11 senior high schools were below the national median. At the ninth grade level, 22 of the 27 junior high schools were below median. At the sixth grade level, 91 of 127 elementary schools were below median; and at the fourth grade level, 87 of 129 were below median. (Court Ex. 4.)

*Reading Clinic.* The school system operates a remedial reading clinic under the general supervision of the Deputy Superintendent of Schools. This includes a main reading clinic, four diagnostic clinics, and 62 reading centers serving 68 of the 131 elementary schools and 22 of the 38 secondary schools.[113] The Reading Clinic is staffed by a supervising director, five assistant directors, 96 or 99 reading specialists, 50 reading clinicians, and three diagnosticians; the reading specialists teach remedial reading in a class situation, the clinicians treating individual cases. Some specialists are teaching in the Special Academic Track, but the Clinic's main program appears to be directed at students outside that Track. Although the 1949 Strayer Report recommended that enrollment in remedial classes should not exceed 18 students, due to lack of trained personnel "it has been necessary to operate with per teacher loads larger than those suggested." (Ex. A–33, pp. 43–44; Ex. 27; Tr. 2265–2267.)

---

113. There is no evidence as to which schools do *not* have reading centers.

*Language Arts Program.* Like the Reading Clinic, this program is an established department within the school system and operates through the regular elementary school curriculum. It has been in existence since January 1961. As its name implies, the Program is directed at improving language skills through special instruction and field trips. Only 14 elementary schools are served by the Program, however, which reaches 7,400 children at kindergarten through third grade levels.[114] The Program also runs during the summer. (Ex. 1, pp. 105, 112; Ex. 126; Tr. 3043–3044, 6118.)

*Model School Division.*[115] Several remedial reading programs or cultural enrichment programs are operated under the umbrella of the Division. For example: The Accelerated Progressive Choice Reading Program, serving 352 children in sixth and 10th grade classes; the Pre-School Program, serving 400 disadvantaged three- to five-year-olds in five preschool centers; Project Cultural Enrichment, which has sponsored 14 concerts and has taken a group of Cardozo High School students to a local play; the Reading and Tutoring Program, with 125 high school students providing biweekly tutoring for 125 elementary schoolchildren. (Ex. 1, pp. 35, 39, 40, 48; Ex. 126.)

*Other.* The Urban Service Corps sponsors a number of programs similar to those described for the Model School Division, including the Widening Horizons Program which has provided tours during the summer months for between 2,000 and 2,500 students. (Ex. 1, pp. 29, 31; Ex. 126. *See generally* Ex. 1, pp. 3–32.) As of June 1965, 800 students were being tutored under the auspices of the Urban Service Corps. (Ex. 126.) Programs established under federal funds have included various enrichment projects, distribution of free paperback books, efforts to detect and deter potential drop-outs, and the hiring of 360 part-time teacher's aides. (Tr. 2635–2642, 2677–2687.)

All of these programs are of course commendable; indeed they are vital to the future of Washington's public school system. But as yet they have not gone far enough. They cannot obscure the sad fact that the vast majority of the disadvantaged school children in this school system, if not altogether untouched by remedial and compensatory programs, are at best touched only in passing. It is true that the schools alone cannot compensate for all the handicaps that are characteristic of the disadvantaged child; but it is the schools that must—as defendants admit—lead the attack on the verbal handicaps which are the major barrier to academic achievement. (Defendants' Proposed Findings, p. B–13.)

The track system adds to that obligation, however, because tracking translates ability into educational opportunity. When a student is placed in a lower track, in a very real sense his future is being decided for him; the kind of education he gets there shapes his future progress not only in school but in society in general. Certainly, when the school system undertakes this responsibility it incurs the obligation of living up to its promise to the student that placement in a lower track will not simply be a shunting off from the mainstream of education, but rather will be an effective mechanism for bringing the student up to his true potential. Yet in the District the limited scope of remedial and compensatory programs, the miniscule number of students upgraded, and the relatively few students cross-tracking make inescapable the conclusion that existing programs do not fulfill that promise.

### 3. *Placement and testing.*

What emerges as the most important single aspect of the track system is the process by which the school system goes about sorting students into the different

114. Total enrollment in all elementary schools for 1966–67 was 85,513 pupils. (Ex. 146.)

115. *See* Finding III–H–3 *supra.*

tracks. This importance stems from the fact that the fundamental premise of the sorting process is the keystone of the whole track system: that school personnel can with reasonable accuracy ascertain the maximum potential of each student and fix the content and pace of his education accordingly. If this premise proves false, the theory of the track system collapses, and with it any justification for consigning the disadvantaged student to a second-best education.

Plaintiffs' contention is that the sorting process is based largely on information about a student obtained from testing, specifically standardized tests of achievement and scholastic aptitude. The issues plaintiffs raise with regard to testing and placement are two: First, tests are not given often enough, with the result that a few test scores have an enormous influence on a child's academic career. Second, the tests which are used, and which are of such critical importance to the child, are wholly inappropriate for making predictions about the academic potential of disadvantaged Negro children, the tests being inherently inaccurate insofar as the majority of District schoolchildren is concerned. Both of these circumstances, plaintiffs allege, lead to artificial and erroneous separation of students according to status, and result in the undereducation of the poor and the Negro.

Defendants dispute all of plaintiffs' points. First, they say, tests are but one factor in deciding where to place a student. Second, tests are given often enough where needed. Third, the tests used are appropriate and do give valid results for placement purposes. The first two points of contention can be readily disposed of; it is the third point that raises the most difficult questions.

a. *Fundamentals of track placement.*

To review briefly, the tripartite division of the curriculum at the elementary school level takes place midway through the fourth grade, this being the point in time the school system considers it appropriate and feasible to identify with some certainty those children who are gifted—or potentially so—and those who are retarded. (Tr. 231–234, 241.) [116] The majority of students continue in the General curriculum, although within that Track there are subgroupings by ability levels. Evaluation of students is to be a continuing process, although special emphasis is given to evaluation in the sixth and ninth grades as the students prepare to move into either junior or senior high school.[117] (Tr. 264, 309, 319–321.) The fruits of this evaluative process have already been examined above in the section dealing with movement between tracks—*i. e.*, upgrading, downgrading and cross-tracking.

Those charged with making the decision as to what curriculum best fits the individual student are the student's teacher, his principal, the school counselor, and in special cases the staff of the Department of Pupil Personnel Services—especially a clinical psychologist. (Tr. 232, 241–242, 308–309, 337, 405–406.) As a practical matter, the burden of the placement decision rests with the teacher. The teacher is the one who, through daily contact with the student, presumably knows him best. Equally important, it is the teacher who gives the grades and records the comments that go into making up the student's "paper image," which follows him through school as a part of his file; and it is the teacher who, in the day-to-day teacher-pupil relationship, greatly influences how the student acts and how well he succeeds in school.

116. Actually, some retarded students are identified and placed in Special Academic classes as early as the first grade; and there is the Junior Primary class for slow-starting first graders.

117. Because the school year breaks into semesters, placement changes normally occur at mid-year or with the start of each new school year in September. However, principals have been authorized to place students in the Special Academic Track at any time during the school year, subject to appropriate clearances. (Tr. 241–242.)

To set the approximate boundaries of the respective tracks, the school system has issued fairly specific criteria to guide the teacher and others in making placement decisions. (*See* Section C, *supra*.) Those criteria include a number of elements: grades, classroom performance, maturity, emotional stability, physical condition, attitude—and performance on standard achievement and scholastic aptitude tests. (Tr. 307–308, 323, 337, 1494–1495, 1601–1603, 3108–3109; *and see* Section C, *supra*.)

For the most part, the tests used in the District are group tests—that is, tests one teacher can give to any number of students at the same time. The group tests used in the school system in 1965 (assumed for purposes of this case to reflect those currently in use) are shown in Table T–1, in the Appendix. In addition to group tests, individual aptitude tests will under present policy be given to students recommended for placement in the Special Academic Track.[118] Because of a lack of resources, however, it is not feasible to give individual tests to students not being considered for the Special Academic curriculum, except in occasional "special" circumstances. (Tr. 20–22, 308–309, 391–392.)

Throughout, defendants have tried to play down the importance of tests in the placement process. They have not, however, been wholly consistent in this, nor do the facts permit such a conclusion. The court does accept the general proposition that tests are but one factor in programming students; but it also finds that testing looms as a most important consideration in making track assignments. There are several reasons for this finding.

First, as a review of the official criteria makes obvious, there is a heavy emphasis on achievement and aptitude test scores, including IQ levels.[119]

Second, and more importantly, the proper operation of the track system practically demands reliance on test scores. For one thing, classes are designed to serve students of similar achievement or ability levels, and this requires uniformity in the standards by which students are selected for placement in particular classes. For example, if teachers have different concepts of what constitutes "above average," placement decisions will vary accordingly and the homogeneity of the classes will be undermined. Thus, as defendants have said, a "distinct advantage of the standardized achievement test exists in the fact that it measures the performance of each pupil against a single scale so that the academic growth of a child may be accurately measured." (Defendants' Proposed Findings, p. G–3.)[120] But the most critical aspect of the track system that elevates the importance of testing is the necessity of predicting a student's maximum educational potential. It is in aiding the educator, especially the teacher, to discharge this awesome responsibility that tests become "indispensable for optimum and accurate placement

---

118. This marks a change in policy instituted in September 1965, at least in part in response to criticisms charging that students had been improperly assigned to the Special Academic Track. (Tr. 390–408.) A disturbing by-product of this change is discussed *infra*.

119. *E. g.*, "a student is functioning three or more years below grade level as shown by achievement tests * * *; his mental retardation is indicated by an IQ index of 75 or below" (Ex. B–11, pp. 52–53); "mental ability indicated to be in the upper quartile * * *" (*id.* at 52); "generally, high normal IQ, or above * * *." (Ex. G–1, p. 14.) *See* Tr. 232–233, 257–258, 264, 307–308, 353, 1494–1495, 1601–

1603, 3108–3109. *See generally* Section C, *supra*.

Dr. Hansen indicated in testimony that he thought the school system will "ultimately" abandon the Otis test, the only group test producing an IQ score. (Tr. 257.) He did not indicate when the abandonment might come about. Moreover, scholastic aptitude tests will remain in use, as will individual IQ tests.

120. "Standardized tests provide an independent yardstick that complement the judgment teachers or the school administration staff otherwise make concerning students." (Defendants' Proposed Findings, p. G–13.)

within various pupil ability groupings." (Defendants' Proposed Findings, p. G–15.) [121] It escapes the court, therefore, how defendants can possibly suggest that tests do not have a decisive influence on pupil programming decisions. (*Cf.* Tr. 405–406.)

b. *Frequency of testing.*

Turning to the question of frequency of testing, the court makes reference to Table T–1 (Appendix). That Table shows that between kindergarten and 12th grade a student will receive the following group tests: (1) a first-grade readiness test (kindergarten or prior to enrollment in first grade); (2) a reading and spelling achievement test (second grade); (3) one achievement test and one aptitude test in each of three grades (sixth, ninth and 11th). In addition, optional aptitude tests may be given in the seventh, ninth, 10th or 12th grades; but there is no evidence of how many students are actually tested under the optional program. Individual tests, as indicated earlier, are confined almost entirely to those students recommended for placement in the Special Academic Track.

A student tested only according to the mandatory schedule will take a total of six aptitude tests of various kinds and five achievement tests of various kinds. Four of the six aptitude tests and three of the five achievement tests are given in elementary school, and one of each at both the junior and the senior high levels. Under such a program a student may go as many as three years without undergoing new tests (sixth grade to ninth grade; ninth grade to 11th grade), so that his most recent test scores may be as much as three years old.

There is a distinct possibility that students are not seriously reevaluated for upgrading except when the time for mandatory testing comes around; moreover, any evaluations in the interim would be based on what might in a year's time become stale data. This would tend to account for the relatively limited amount of upgrading and cross-tracking found to exist. While there is insufficient evidence of a clear causal relationship of this sort, the inflexibility of tracking is an indisputable fact. This, at least, does create substantial doubt as to the sufficiency of the testing schedule, although the lack of evidence precludes an ultimate finding in this regard.

c. *The use and misuse of tests.*

The court now turns to the crucial issue posed by plaintiffs' attack on defendants' use of tests: whether it is possible to ascertain with at least reasonable accuracy the maximum educational potential of certain kinds of schoolchildren. This question goes to the very foundation of the track system since, as was seen in Section B, *supra,* one of the fundamental premises of track theory is that students' potential can be determined.[122] On this premise rests the practice of separating students into homogeneous ability groups; and most importantly, on this premise rests the sole justification for a student's being *permanently* assigned to lower track classes where the instructional pace and content have been scaled down to serve

121. Lest there be any doubt as to the weight defendants place on tests, the following are representative of the virtues defendants have asked the court to find as inhering in tests and their use: "[Aptitude tests] are tests which are special in the sense that they help an educator to judge the likelihood of success a student [will have] in a particular educational * * * endeavor." "An intelligence test is of special assistance to a teacher in evaluating among pupils * * *." "In the employment of standardized tests the school system including the classroom teacher, the guidance counselor, the superintendent and administrators acquire a source of information about students' talents, accomplishments and progress and about the efficacy of the educational program that could be obtained in no other fashion." "The test result can display objectively the peculiar ability an individual pupil may possess. The test achieves that result apart from subjective criteria * * *." (Defendants' Proposed Findings, pp. G–3, G–5, G–12, G–15.)

122. *See* Note 119 *supra*, HANSEN 44.

students of supposedly limited abilities. That is, according to track theory, those who remain in a lower curriculum remain *because they are achieving at their maximum level of ability.*[123] They are not admitted to—or are at least discouraged from seeking admission to—a higher instructional level because the school system has determined that they cannot "usefully" and "successfully" rise above their present level. The evidence that defendants are in no position to make such judgments about the learning capacity of a majority of District schoolchildren is persuasive. Because of the importance of testing to the process of evaluating and programming students, the evidence has focused primarily on tests. However, necessarily bound up in the question of testing is the larger problem of the whole evaluation process —how the school goes about deciding who gets what kind of education. Plaintiffs' attack strikes at the heart of this process.

Briefly, plaintiffs make two contentions. First, they allege that for technical reasons the tests being used in the District cannot provide meaningful or accurate information about the learning capacity of a majority of District schoolchildren. Second, largely because of misleading test scores these children are being misjudged and, as a result,

undereducated. Although both arguments have a common basis in the technical aspects of testing, they raise somewhat separate questions. The following discussion will therefore begin with a review of the evidence concerning tests in general before turning to the specifics of plaintiffs' arguments.

(1) *Test structure.*[124]

(a) *The nature of scholastic aptitude tests.*

There are essentially two types of tests used in educational evaluation, achievement tests and scholastic aptitude tests. An *achievement* test is designed primarily to measure a student's level of attainment in a given subject, such as history, science, literature, and so on. The test presumes the student has been instructed in the subject matter; it seeks to find out how well he has learned that subject. Although achievement test scores play an important role in placement decisions, their use has not been seriously questioned by plaintiffs except to the extent the test scores tend to reinforce already erroneous decisions.[125] Consequently, the discussion here will center on aptitude tests.

A *scholastic aptitude* test is specifically designed to predict how a student will achieve in the future in an academic curriculum.[126] It does this by testing

123. Of course there are students who will underachieve despite the best efforts of the school system. However, track system theory postulates that most of these students could be identified as having potential to exceed present achievement levels.

Other reasons for lack of movement would be inadequate counseling or insufficient remedial instruction; but these would be considered failures to carry out track theory, not justifications. *See* HANSEN 53. As has been seen already, there is substantial evidence that these breakdowns have occurred in the District and are in part responsible for low mobility. *See* Sections E, F–2, *supra.*

124. The following discussion is based on the testimony of these expert witnesses: Dr. Marvin G. Cline (Plaintiffs; Tr. 1308–1435, 1652–1802, 6543–6684); Dr. Roger T. Lennon (Defendants; Tr. 3147–3571); Dr. John T. Dailey (Defendants; Tr. 6245–6396). The court also has had

occasion to refer to these standard textbooks to clarify minor technical matters: A. ANASTASI, DIFFERENTIAL PSYCHOLOGY (3d ed. 1958); L. CHRONBACH, ESSENTIALS OF PSYCHOLOGICAL TESTING (2d ed. 1960); L. TYLER, THE PSYCHOLOGY OF HUMAN DIFFERENCES (2d ed. 1956).

125. *See* "Misjudgments" *infra.*

126. There are other kinds of aptitude tests, used to predict success in some kind of occupation or training course. *See generally* L. CHRONBACH, *supra* Note 124, at 17–36. Having noted the distinction, the court will use the terms "scholastic aptitude tests" and "aptitude tests" interchangeably in this opinion.

The scholastic aptitude tests focused on in this lawsuit have been group tests as distinguished from individual tests. The types of group aptitude tests in current use are listed in Table T–1, Appendix.

certain skills which have come to be identified as having a high correlation with scholastic achievement. Once a student's present proficiency in these skills is ascertained, an inference is drawn as to how well he can be expected to do in the future.

The skills measured by scholastic aptitude tests are verbal. More precisely, an aptitude test is essentially a test of the student's command of standard English and grammar. The emphasis on these skills is due to the nature of the academic curriculum, which is highly verbal; without such skills a student cannot be successful. Therefore, by measuring the student's present verbal ability the test makes it possible to estimate the student's likelihood of success in the future.

Some aptitude tests may include questions that are nonverbal in content so as to circumvent possible verbal handicaps. Technically, nonverbal tests are nonlanguage tests of reasoning processes thought to be indicative of ability to handle academic tasks successfully. (Tr. 6273.) The usual type of question consists of geometric symbols or drawings, the student being required to perceive and analyze relationships among a group of symbols. The process is variously termed "abstract reasoning," "spatial perception," or the like. As with verbal tests, prediction is based on how well a student is able to answer nonverbal questions.

The scholastic aptitude tests used in the District school system are verbal, with the exception of one series (TOGA) which includes a nonverbal component.[127] The Otis test, given in the sixth grade and the only group test producing an IQ score, is verbal. See Table T-1, Appendix.

Whether a test is verbal or nonverbal, the skills being measured are *not* innate or inherited traits. They are learned, acquired through experience. It used to be the prevailing theory that aptitude tests —or "intelligence" tests as they are often called, although the term is obviously misleading—do measure some stable, predetermined intellectual process that can be isolated and called intelligence. Today, modern experts in educational testing and psychology have rejected this concept as false. Indeed, the best that can be said about intelligence insofar as testing is concerned is that it is whatever the test measures. (Defendants' Proposed Finding 16.) In plain words, this means that aptitude tests can only test a student's present level of learning in certain skills and from that infer his capability to learn further.

Of utmost importance is the fact that, to demonstrate the ability to learn, a student must have had the opportunity to learn those skills relied upon for prediction.[128] In other words, an aptitude test is necessarily measuring a student's background, his environment. It is a test of his cumulative experiences in his home, his community and his school. Each of these social institutions has a separate influence on his development; one may compensate for the failings of the others, or all may act in concert and reinforce each other—for good or for ill.

(b) *Causes of low test scores.*

A low aptitude test score may mean that a student is innately limited in intellectual ability. On the other hand, there may be other explanations possible that have nothing to do with native intelligence. Some of those reasons are pertinent here.

As the discussion in the preceding section indicated, one of the important factors that could account for a low test score is the student's *environment.* If a student has had little or no opportunity to acquire and develop the requisite verbal or nonverbal skills, he obviously cannot score well on the tests.

---

127. In a broad sense, the Metropolitan Readiness test might also be classed as nonverbal.

128. According to defense witness Dailey, that "opportunity is about 90 per cent being fortunate enough to have a home where standard English is spoken during the formative years." (Tr. 6376.)

Another source of variation is the student's *emotional* or *psychological condition* when he takes the test. He may have a poor attitude toward the test or the testing situation, generally characterized as apathy. This may be due to lack of motivation; or it may be a defensive reaction caused by worry or fear —what has been called "test anxiety." Anxiety can also cause extremely nervous reactions. All of these behavior patterns will cause the student to perform poorly on a test, either because he panics and forgets what he knows or rushes through the test skipping questions, guessing at answers, or otherwise acting carelessly.

Some tests are constructed to take account of some behavior variations. In general, however, every test score must be interpreted by those who intend to rely on them for making decisions about the individual student. Test publishers warn that scores must be evaluated in terms of the individual so as to discover, if possible, any nonintellectual variables that could have influenced the student's test score.

(c) *Test standardization.*

A standardized test is one for which a norm or average score has been established so that subsequently obtained scores can be comparatively evaluated. A test is standardized on a selected group of students whose scores are distributed to obtain a median; the median then becomes the norm for that test. Usually the standard is a national one, in the sense that the test publisher seeks to recreate in the norming group a representative cross-section of American schools. Tests may also be standardized on a local basis so as to enable comparisons between students from the same community. All the group aptitude tests used in the District are nationally standardized.

The test norm or median score can be expressed in a number of ways. The most common today is a percentile score, the national median being the 50th percentile. Another commonly used measurement is the IQ, or intelligence quotient, the norm being 100. Often scores will be expressed in percentile ranges or bands so as to make clear the element of measurement error inherent in any test; thus an average score might be expressed as falling within the 48–52 percentile range.

The norming group of students is selected according to certain factors. The principal ones are socio-economic and cultural status, as defined by the median annual income and average amount of schooling of the adults in the students' community. Other factors considered are region and school size. Race is not a controlled factor. Given the demography of the total population, the standardizing group will be predominantly white and middle class. Defendants' expert, Dr. Lennon, estimated that at least 60% of the group would fall into this category; the breakdown of the remaining 40 or less per cent was not given.[129]

(2) *Testing the Disadvantaged Child.*

Having touched generally upon the technical aspects of scholastic aptitude testing, it is now possible to give attention to plaintiffs' specific arguments. At base they are focusing on an area of educational testing that has been given close attention only in recent years: the testing of the disadvantaged child.[130]

129. The per cent of Negroes in a sample group will vary. The norming groups for Harcourt-Brace-World's Stanford and Metropolitan Achievement Tests included from 5 to 7% Negroes. (Tr. 3391, 3416, 3421–3422.) As of 1960 the per cent of Negroes in the total population was as follows in these age groups: Ages 5–9, 12.8% Negro; ages 10–14, 11.8% Negro; ages 15–19, 11.3% Negro. (Tr. 3553–3554.) No figures are available as to the per cent of Negroes in school; Dr. Lennon did express the belief that the per cent of Negroes declined the higher the grade level.

130. *See, e. g.*, American Council on Education, Testing Problems in Perspective (A. Anastasi ed. 1967); K. Eels *et al.*, Intelligence and Cultural Differences (1951); F. Riessman, The Culturally Deprived Child (1962); P. Sexton, Education and Income (1961); Deutsch & Brown, *Social Influences in Negro-White Intelligence Differences*, 20 J. Social Issues 24

The issue plaintiffs have raised is whether standard aptitude tests are appropriate for making inferences about the innate intellectual capabilities of these children.

Although the term "disadvantaged" is by nature imprecise, a working definition adopted for purposes of discussing educational problems is commonly based on two factors: the child's socio-economic status, as measured by the family's annual income; and his cultural status, as measured by the number of years of schooling attained by his parents. Both of these factors have been identified as having a high correlation with achievement both in school and in society generally, since they tend to reflect the kinds of background more or less conducive to developing scholastic-type skills. There are also indications that racial factors may well have some separate bearing on whether a child can be considered disadvantaged.

As was noted in Section D, *supra*, a substantial portion of the District's Negro schoolchildren can be characterized as disadvantaged. According to most recent census data (1960), the median annual family income within the District of Columbia is $5,993. For white families the median is $7,692. For Negroes the median is $4,800, placing at least 50% of the Negro families within a poverty range. In 1964 about 17% of the elementary school pupils lived in census tracts where the median family income was under $4,000; two-thirds lived in zones where income was under $6,000. The vast majority of these pupils were Negro. (Ex. 124; Ex. V–9; Ex. V–16.) As far as educational attainment is concerned, the pattern is the same. In 1960 the median years of schooling of all adults over 25 was 12.4 years for whites and 9.8 for Negroes. Of those with less than five years of schooling, 75% were Negroes. At least one-third of the elementary school pupils live in tracts where the educational level is under 10 years. Almost eight out of 10 elementary school pupils live in areas where the majority of the adults have not completed high school. (Ex. 124; *see generally* Defendants' Proposed Findings pp. B–4 to B–5.)

(a) *Handicaps to learning.*

Disadvantaged children typically are saddled with tremendous handicaps when it comes to competing in the ethnocentric academic society of public schools. That society, mirroring American society generally, is strongly influenced by white and middle class experiences and values. While there is nothing necessarily wrong about this orientation, it does raise certain barriers for lower class and Negro children —barriers that are to be found in most aptitude tests as well.

1. *Environmental factors.* The chief handicap of the disadvantaged child where verbal tests are concerned is in his limited exposure to people having command of standard English. Communication within the lower class environment, although it may rise to a very complex and sophisticated level, typically assumes a language form alien to that tested by aptitude tests. Slang expressions predominate; diction is poor; and there may be ethnically based language forms. The language spoken by Negro children in the ghetto has been classified as a dialect.[131]

---

(April 1964); *cf.* J. CONANT, SLUMS AND SUBURBS (1961). *See generally* EDUCATION IN DEPRESSED AREAS 101–235 (A. H. Passow ed. 1963).

The College Entrance Examination Board has formed a National Commission on Tests to investigate testing practices and assumptions. One area being given close attention is the testing of the culturally disadvantaged and members of distinctive cultural groups. *See* D. GOSLIN, CRITICISMS OF STANDARDIZED TESTS AND TESTING (May 1967), a report recently delivered to the Commission members.

131. Some fairly typical language usage is cited in one of plaintiffs' exhibits:
"You no longs in dis class."
"What ah sposed to did?"
"What do bunch mean?"
"Ah seed im."
"He done seed me."
"How old you was den?"
"Gi it tu me."
"What do praise mean?"
(Ex. C–10, p. 11.)

Other circumstances interact with and reinforce the language handicap. Verbalization tends to occur less frequently and often less intensively. Because of crowded living conditions, the noise level in the home may be quite high with the result that the child's auditory perception—his ability to discriminate among word sounds—can be retarded. There tends to be less exposure to books or other serious reading material—either for lack of interest or for lack of money.

The disadvantaged child has little or no opportunity to range beyond the boundaries of his immediate neighborhood. He is unfamiliar, therefore, with concepts that will expand both his range of experiences and his vocabulary. He has less exposure to new things that he can reduce to verbal terms. For example, one defense witness, a principal of a low-income Negro elementary school, told of how most of the children had never been more than a few blocks from home; they had never been downtown, although some had been to a Sears department store; they did not know what an escalator was, had not seen a department-store Santa Claus, had not been to a zoo. These experiences, common in the subject matter of tests and textbooks, were alien to the lives of these children.

The way in which environmental factors affect the development of nonverbal skills is not quite as clear. There is evidence that such factors are less of a handicap to scoring well on a nonverbal aptitude test than they are to scoring well on a verbal test. (Ex. C–10.) Nonetheless, the child's environment remains very much a factor in the development of nonverbal skills. Defendants' expert, Dr. Dailey, was of the opinion that a nonlanguage test of abstract reasoning tests the same intellectual process required to read a paragraph and answer questions about it. Thus the skill a child develops in the process of reducing life experiences to verbal terms is really but another aspect of the process by which a child reasons abstractly about geometric symbols in nonlanguage terms. The less a child is exposed to situations in which he has the stimulation or the opportunity to deal with complex experiences or concepts, the more retarded both his verbal and nonverbal development will be—although the retarding effect may be greater in the case of verbal skills.[132]

2. *Psychological factors.* Although any student taking a test may be subject to psychological influences of various sorts, there is a good deal of evidence that disadvantaged children and Negro children are more likely than others to suffer from influences that have a depressing effect on test scores. The problem can generally be described as one of low self-esteem, or lack of self-confidence.

i. *Socio-economic causes.* There is evidence that disadvantaged children, black or white, are those most likely to lack self-confidence in the school situation. This is due to a complex of causes, many of them directly related to the environmental factors already discussed. The disadvantaged child is made profoundly aware of this academic shortcoming as soon as he enters school. There is a great risk of his losing confidence in his ability to compete in school with children who are "better off." A frequent manifestation of this is for the child to become a discipline problem, as he goes through the process of rejecting a situation in which he feels

---

**132.** At least one aptitude test in use in the District claims that a nonverbal test avoids any environmental handicaps a disadvantaged child may have. *See* Flanagan Tests of General Ability (TOGA), Form A, grades 6 to 9: "Part II avoids any cultural content; it presents geometric drawings designed to test the pupil's powers of abstract reasoning. This part of the test presents an equal challenge to all pupils regardless of their cultural backgrounds." Manual, p. 4. As defense witness Dailey made quite clear, this claim is unfounded and is indeed highly misleading. This is a prime illustration of the way in which standardized tests can lead the unsophisticated into mistaken judgments about the import of test scores.

inadequate. All of this can have a direct and significant effect on test performance as much as on scholastic performance.

ii. *Racial causes.* Apart from factors related to socio-economic status, there is striking evidence that Negro children undergo a special kind of psychological stress that can have a debilitating effect on academic and test performance. *See* Findings I-G, *supra.* Because of their race and the ever present reminders of being "different," Negro children generally are subject to very serious problems of self-identification. By the time the Negro child is about to enter school he has become very much racially self-conscious, which causes considerable psychological turmoil as he attempts to come to terms with his status as a Negro. He tends to be imbued with a sense of worthlessness, of inferiority, of fear and despair which is transmitted to him primarily through his parents.

In this state of turmoil, many Negro children approach school with the feeling they are entering a strange and alien place that is the property of a white school system or of white society, even though the school may be all-Negro. And when the school *is* all-Negro or predominantly so, this simply reinforces the impressions implanted in the child's mind by his parents, for the school experience is then but a perpetuation of the segregation he has come to expect in life generally. Evidence of turmoil can be found in the inability of many Negro pre-schoolers and first graders to draw themselves as colored, or other than in an animal-like or caricature-like fashion. This general psychological phenomenon is not confined to the South but is common to Negroes throughout the country. (Ex. A–24, *passim. See also* Tr. 879–893, 5063–5066, 5080–5084.)

When economically based deprivation is combined with the traumas suffered simply because of being Negro, the psychological impact can be crushing.

iii. *Manifestations of low self-esteem: anxiety and apathy.* When a child lacks confidence in himself or is self-degrading, he is likely to manifest this during the test-taking experience. One reaction that has been identified has been called "test anxiety." The child, apprehensive about his ability to score well and fearful about what others—especially his teacher or principal—might see in the test score, reacts in a self-defeating manner: He becomes highly nervous, even "wildly rampant"; or he withdraws. Either reaction lowers his test score. (Tr. 1375–1376.) Although both advantaged and disadvantaged children can experience test anxiety, in the opinion of Dr. Cline, plaintiffs' expert, the disadvantaged child—and particularly the disadvantaged Negro child—tend to be under much greater psychological stress in the testing situation and thus are more likely to show the effects in test performance. (Tr. 1376.) Several empirical studies support Dr. Cline's conclusion. (Tr. 3279–3280; 1376–1380.) [133]

Aside from anxiety-caused withdrawal, a child may be apathetic about a test simply because he does not see it as important. Children who come from backgrounds lacking in parental and environmental support for academic achievement will be more prone to be apathetic about testing; and disadvantaged children are those most likely to have nonsupportive backgrounds. In general, the middle and upper class child is made aware of the importance and value of school and testing; this will make him take both more seriously in terms of his goals in life. The lower class child, and especially a Negro facing the fact of racial discrimination, is more likely to view school and testing as a waste of time. Those grown accustomed

[133]. Defense witness Lennon thought the studies "open to other interpretations," which he did not elaborate; he himself has made no "hard study" of the area. (Tr. 3280.) Dr. Lennon also pointed out that test anxiety might be a factor measured by a test since anxiety can affect scholastic achievement as well. (Tr. 3280–3281.) This, however, does not mean that it is a measurement of innate intellectual ability.

to lower horizons may find it hard to take seriously such things as aptitude tests.

### (3) Empirical confirmation.

Empirical confirmation of the disadvantaged child's handicaps on aptitude tests can be found in the remarkably high degree of correlation between test scores on standard aptitude tests and the socio-economic status of the child. The more disadvantaged the child, the lower his test score will be. Dr. Lennon estimated that in a school system such as the District's where 90% of the students are Negro and at least 50% come from families whose annual income is substantially below that of the national median (estimated by Dr. Lennon to be about $6,200), the average aptitude test score would be at least seven points below the norm. As an IQ figure, this would mean a score of 93 as compared with 100; as a percentile score it would mean a score in the 43rd as compared with the 50th percentile.

Defendants, while acknowledging the handicaps of the disadvantaged child, have steadfastly maintained that the cause of low test scores is strictly a matter of socio-economic status, not race. In their view, the fact that a child is Negro is irrelevant to test performance. The evidence, however, does not support such a definitive conclusion. Dr. Lennon testified that, in constructing sampling groups, socio-economic and cultural factors seem to account for any significant variances. And Dr. Dailey testified to having conducted a multiple regression study of District test results, finding that the race of the child had no observable impact on those particular test scores. (Tr. 6316–6317, 6323–6324; Ex. 119; Ex. 120.) Nevertheless, Dr. Dailey later admitted that he has not firmly ruled out race as a wholly irrelevant factor. (Tr. 6395.) Thus, what both he and Dr. Lennon left open was the possibility of an overlap between socio-economic and racial factors, the former in many instances masking the effects of the latter.

Certainly, given the persuasive evidence of the psychological impact of segregation and other forms of discrimination on the Negro, defendants' evidence falls far short of successfully eliminating racial factors as influential in test performance.[134]

### (4) The influence of school.

For the disadvantaged child, handicapped as he is by home and community circumstances, the school remains as the last hope for overcoming academic deficiencies. In recognition of this fact the urban schools, including the District school system, are giving more and more attention to providing compensatory education for these children, for it is the school that by definition is best suited to providing students with the opportunity to acquire and perfect the academic skills which the school itself demands. And if the school fails in this task, the disadvantaged child will remain handicapped both in class and in taking tests.

But the influence of the school is not confined to how well it can teach the disadvantaged child; it also has a significant role to play in shaping the student's emotional and psychological make-up. The formula for reaching a student who comes to school academically ill-equipped from the start, who is disposed to reject the whole educational complex because of feelings of fear, frustration and an abiding sense of futility, is still one of the unsolved problems in American education. What is clear is that the urban school treads a narrow and difficult path in trying to reach the disadvantaged child. If it missteps, the consequence can be a devastating reinforcement of the psychological handicaps that already plague these children.

Plaintiffs' expert, Dr. Cline, has concluded that one of the most important

---

134. The court also takes judicial notice of the fact that there are studies which indicate that race does indeed have a separate effect. E. g., Deutsch & Brown, *supra* Note 130; *cf.* U. S. Comm'n on Civil Rights, Racial Isolation in the Public Schools (1967).

influences on both academic achievement and aptitude test scores inheres in the teacher-pupil relationship, a syndrome Dr. Cline has termed "teacher expectation." Studies have found that a teacher will commonly tend to underestimate the abilities of disadvantaged children and will treat them accordingly—in the daily classroom routine, in grading, and in evaluating these students' likelihood of achieving in the future. The horrible consequence of a teacher's low expectation is that it tends to be a self-fulfilling prophecy. The unfortunate students, treated as if they were subnormal, come to accept as a fact that they *are* subnormal. They act out in their school behavior and in the testing situation what they have been conditioned to believe is their true status in life; and in conforming to expectations, they "confirm" the original judgment. A noted expert, Professor Kenneth Clark, has summed up the problem thusly:

> " * * * When a child from a deprived background is treated as if he is uneducable because he has a low test score, he becomes uneducable and the low test score is thereby reinforced. If a child scores low on an intelligence test because he cannot read and then is not taught to read because he has a low test score, then such a child is being imprisoned in an iron circle and becomes the victim of an educational self-fulfilling prophecy." [135]

Aside from the influence of the teacher, the whole of the school experience will shape a student's behavior. If that experience is for one reason or another a negative one for the student, his performances will likewise be negative. Although there are immediate implications in this for the track system, the court will defer discussion for later in the opinion.

### d. *Accuracy of test measurements.*

Plaintiffs charge that the disadvantaged child's handicaps—both environmental and psychological—are such that standard aptitude tests cannot serve as accurate measurements of innate ability to learn. In Dr. Cline's opinion these tests are worthless. The evidence that this is so is persuasive.

It will be recalled that a scholastic aptitude test is constructed to test present facility in verbal—and, sometimes, nonverbal—skills so as to make possible an inference about an individual's innate ability to succeed in school. The inference is expressed in the form of a test score which is a statement of how the individual student compares with the median score of the norming group. The median reflects an "average" ability to learn, a score above or below that average indicating superior or inferior ability. A crucial assumption in this comparative statement, however, is that the individual is fairly comparable with the norming group in terms of environmental background and psychological make-up; to the extent the individual is not comparable, the test score may reflect those differences rather than innate differences. For example, perhaps the most ideal circumstance for making an accurate estimate of innate ability from comparing test scores would be in the case of twins. If the twins were given the same test and one scored significantly higher than the other, a reasonable inference would be that the higher scoring twin had the superior innate ability; both children presumably would have had the same opportunity to learn the tested skills and both would probably have been subject to similar psychological influences.

Transferring this principle to standard aptitude tests in general, the best circumstance for making accurate estimates.

135. Clark, *Educational Stimulation of Racially Disadvantaged Children*, in EDUCATION IN DEPRESSED AREAS 142, 150 (A. H. Passow ed. 1963). *See* R. Rosenthal & L. Jacobsen, *Self-Fulfilling Prophecies in the Classroom: Teachers Expec-* tations as Unintended Determinants of Pupils' Intellectual Competence, in M. DEUTSCH, et al., SOCIAL CLASS, RACE AND PSYCHOLOGICAL DEVELOPMENT (1967).

of ability is when the tested student is most like the typical norming student: white and middle class. Because the white middle class student predominates in the norming sample, it is possible to say the average student in that group will have had roughly the same opportunities to develop standard verbal and nonverbal skills as the rest of the group and will probably be psychologically similar as well. Thus the national median or norm is a reasonably accurate statistical statement of what the average American student ought to have learned in the way of verbal and nonverbal skills by a certain age and what can therefore be considered average intelligence or ability to learn. For this reason, standard aptitude tests are most precise and accurate in their measurements of innate ability when given to white middle class students.

When standard aptitude tests are given to low income Negro children, or disadvantaged children, however, the tests are less precise and less accurate—so much so that test scores become practically meaningless. Because of the impoverished circumstances that characterize the disadvantaged child, it is virtually impossible to tell whether the test score reflects lack of ability—or simply lack of opportunity. Moreover, the proba-bility that test scores of the Negro child or the disadvantaged child will be depressed because of somewhat unique psychological influences further compounds the risk of inaccuracy.

*Lorton study.* Striking evidence of the inaccuracy of standard tests is revealed in a study made in 1965 at the Lorton Youth Center, a penal institution set up under the Federal Youth Corrections Act and serving the District of Columbia. Inmates range in age from 18 to 26 years; 90% are dropouts from the District schools; and 95% of these are Negroes. Sixty-nine inmates enrolled in the Youth Center School pursuing a course of study leading to a high-school-equivalent diploma were examined as a follow-up to an earlier study to determine these inmates' educational progress under "ideal" educational circumstances. In the earlier study several factors had been identified as causing these inmates to underachieve in school and eventually to drop out; the second study was designed to measure achievement once those factors had been removed. A summary of the study is quoted in the margin [136]; the major points of interest are these:

1) Two types of aptitude tests were used to measure ability, the Otis test used in District schools, a verbal test;

136. "Data pertaining to intelligence quotients and Stanford Achievement test scores were obtained from the files of the psychological unit of the Youth Center. Ranges and averages were computed for intelligence quotients as measured by the Otis Test of Mental Ability and for intelligence quotients as measured by the Revised Beta Examination. The ranges and averages were also found for reading levels and arithmetic levels for this group as measured by the Stanford Achievement Test. A comparison was made between the reading levels and arithmetic levels obtained by these youths on entrance to the Youth Center and the reading levels and arithmetic levels obtained after one year of instruction at the Youth Center School.

"An analysis of these data revealed that the range of intelligence quotients as measured by the Otis Test of Mental Ability was from 50 to 110. The average I.Q. for this group was computed at 78 from scores obtained on the Otis Test of Mental Ability. When measured by the Revised Beta Examination, a non-verbal intelligence test, the range of intelligence quotients for this group was found to be from 71 to 118. The average intelligence quotient was measured as 98 on the Revised Beta Examination. A difference of 20 points was indicated in the average intelligence quotient obtained on the Otis Test of Mental Ability and the average intelligence quotient as measured by the Revised Beta Examination.

"A further comparison was made of the intelligence quotients as measured by these two tests using those incarcerees who had obtained an I.Q. of 75 or below on the Otis Test of Mental Ability. The range of intelligence quotients for this group, as measured by the Otis Test of Mental Ability, was from 50 to 75. When measured by the Revised Beta Examination, the range in intelligence quotients for this group was found to be from 71

and the Revised Beta Examination, which is nonverbal. The IQ ranges for the two tests differed markedly. For the whole group of 69 inmates the range of IQ's obtained by using the Otis test was from 50 to 110; the average was 78, substantially below normal. Scores on the nonverbal Beta test, however, were higher, ranging from 71 to 118; the average was 98—20 points higher than the Otis average, and a level considered to indicate average intelligence.

to 112. The average I.Q. increased 29 points. From scores obtained on the Otis Test of Mental Ability, the average intelligence quotient was found to be 62. From scores obtained on the Revised Beta Examination, the average intelligence quotient was found to be 91.

"The findings indicated the following gains in intelligence quotients from scores obtained on the Otis Test of Mental Ability to scores obtained on the Revised Beta Examination by categories:

28 inmates gained 20 points or more
20 inmates gained from 10 to 19 points
13 inmates gained from 1 to 9 points
4 inmates showed no gain
4 inmates showed a loss

"The highest individual gain was 60 points. This individual obtained an I.Q. of 52 (deficient) on the Otis Test of Mental Ability, and he obtained an I.Q. of 112 (above average) on the Revised Beta Examination.

\* \* \* \* \*

"Consideration was given to progress in reading after one year of instruction at the Youth Center School. These data revealed that for the entire sampling of 69 incarcerees the range in reading levels on entrance to the Youth Center was from 1.5 (fifth month of the first grade) as measured by the Stanford Achievement Test. The average initial reading level was found to be 6.9 (ninth month of the sixth grade). After one year of instruction at the Youth Center School, the average reading level for this group increased by 1 year and 3 months to 8.2 (second month of the eighth grade). The range in reading levels after one year of instruction was found to be from 2.5 to 12.0.

"An analysis was made of the reading progress over a one year period of incarcerees who obtained an I.Q. of 75 or less on the Otis Test of Mental Ability. There were 24 inmates in this sampling. The initial range of reading levels for this group was from 1.6 to 6.8 and the range of reading levels for this group after a year of instruction was from 2.5 to 7.3. The average reading level for this group of incarcerees whose I.Q. measured 75 or below on the Otis Test of Mental Ability increased from 3.9 to 5.2. This represents an average gain of one year and three months for this group after one year of instruction. It should be noted here that the average gain in reading made by this selected sampling was the same as the average gain in reading made by the total population. A normal individual should make one year's progress or 1.0 in one year.

"The range in arithmetic levels for the total group on entrance to the Youth Center was from 3.2 to 9.1. The range in arithmetic levels for the total group after one year of instruction was from 4.2 to 11.9. The initial average arithmetic level was 5.6, and the final average arithmetic level was 7.4, representing a gain in the average arithmetic level of 1 year and 8 months after one year of instruction.

"An analysis was also made of the progress in arithmetic made by the 24 subjects whose I.Q. measured 75 or below on the Otis Test of Mental Ability. These youths would be classed as having borderline intelligence if this I.Q. were recorded on their public school records. However, this group of so-called 'borderline' subjects also had an average gain in arithmetic level of 1 year and 8 months after one year of instruction at the Youth Center School. The initial range in arithmetic levels for this group was from 3.2 to 6.5. The final range in arithmetic levels for this group after one year of instruction was from 4.2 to 8.4. The initial average arithmetic level was 4.2, and the final average arithmetic level for this group with I.Q.'s which measured 75 or below on the Otis Test of Mental Ability was 6.0.

"The highest individual gain in reading level by an inmate was 3 years and 6 months. This subject's initial reading level was 5.7. His reading level after one year of instruction was 9.3. The highest individual gain in arithmetic level over a one year period was 3 years and 9 months. This subject's initial arithmetic level was 6.1, and his final arithmetic level was 10.0."

N. Burke & A. Simons, A Measure of the Educational Achievement of a Group of Incarcerated Culturally Disadvantaged and Educationally Deprived Dropouts 25–29 (May 1965) (Ex. C–10; *see also* Tr. 1455–1507, 1576–1635; Ex. C–17).

Twenty-four of the 69 inmates scored at 75 or below on the Otis test, the IQ's ranging from 50 to 75; the average was 62.[137] Yet on the Beta test the range was from 71 to 112, the average being 91—or 29 points higher than the Otis average.

2) Gains in achievement in reading and arithmetic over a one-year period were measured using the Stanford Achievement Tests, one of the series used in the District schools. The expected gain for a student of average intelligence, according to Stanford norms, is 1.0 (*i. e.*, a progress equivalent to one grade level in one year).

*Reading.* The average gain for all 69 inmates was 1.3 years, increasing from an average grade level equivalent of 6.9 (ninth month of the sixth grade) to 8.2 (second month of the eighth grade). For the 24 inmates in the 75 or below range (Otis), the average gain also was 1.3 years, increasing from a grade level equivalent of 3.9 to 5.2.

*Arithmetic.* The average gain for all inmates was 1.8 years, increasing from 5.6 to 7.4. For the 24 low-scoring inmates the average gain was 1.8, increasing from 4.2 to 6.0.

This study reveals in hard fact that a disadvantaged Negro student with a supposedly low IQ can, given the opportunity, far surpass what might be expected of a truly "subnormal" student.

It illustrates the principle that a standard verbal aptitude test—in this case the Otis test—can be a faulty predictor of actual achievement for disadvantaged students, and confirms Dr. Clines assessment of the disabilities of such tests in making accurate inferences about innate ability.[138]

*Local norms.* Two techniques have been cited by plaintiffs that might help give a more accurate estimation of the ability of the disadvantaged child. One of these is the development of a locally standardized test. The principle is the same as that applied to the nationally standardized test, except that the test questions are made appropriate to the students being tested and the norm is ascertained from a group of similarly situated students—that is, those students within the local school system at the appropriate age levels. The purpose of the local norm is to produce test scores that will reflect what the child *has* had the opportunity to learn and to compare his achievement with that of others who have had comparable opportunities. Defendants have not availed themselves of this technique. (Tr. 6676–6684.)

Another method of establishing a local norm is to use the standard aptitude test but to restandardize the median score according to local performances. At the time of trial defendants were in the process of obtaining such norms under the direction of Dr. Dailey. (Tr. 6387–6396.)

---

137. A person with an IQ of 40 to 59 is considered a "moron." L. CHRONBACH, *supra* Note 124, at 173. In the District a child with an IQ of 75 or below is considered for placement in the Special Academic Track.

138. The nonverbal scores obtained from the Beta test seem to have been more accurate in penetrating the fog obscuring these inmates' abilities, a perfect example of how a deficiency in a tested skill—*i. e.*, a verbal facility—has a direct and misleading effect on test scores.

Although it would appear from this study that nonverbal tests are much the better for use with disadvantaged children, there is substantial evidence that nonverbal tests are subject to the same disabilities as verbal tests since both at base are testing learned skills. Thus,

Dr. Dailey reported that, in a test of ninth grade students from nine of the District's 25 junior high schools, the average score was in the 40th percentile on a verbal component, but only in the 38th percentile on a nonverbal component. (Tr. 6266–6269.)

Interestingly, Dr. Dailey concluded from this experiment that the tests confirmed that District schools were teaching reading as well as could be expected given the "raw material" they had to work with. The foundation for this judgment is Dr. Dailey's theory that nonverbal skills are learned largely out of school. He did not elaborate, however, on why a child's home or community are especially suited for training the child in abstract reasoning whereas the school is not. (Tr. 6347.)

However, because this method continues to rely on test questions that are highly inappropriate to the background of the disadvantaged child, there remains a substantial risk of inaccurate measurement. Although defendants have taken commendable if somewhat belated steps to improve the techniques for ascertaining the abilities of District schoolchildren, they have not gone far enough. (Tr. 6676–6684.)

*Empirical verification.* A second method designed to assure accuracy of measurements, strongly recommended by educational test experts and test publishers alike, is for the school system to conduct an empirical study of the predictive validity of the aptitude tests it uses. Since there is a probability of error in prediction for any school population, it is desirable to obtain evidence as to how accurate the test is for the local student body. When the student body is highly dissimilar to the standardizing group it becomes even more desirable to verify the accuracy of the test's predictions. This is done by making a follow-up study of a group of students to see how much correlation there is between actual scholastic achievement and the initial test score.[139] The District has not made any empirical studies of this sort, even though the student body and the system itself are admittedly "unique." (Defendants' Proposed Findings, p. G–28.)[140]

*Conclusion.* In light of the above evidence regarding the accuracy of aptitude test measurements, the court makes the following findings. First, there is substantial evidence that defendants presently lack the techniques and the facilities for ascertaining the innate learning abilities of a majority of District schoolchildren. Second, lacking these techniques and facilities, defendants cannot justify the placement and retention of these children in lower tracks on the supposition that they could do no better, given the opportunity to do so.

e. *Misjudgments and undereducation.* Plaintiffs have alleged that the harm in using standard aptitude tests is not simply a matter of technical inability to estimate innate learning capacities of disadvantaged children. They go further and say that the false images test scores can project because of this disability will lead teachers—and principals, when they are involved in making the decision about proper track placement—into misjudging the capabilities of these children. The consequence is to create a substantial risk of underestimating and thus undereducating the disadvantaged child.

As was seen in the preceding section, because of the nature of nationally standardized scholastic aptitude tests a majority of District schoolchildren are likely to score below the national norm. This amounts to a *prima facie* statement of their subnormality. As the Lorton study makes strikingly clear, however, the test scores may well be understating true ability. This it is imperative that aptitude test scores not be taken at face value. Defendants agree with this latter principle, and argue that because test scores are almost always interpreted there is little risk of misjudging students' abilities. Moreover, they say, test scores are not the only ingredient in the process of placing students according to ability; other factors are considered which give an accurate picture of each student's needs and abilities. The evidence, how-

---

139. Presumably some control would have to be established to take account of the effect the student's curriculum would inevitably have on his actual achievement level. Otherwise a student who is undereducated due to misjudgments based on the initial test score would appear as a validation of the test's accuracy when in fact he is a victim of the self-fulfilling prophecy discussed earlier. *Compare* HANSEN 185, discussed at Note 93 *supra.*

140. Dr. Lennon indicated that in practice few school systems make empirical studies, being content to rely on historical verifications of accuracy reported by the test publisher. If this is acceptable in some cases, it would not be so for the District given its unique character. Moreover, it is not clear that the historical verifications Dr. Lennon referred to took account of the influence of teaching on achievement, *see* Note 139 *supra.*

ever, reveals that defendants are overly optimistic in their contentions.

*Interpretation.* The major obstacle to defendants' argument that test scores are interpreted is the fact that for many students interpretation cannot provide meaningful information. There is ample evidence, already examined, that for disadvantaged children group aptitude tests are inappropriate for obtaining accurate information about innate abilities. Defendants have not explained how interpretation can overcome these technical limitations on the tests.

The steps defendants have taken to obtain local norms will to some extent remedy the technical limitations on these tests. There is no evidence, however, as to how these local norms are being used in practice; at the time of trial, they had not even been fully developed. Moreover, defendants have not indicated any intention to investigate whether group tests being used are accurate predictors of achievement for District school children, another limitation on the meaningfulness of interpretation.

Consequently, the court finds that for a majority of District school children there is a substantial risk of being wrongly labelled as having subnormal intelligence, a label that cannot effectively be removed simply by interpreting aptitude test scores. To whatever extent placement decisions are based on these scores, interpreted or not, there is a distinct possibility that that placement is erroneous. Defendants are left, therefore, with the proposition that accurate judgments about students' abilities can be made without reference to test scores in circumstances where those scores are likely to be erroneous.

*The influence of test scores.* The court has already had occasion to express its conclusions regarding the crucial role aptitude test scores inevitably must play in the proper operation of the track system. Nonetheless, assuming that those charged with the responsibility of evaluating and programming students according to their abilities could do so without regard to test scores, the court will turn to the evidence of whether in practice a student's test score is ignored so as not to influence judgments.

There can be no disputing the fact that teachers universally tend to be strongly influenced in their assessment of a child's potential by his aptitude test scores. Defendants' own expert, Dr. Lennon, acknowledged this to be the common experience; and it would defy common sense to think the situation could be otherwise. Although test publishers and school administrators may exhort against taking test scores at face value, the magic of numbers is strong.[141]

A teacher, like any human being, must rely to some extent on appearance in making judgments about other people. If a student is slow in class, has trouble reading, seems dull-witted, and his reported IQ is 80, the natural inclination is to view the evidence as supporting one conclusion: the student is indeed a dullard. Yet it may be that both the slowness and the low IQ are the result of those factors—environmental or psychological—that have nothing to do with native intelligence.

The inclination to give undue weight to test scores can be enhanced if scholastic aptitude tests assume an important role within the school system—as is the case with the District. Thus the school system makes mandatory the use of at least five aptitude tests for each student during his academic career, in effect placing its official imprimatur on these particular tests. And, as noted earlier, the criteria for placement in the respective tracks are couched in terms of measured ability levels, reflecting the premise of the track system that maximum potential must be discovered. In such an atmosphere, the worth of a test score rises high. The court cannot accept defendants' suggestion that test scores are not influential in placing students.

*Misjudgments.* Not only is there ample evidence that tests are influential

141. *See, e. g.,* Rosenthal & Jacobsen, *supra* Note 135.

in shaping teachers' judgments, but there is dramatic evidence of the misjudgments that can come from this.

The first example of this is in an incident described by Dr. Hansen in his *Addendum: A Five-Year Report on Desegregation in the Washington, D. C. Schools* (1960).

"The 1,303 students who were enrolled in the tenth grade basic curriculum in 1958–59 were given the advanced form JM of the Stanford Achievement Test in October 1958.

"The average of the medians in the six tests is 6.5 grade, or 3.6 school years below the students' actual grade of 10.1. *While they were in the ninth grade these students were assigned to the basic curriculum* at about the sixth grade level or below, *as indicated by tests and teacher and counselor judgment.* For more than half of them to make test scores above the sixth grade equivalent in the tenth grade indicates a phenomenal improvement over the testing period the preceding January, when all ninth graders took the Stanford Achievement Test, Form LM.

"In the summary of this point, about two-thirds of the group tested in October 1958 who in January 1958 had scored at the sixth grade or below, made scores above the sixth grade equivalent. As an example, of the 1,303 students in the basic curriculum who took the test in paragraph meaning, 810 scored above the sixth grade equivalent. A spectacular finding is that 116 of these students made grade equivalents of 10.1 to 12.8. On the basis of these results alone, they were possibly ready for placement at the general, college preparatory, or even honors levels.

"For these 810 students, then, significant gains were reported for the ten months, January to October. These gains undoubtedly represent, in part at least, improvement resulting from instruction during these months, and perhaps for some, from attendance in summer school. *They may also have resulted partly from differences in pupils' attitudes at the time they took the test. They do point up the necessity for greater care in guidance of pupils into the proper curriculum sequence.*"

(Ex. 8, pp. 21–22.) (Emphasis added.)

Despite the call for "greater care," as the next example shows, misjudgments have continued.

In 1965 Dr. Hansen announced a change in official policy: thenceforth, no student was to be assigned to the Special Academic Track without first being evaluated by a clinical psychologist and, if necessary, undergoing an individual test of ability. In September of that year 1,272 students, either already in the Special Academic Track or about to be enrolled in it on the recommendations of their teachers and principals, were reevaluated by the psychologists under the new order. As a result of this reevaluation approximately 820, almost two-thirds, were discovered to have been improperly judged as requiring assignment to the Special Academic curriculum. Dr. Hansen's comment on this incident is instructive:

"Q Dr. Hansen, were you surprised by the * * * results of the testing, this crash program testing, did you expect that result?

"A I am not surprised by the result because when moving in the direction * * * of developing a special program for the mentally retarded, those who by endowment seem mentally retarded, and those who are culturally handicapped, * * * it seems to me we could expect a variation of this kind in terms of the evaluations and judgments of principals * * *."

(Tr. 405–406.) This acknowledgement of the probability of "variation" in judgments regarding the academic needs of the disadvantaged student betrays the fatal weakness in the track system. In the 1965 incident 60% of the principals' —and teachers'—evaluations were overruled only because experts apparently better able or better equipped were called

in to analyze these students. But what of the thousands of students *not* re-evaluated with such close scrutiny? One can only speculate, for example, how many students left in the General Track to prepare themselves for a useful vocation are there because of a "variation" in judgment. Surely the same considerations that led the principals and teachers to misjudge 820 students in 1965—grades, behavior, test scores, etc.—can work to the detriment of any disadvantaged child, even if he is not recommended for downgrading to the Special Academic Track. A child's future is entitled to judgments giving better odds than one out of three.[142]

*The self-fulfilling prophecy.* The real tragedy of misjudgments about the disadvantaged student's abilities is, as described earlier, the likelihood that the student will act out that judgment and confirm it by achieving only at the expected level.[143] Indeed, it may be even worse than that, for there is strong evidence that performance in fact *declines*. (Tr. 1727, 1785–1789, 1792–1796.) [144] And while the tragedy of misjudgments can occur even under the best of circum-

142. Evidence of the impact of the new regime is startling in some instances. As Table A (Section D, *supra*) shows, there was an overall decline in enrollments in the Special Academic Track in 1965. In some schools the drop was extreme, suggesting a high incidence of misjudgments prior to 1965. This is evident in these *junior high schools*: Browne, a decline of 17.3% (25.1% to 7.8%); Douglass, 14.7% (23.3% to 8.6%); Sousa, 12.9% (16.3% to 3.4%); Hine, 10.0% (14.1% to 4.1%); Shaw, 8.0% (36.0% to 28.0%). Two *senior high schools* had significant declines: Dunbar, 6.9% (16.7% to 9.8%); Cardozo, 6.2% (18.2% to 12.0%). All of these are low-middle or low income, almost all-Negro, schools. (See Tables B and C, Section D, *supra*.)

143. Another result can be the student's disenchantment with school, causing him to drop out before graduating. Plaintiffs have charged the track system with causing dropouts; defendants claim that it increases the school's holding power. The evidence on the matter is extremely confused, though.

It is clear that the District does have a dropout problem. In 1963, 37% of the 1960 tenth grade class did not graduate, making the District the third worst of 19 large-city school systems in the country —better than only New York and Detroit. However, the trend in this regard has been upward in the past several years, albeit slowly. (Ex. 45; Ex. A–3, p. 60.) On the other hand, other evidence indicates that the *number* of dropouts is increasing. (Ex. C–2.) Almost all of these are Negroes from the Special Academic and General Tracks, at both junior and senior high levels—although 1964 figures show an increase in dropouts from the Regular Track as well. (Ex. C–21.)

Given the conflicting and incomplete data, the court has been unable to establish a clear link between tracking and dropouts, one way or the other. The problem of the inadequate data is well analyzed in Exhibit A–3, pp. 57–60.

144. One striking item of evidence in this regard reveals that, in reading achievement in the District schools, 67.2% of the students are reading at or above grade level in Grade 3 but by Grade 8 that per cent has *dropped* to less than half (45.5%). (Ex. A–3, p. 27.)

This pattern is also reflected in 1966 test scores. Thus, on second, fourth and sixth grade reading tests the results were as follows:

(1) Per cent of elementary school classes at or above median: Grade 2—50%; Grade 4—44%; Grade 6—36%.

(2) Per cent of elementary schools at or above median: Grade 2—54%; Grade 4—38%; Grade 6—20%.

As could be expected, the low scoring schools were the lower-income, Negro or predominantly Negro schools. (*See generally* Court Ex. 4.)

At the junior high school level (ninth grade), 20 of the 25 schools were below median (from 2 to 14 points); all but two had virtually all-Negro enrollments, and the two exceptions were only slightly below median. The income levels ranged from the poorest to one predominantly Negro school at the $8,000–$8,999 level; the mean income level was about $4,500. (*See ibid.*)

At the senior high school level (11th grade), six of the 11 high schools were below median. Again the pattern was for the lower income Negro schools to gravitate toward the bottom. (*See ibid.*) That senior high schools might appear to be relatively better off is misleading, since between junior and senior high school the system loses many Negroes from the General and Special Academic Tracks. *See* Note 143 *supra*.

stances, there is reason to believe the track system compounds the risk.

First, the fundamental commitment of the track system is to educate *ability*, not just the student.[145] By assuming the responsibility of deciding who gets what kind of educational opportunity, the school system places a dear price on teacher misjudgments. Thus, when a misjudgment does occur, the result will be institutionally to shunt the student into a curriculum paced to his presumed abilities, where he is likely to progress only at the speed at which he is taught.[146] A sixth-grade student nourished on third-grade instruction is apt to finish the year with a third-grade education; yet the haunting question: could he have done better?

Another aspect of the track system's emphasis on ability is the distinctly competitive atmosphere injected into the curriculum. Indeed, competition is the intent, for it is competition that Dr. Hansen relies upon as the spur to individual efforts to achieve and rise up. But in a school system such as the District's where well over half of the students come from improvished backgrounds and 90% are born into a world where the color of their skin makes life an inevitable struggle simply to obtain equality, turning the pursuit of education into yet another competition is just unfair. As might be expected, in such a setting the race goes to the swift; and to the child disadvantaged only by birthright can go a second-class education.

The third feature of the track system is its tendency to reinforce the psychological impact of being adjudged of low ability. By consigning students to specifically designated curricula, the track system makes highly visible the student's status within the school structure. To the unlearned, tracks can become pejorative labels, symptomatic of which is the

recent abandonment of the suggestive "Basic" for the more euphemistic "Special Academic" as the nomenclature of the lowest track.[147] And even if a student may be unaware of labels, he cannot ignore the physical fact of being separated from his fellow students.

None of this is to suggest either that a student should be sheltered from the truth about his academic deficiencies or that instruction cannot take account of varying levels of ability. It is to say that a system that presumes to tell a student what his ability is and what he can successfully learn incurs an obligation to take account of the psychological damage that can come from such an encounter between the student and the school; and to be certain that it is in a position to decide whether the student's deficiencies are true, or only apparent. The District of Columbia school system has not shown that it is in such a position.

## OPINION OF LAW

### I. PREVIEW

A preliminary matter concerns identification of the governing constitutional principles. In Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), the companion to Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court held that the equal protection clause's proscription against *de jure* school segregation—segregation directly intended or mandated by law or otherwise issuing from an official racial classification— was an element of due process of law under the Fifth Amendment, thereby applicable in the District of Columbia. In so doing the Court postponed consideration of which additional doctrines of equal protection due process includes, at least insofar as the District of Columbia is concerned.

145. HANSEN 44.

146. Defendants' witness, Dr. Dailey, pointed to another risk of reinforcing a child's present disabilities—the lack of contact with students having a command of standard English. The homogeneous class,

by grouping students similarly handicapped, removes a source of stimulation available in a mixed-ability setting. (Tr. 6386–6387.)

147. *Compare* HANSEN 46–47.

In the intervening years the Court has found the due process clause of the Fourteenth Amendment elastic enough to embrace not only the First [148] and Fourth Amendments,[149] but the self-incrimination clause of the Fifth,[150] the speedy trial, confrontation and assistance of counsel clauses of the Sixth,[151] and the cruel and unusual punishment clause of the Eighth.[152] In so doing the Court has responded with implicit and understandable revulsion to invitations to distinguish between the core and substance of a constitutional right and its supposed mere incidents or excrescences.[153]

In the meantime the equal protection clause has consolidated its position as the cutting edge of our expanding constitutional liberty [154]; and a constitutional amendment, the Twenty-third, has struck at the idea that denizens of the District are second-class citizens. Apart from these post-*Bolling* transitions is the consideration which *Bolling* itself adumbrated, at once eminently commonsensible and yet rooted deep in the theory of federalism: it is "unthinkable," 347 U. S. at 500, 74 S.Ct. at 695, that school practices which the Constitution forbids in New York, Birmingham and Los Angeles it should forgive in Washington, D. C. "[T]he District of Columbia is not a provincial community but the cosmo-

politan capital of a nation that professes democracy." Carr v. Corning, 86 U.S. App.D.C. 173, 192, 182 F.2d 14, 33 (1950) (Edgerton, J., dissenting).

From these considerations the court draws the conclusion that the doctrine of equal educational opportunity [155] —the equal protection clause in its application to public school education—is in its full sweep a component of due process binding on the District under the due process clause of the Fifth Amendment.

To fathom and apply the content of the principle of equal educational opportunity is the court's next project. As every student of the Constitution knows, the intense debate over racial segregation in the schools has clustered around two seminal concepts: *de jure* and *de facto* segregation. The first of these, as already indicated, adverts to segregation specifically mandated by law or by public policy pursued under color of law; this is the segregation unequivocally denounced by *Bolling* and *Brown*. School segregation is *de facto* when it results from the action of pupil assignment policies not based on race but upon social or other conditions for which government cannot be held responsible;[156] whether segregation so occasioned does fall within *Brown*'s proscription the Supreme Court has not yet considered or decided. A

---

148. Near v. State of Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

149. Wolf v. People of State of Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949).

150. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

151. Klopfer v. State of North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967); Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

152. Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

153. *E. g.*, see the conflicts in the various opinions in Pointed v. State of Texas, *supra* Note 151, and Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

154. *See* Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (May 29, 1967); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Goldberg, *Equality and Government Action,* 39 N.Y.U.L.Rev. 205 (1964).

155. Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686 (1954).

156. *See* Dowell v. School Board, W.D.Okl., 244 F.Supp. 971, 976 (1965), *affirmed, sub nom.* Board of Ed. of Oklahoma City, etc. v. Dowell, 10 Cir., 375 F.2d 158 (1967), *cert. denied,* 387 U.S. 931, 87 S. Ct. 2054, 18 L.Ed.2d 993 (May 29, 1967), holding segregation unconstitutional in part because the residential conditions which produced it had been "initiated by law."

third equal protection approach to the problems presented by this case questions whether the principle of equal educational opportunity does not require that schools must be materially equal whenever, for whatever reasons, these schools are substantially segregated racially or economically.

After briefly treating and rejecting plaintiffs' unseasonable argument invoking the requirement that formerly (before 1954) de jure school systems affirmatively "disestablish" segregation, the court holds that a separate-but-equal rule, a variation perhaps of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), does apply, and that violations of this rule have been recorded here in the District. The court then turns to the optional zones and teacher segregation, concluding that these practices are condemned by de jure reasoning. Next, the court assesses the de facto segregation question and holds that the District's neighborhood school policy, as presently administered at least, results in harm to Negro children and to society which cannot constitutionally be fully justified. Finally, the court finds that the effect of the track system is to deny a majority of District students their right to equal educational opportunities.

## II. DISESTABLISHING DE JURE SEGREGATION

Until 1954 the District of Columbia's public schools were segregated by law. The question arises of what relevance this fact has to a segregation suit launched in 1966.

Plaintiffs press the argument that effectively to "disestablish" de jure segregation—no matter what the law on de facto segregation—a school board must adopt an assignment system which will achieve substantial actual integration. Indeed, considerable apparent support in precedent can be marshalled in defense of this position, including the Office of Education desegregation guidelines, which in some cases require minimum percentages of actual integration, 45 C.F.R. § 181.54 (Supp.1967); the accent in all the recent cases on a desegregation plan that "works" and gets "objective" results, e. g., United States v. Jefferson County, 5 Cir., 372 F.2d 836, 847 (1967) [157]; Bradley v. School Board, 4 Cir., 345 F.2d 310, 322–323 (1965) (Sobeloff and Bell, JJ., concurring in part); Dove v. Parham, 8 Cir., 282 F.2d 256 (1960); and the Fifth and Eighth Circuits' recent rejection in its application to desegregation suits of the Briggs v. Elliot, E.D.S.C., 132 F.Supp. 776, 777 (1955), "the Constitution * * * does not require integration" dictum. Jefferson County, supra, 372 F.2d at 861–872; Kemp v. Beasley, 8 Cir., 352 F.2d 14 (1965).

All this learning, however, has been applied primarily in situations where not only the condition of segregation persists, but the same students attend the very schools they were attending before "desegregation." The courts have shown less inclination to apply it to situations in which a complete revamping of the school system into neighborhood schools proves to have segregatory effects. See, e. g., Davis v. Board of School Comm'rs, 5 Cir., 364 F.2d 896, 900 n. 1a (1966). The Office of Education percentage guidelines themselves do not apply to desegregation plans entailing establishment of neighborhood schools. See 45 C.F.R. §§ 181.31–181.35 (Supp. 1967).

The argument can be made, however, that even in these situations the court has the power, though not necessarily the duty, to insist on a degree of actual integration.[158] Twin considerations could be thought to underlie such a remedy. One, the court is entitled to real assurance that the school board has

157. The opinion reported in 372 F.2d is by Judge Wisdom for the panel. The case was reaffirmed by the Fifth Circuit en banc on March 29, 1967, 380 F.2d 385, which adopted Judge Wisdom's opinion, though prefixing it with six paragraphs of text.

158. This is one of the holdings, or readings, of Dowell v. School Board, supra Note 156.

abandoned its earlier unconstitutional policy of segregation, assurance which only the objective fact of actual integration can adequately provide, inasmuch as only that is "clearly inconsistent with a continuing policy of compulsory racial segregation." Gibson v. Board of Public Instruction, 5 Cir., 272 F.2d 763, 766 (1959). Two, the entire community, white and black, whose own attitude toward Negro schools is what stigmatizes those schools as inferior, must be disabused of any assumption that the schools are still officially segregated, an assumption it might cling to if after supposed "desegregation" the schools remained segregated in fact.[159]

But whatever the merits of the argument in the large, the court is not disposed to grant relief on its basis in this case, for two reasons. First, there is a failure of proof. Plaintiffs have not supplied the court with the necessary data as to the degree of actual integration in the years immediately following *Bolling*, which obviously under this theory form the crucial period.[160] Although substantial segregation was an inevitable result of adoption of the neighborhood plan in 1954, without hard figures the court cannot be assured that actual integration was then so minor as to justify relief.

Second, the argument is untimely. This suit was begun 12 years after the institution of the neighborhood school policy, making the policy older than most of the students today attending the local schools. Many concurrent causes have combined with the Board's 1954 decisions in the evolution of present reality. If the segregation in the District's schools is not currently objectionable under either an independent *de facto* or *de jure* rationale, it would be very difficult to strike it down merely because the neighborhood school policy failed to produce sufficient integra-

tion when it replaced an overt *de jure* system 13 years ago.

### III. SEPARATE BUT UNEQUAL

Section III of the findings above transcribes the court's conclusions respecting the comparative inferiority which vexes the typical predominantly Negro school in the District. The major findings can be briefly restated here. First, the school system's most ancient and dilapidated buildings can be found in the low income areas—which in Washington means in the Negro ghettos. There the typical school building is nearly 60 years old; the median building age elsewhere in the city is approximately 40 years.

The predominantly (*i. e.* 85–100%) Negro schools suffer from drastic student overcrowding (the median in 1965–66 for the 107 predominantly Negro elementary schools: 115% of capacity, which qualifies as an emergency situation), even while the 85–100% white schools flourish with empty seats and classrooms (their median: 77%). The distinction is almost systematic, in the sense that virtually every predominantly Negro school is more crowded than the majority of predominantly white schools.

By virtue of the compound of several individual ingredients of imbalance, the teachers at the predominantly white schools are a clear class above predominantly Negro school faculties in quality. Teachers at these latter schools have had much less teaching experience than their colleagues in the predominantly white schools, and more than twice as many of them have only temporary licenses, signifying their failure to compile the qualifications demanded by the school system for tenured positions; indeed, almost all the schools except those predominantly white must deal with a surfeit of temporary teachers. The large number of teachers with graduate de-

159. *Compare* the NLRB's remedy of permanently "disestablishing" company-dominated unions, which it anounced in Carpenter Steel Co., 76 N.L.R.B. 670 (1948). *See* Freund, *Civil Rights and the Limits*

of Law, 14 BUFFALO L.REV. 199, 205 (1964).

160. The only figures in the record are the meagre ones reported in Findings I–D.

grees in the predominantly white schools is a feature the predominantly Negro schools do not equal. The fact that median per pupil expenditure in the predominantly Negro elementary schools has been a clear $100 below the figure for predominantly white schools, and $132 below the schools west of the Park, summarizes all the inequalities above, and perhaps significant others.

Every student within the boundaries of predominantly white schools gets a chance to attend kindergarten in his neighborhood school; the comparable opportunity is available in the predominantly Negro neighborhoods only if classroom space is available—and often it is not. In view of society's growing awareness that the children of the slums absolutely must be brought into the culturally rich atmosphere of the school at the earliest age—three or four if possible—this failure in many Negro neighborhoods to provide even kindergarten training, freely available in the white districts, cannot but be disquieting.

 The predominantly Negro schools, thus, are at comparative disadvantage in major respects. True, large dosages of federal financial assistance are infused into the slum schools and those alone under the Economic Opportunity Act,[161] the Elementary and Secondary Education Act,[162] and the impact aid legislation.[163] None of these, however, requires more than nominal local contributions, and so they have all but nil effect on how the Board disburses its own assets. Furthermore, these statutes are manifestly intended to provide extraordinary services at the slum schools, not merely to compensate for inequalities produced by local school boards in favor of their middle-income schools. Thus, they cannot be regarded as curing any inequalities for which the Board is otherwise responsible.

 Taking what has been called "a 'new' approach to litigation over racial imbalance," [164] the court considers whether these documented inequalities in the predominantly Negro schools deny the children who are assigned by defendants to attend them equal educational opportunity and equal protection of the law. However the Supreme Court ultimately decides the question of a school board's duty to avoid pupil-assignment policies which lead to de facto segregation by race and class, it should be clear that if whites and Negroes, or rich and poor, are to be consigned to separate schools, pursuant to whatever policy, the minimum the Constitution will require and guarantee is that for their objectively measurable aspects these schools be run on the basis of real equality, at least unless any inequalities are adequately justified.

To invoke a separate-but-equal principle is bound to stir memories of the bygone days of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138 (1896). To the extent that Plessy's separate-but-equal doctrine was merely a condition the Supreme Court attached to the states' power deliberately to segregate school children by race, its relevance of course does not survive Brown. Nevertheless, to the extent the Plessy rule, as strictly construed in cases like Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950), is a reminder of the responsibility entrusted to the courts for insuring that disadvantaged minorities

161. 42 U.S.C. §§ 2781–2791 (1964), as amended.

162. 20 U.S.C. §§ 241a—241l (Supp. I 1965).

163. 20 U.S.C. §§ 236–244 (1964), as amended, 20 U.S.C. § 244(8) (Supp. I 1965).

164. See T. EMERSON, D. HABER & N. DORSEN, POLITICAL AND CIVIL RIGHTS IN THE UNITED STATES 1779 (3d ed. 1967). See also Rousselot, Achieving Equal Educational Opportunity for Negroes in the Public Schools of the North and West: The Emerging Role for Private Constitutional Litigation, 35 GEO. WASH.L.REV. 698, 712–718 (1967); Horowitz, Unseparate but Unequal—The Emerging Fourteenth Amendment Issue in Public School Education, 13 U.C.L.A. L.REV. 1147 (1966).

receive equal treatment when the crucial right to public education is concerned,[165] it can validly claim ancestry for the modern rule the court here recognizes. It was in the latter days of *Plessy* that the rule of actual equality began regularly to be applied. At that time *de jure* segregation was of very shaky status, morally, socially and constitutionally; so it is with *de facto* segregation today. If in either circumstance school boards choose not to integrate, it is just and right that courts hold these segregated schools to standards of material equality. Of course, however, there are important differences between the doctrines old and new. Under *Plessy's* provisions once a court discovered a substantial inequality between white and Negro schools its inquiry apparently came to an end: even strong justification underlying the inequality could not deprive the Negro student of his right to judicial relief. No court would advance so absolutist an approach outside the *de jure* framework.

▇▇ The constitutional principle from which this modern separate-but-equal rule draws its sustenance is, of course, equal protection. Orthodox equal protection doctrine can be encapsulated in a single rule: government action which without justification imposes unequal burdens or awards unequal benefits is unconstitutional. The complaint that analytically no violation of equal protection vests unless the inequalities stem from a deliberately discriminatory plan [166] is simply false. Whatever the law was once, it is a testament to our maturing concept of equality that, with the help of Supreme Court decisions in the last decade, we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme.[167]

▇▇ Theoretically, therefore, purely irrational inequalities even between two schools in a culturally homogeneous, uniformly white suburb would raise a real constitutional question. But in cases not involving Negroes or the poor, courts will hesitate to enforce the separate-but-equal rule rigorously. Through use of a generous *de minimis* rule or of a relaxed justification doctrine, or simply in the name of institutional comity, courts will tolerate a high degree of inequality-producing play, and delay, in the joints of the educational system. But the law is too deeply committed to the real, not merely theoretical (and present, not deferred) equality of the Negro's educational experience to compromise its diligence for any of these reasons when cases raise the rights of the Negro poor. Further, the inequality of a predominantly Negro school is most often no mere random fortuity unlikely to persist or recur, as these proposed rules impliedly regard it. It is instead just one more exemplification of a disheartening and seemingly inexorable principle: segregated Negro schools, however the segregation is caused, are demonstrably inferior in fact. This principle is unanimously attested to by reports from every quarter.

---

165. The crime which *Plessy* committed was that in applying its standard it concluded that *de jure* segregated facilities were or could be equal. The Court, ruling in *Brown* that deliberately segregated schools were *inherently* unequal, implicitly accepted the separate but equal frame of reference, exploding it from the inside so far as its application to *de jure* schools was concerned.

166. *See* Kaplan, *Segregation Litigation and the Schools—Part II: The General Northern Problem*, 58 Nw.U.L.Rev. 157, 158–159 n. 3 (1963).

167. See Baker v. Carr, 369 U.S. 186, 226, 82 S.Ct. 691, 715, 7 L.Ed.2d 663 (1962): discrimination-in-fact is bad when it "reflects *no* policy, but simply arbitrary and capricious action." (Justice Brennan's emphasis.) The record here indicates, moreover, that not all the inequalities have been thoughtless.

The government classification in this case results from the neighborhood policy which assigns students according to residential zones, and also from the numerous but deliberate government allocative decisions the sum of which represents the inequalities the court has found.

*E. g.*, U. S. COMM'N ON CIVIL RIGHTS, PUBLIC SCHOOLS NORTH AND WEST 216–226 (1962); SILVERMAN, CRISIS IN BLACK AND WHITE 262–263 (1965); NATIONAL ASS'N OF INTERGROUP RELATIONS OFFICIALS (NAIRO), PUBLIC SCHOOL SEGREGATION IN THE NORTH 34–35 (1963); Dentler, *Barriers to Northern School Desegregation,* in THE NEGRO AMERICAN 472, 473 (K. Clark & T. Parsons ed. 1966); Peck & Cohen, *The Social Context of De Facto School Segregation,* 16 W.RES.L.REV. 572, 590, 593–594 (1965).

In any event the particular inequalities which have been uncovered in the course of this very long trial easily suffice to lay the predicate for an equal protection violation; as the Task Force commented, they may well spell the margin between "superior and inferior education." (Ex. A–3, p. 19.) If any countervailing advantages favor the predominantly Negro schools,[168] defendants have failed to highlight them.

 And here, too, there is an absence of convincing justification for the discriminations. The school system's failure to keep up with burgeoning population in the Negro neighborhoods explains several of the inequalities, thereby showing that the Board cannot be charged with having schemed their eventuation. But the element of deliberate discrimination is, as indicated above, not one of the requisites of an equal protection violation; and, given the high standards which pertain when racial minorities and the poor are denied equal educational opportunity, *see* pp. 506–508, *infra,* justification must be in terms not of excusing reasons of this stripe but of positive social interests protected or advanced. A related line of defense is that the school administration, through its six-year building plan, is moving to close at least the most glaring inequalities. But that a party is in process of curing illegality, although that

circumstance may affect the relief which equity finally grants, does not oust the court from its jurisdiction to declare the constitutional wrong. *See* United States v. W. T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

The failure to justify the teacher inequalities can also be confirmed. The attributes of individual schools' faculties are natural outgrowths of the methods by which teachers are assigned to the schools. And the court has already found that teacher assignment has been characterized by unconstitutional racial considerations. Absent strong evidence, the court will not assume that the superiorities in the qualifications of the predominantly white schools' faculties are unrelated to the infirmities in the appointment process.

 The final question concerns the remedy to be administered for relief of the inequalities here identified. Once the showing of inequality is completed, it may be that until it is eliminated the Negro student has the right to transfer to one of the advantaged white schools, as he did during *Plessy*'s reign under similar circumstances. *See* Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938). He certainly is entitled to appropriate injunctive relief directed at phasing out the inequality. These two considerations coalesce in the remedy the court is ordering for overcrowding: that the Board transport volunteering Negro students from the city's overcrowded elementary schools into the partly vacant white schools west of the Park. On this score the court is impressed that Dr. George Brain, whom defendants qualified as an expert on public school administration, as Superintendent of Baltimore's schools ordered the busing of center city Negro students into white schools along the city's periphery for this precise reason: to even out overcrowding. At the time of trial this busing

---

168. See Leflar & Davis, *Segregation in the Public Schools—1953,* 67 HARV.L.REV. 377, 398 (1954). It is instructive that another court has provided a remedy when the only disparity found was in the number of uncertified teachers. Matter of Skipwith, 14 Misc.2d 325, 180 N.Y.S.2d 852 (Dom.Rel.Ct.1958).

project in Baltimore was in its third year. Similar projects are under way in other cities. Implicit in the court's choice of remedy is the judgment that the Board's open transfer policy, *see* Findings I–E–3–a, as relief from the disparate overcrowding is unacceptably meagre. The transfer right which places the burden of arranging and financing transportation on the elementary schoolchildren is, particularly for the poor, a sterile right, one of form only.

The court should add that the integration implications of this remedy are obvious; as such, it gets cumulative support from the court's *de facto* segregation holding spelled out in Section V, where its equities are more thoroughly explored.

The teacher inequalities need no direct rectification at this time. Pursuant to one section of this court's order entered for reasons apart from separate-but-equal, the school system will soon be integrating its faculties. Compliance with this provision will necessarily encompass the reassignment of a number of white teachers currently serving at predominantly white schools. Since in general these are the best educated, longest-experienced and highest salaried teachers in the system, integration will also serve as a vehicle for equalizing faculty. The court will therefore defer formulation of specific provisions for faculty equalization at least until the dust surrounding this fall's "substantial" teacher integration settles.

## IV. DE JURE SEGREGATION

### A. *Optional Zones.*

Optional zones, deviants from the core principles of a neighborhood school policy, allow students living within their borders to choose which of two or more schools they will attend. In Washington, zones couched betwen the Park and 16th Street let the whites and Negroes in that integrated neighborhood attend either nearby predominantly (85–100%) Negro schools or integrated or white schools far on the other side of the Park. In the Southwest, urban renewal whites and public housing Negroes may attend either the distant, integrated Western High School or Dunbar, predominantly Negro. The theme which the court finds runs through these and other optional zones recently abolished is the school system's reluctance to make white students attend primarily Negro schools.[169]

To place this case in the larger perspective, it can be pointed out that an unwillingness to pursue a neighborhood school policy through to its logical consequences when that entails relegating whites to Negro schools is not a habit peculiar to local school officials. The Fifth Circuit Court of Appeals, schooled and toughened by a decade of experience with Southern desegregation, was recently moved to comment wearily on the steadfastness with which those Southern communities that have adopted neighbor-

169. This reluctance is evident in other school system practices and incidents: a. Two years ago the boundary line between Rabaut and Paul Junior Highs was redefined in order to avoid splitting up a small minority of white students between those two predominantly Negro schools. b. There was an "optional feature" in the Board's desegregation plan, allowing students to remain in the schools they were attending when *Bolling* was handed down even if outside their own neighborhoods as defined by the 1954 reorganization. It apparently expired of its own terms no later than 1960. *See* Mapp v. Board of Educ., 6 Cir., 373 F.2d 75, 77 (1967); Dowell v. School Board, W.D.Okla., 244 F.Supp. 971, 974–975 (1965), *affirmed*, Board of Ed. of Oklahoma City, etc. v. Dowell, 10 Cir., 375 F. 2d 158 (1967), *cert. denied*, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (May 29, 1967). c. Another practice permitted white students who alleged they would be psychologically unnerved by integration to flee from the predominantly Negro schools in their neighborhoods into public schools with greater white enrollment elsewhere in the city, a practice obviously giving encouragement to misrepresentations and to nascent prejudice in the young. There is no evidence as to whether this practice or any variant thereof is still in existence. *See* Goss v. Board of Educ., 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963).

hood school plans carve exceptions there-from:

"As every member of this court knows, there are neighborhoods in the South and in every city in the South which contain both Negro and white people. So far as has come to the attention of the court, no Board of Education has yet suggested that *every* child be required to attend his 'neigborhood school' if the neighborhood school is a Negro school. Every board of education has claimed the right to assign every white child to a school other than the neighborhood school under such circumstances." [170]

Nor is this even an exclusively Southern phenomenon; across the North similarly derived optional zones besmirch the supposed racial evenhandedness of many school boards' neighborhood school policies.[171]

 Nationally common or not, these zones in the District produce *de jure* constitutional violations. Given their unmistakably segregatory aspects and the Supreme Court's broad expression in Goss v. Board of Education, 373 U.S. 683, 686, 688, 83 S.Ct. 1405 (1963), that any device which "promote[s]" or inevitably "lends itself" to segregation is unconstitutional, the optional zones might be thought to pose an easy equal protection question. Unlike the minority-to-majority transfer struck in *Goss*, however, these zones do allow the Negro as well as the white students who live within them to choose a white (or integrated) rather than a predominantly Negro school; and at first glance these zones may be thought to bear a slight resemblance to student freedom of choice plans now being approved in the South, if only on a provisional basis.[172] These

are plans which let all the students within a school system elect which of two or more schools they will attend. On closer analysis the similarity vanishes.

For, whatever the value of a free choice plan adopted city-wide, anomalies flower when islands of free choice are planted selectively in the midst of a neighborhood school system. These zones in the District admittedly were created to accommodate white families anxious not to send their children to Negro schools; they were created in Crestwood, Kalorama Triangle, and in the Southwest because of the residence thereof of a significant number of whites, probably a higher density of white families, the court can note, than anywhere else in the Roosevelt, Cardozo and Dunbar High School districts. They were not established in any of the nearly exclusively Negro neighborhoods which typify the Roosevelt-Cardozo-Dunbar swath of the central city.

Thus the racial basis for the optional zones becomes not only obvious but discriminatory. Negro students living in the Dunbar High School district, but outside the optional zone, and therefore compelled by the neighborhood school logic to attend Dunbar (a predominantly Negro school) are frustrated in their right to equal protection when that logic is withheld from students in the integrated Southwest corner of the Dunbar district to whom it equally applies. If the neighborhood policy anywhere in the District locks Negro students without their consent into predominantly Negro schools, they certainly are entitled to know that in similar circumstances concentrations of whites, and Negroes living near them, are not being accorded undue

---

170. Davis v. Board of School Comm'rs, 5 Cir., 364 F.2d 896, 901 (1966).

171. *See* 1 U. S. Civil Rights Comm'n, Racial Isolation in the Public Schools 52–54 (1967); NAIRO, Public School Segregation and Integration in the North 25–26 (1963).

172. United States v. Jefferson County Bd. of Educ., 5 Cir., 372 F.2d 836 (1966), *reaffirmed en banc*, 380 F.2d 385 (March 29, 1967) ; Kemp v. Beasley, 8 Cir., 352 F.2d 14 (1965); Bradley v. School Board, 4 Cir., 345 F.2d 310, *vacated on other grounds*, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965).

differential treatment in other parts of the city.[173]

One question is left. The unsupported utterance of a school official respecting the Dunbar zone, but that zone only, was that whites in the zone would sign up at private schools rather than attend the predominantly Negro neighborhood high school, Dunbar. (Tr. 2984–2985.) Even if proved, that fact cannot justify the zone, constitutionally. White students cannot earn for themselves discriminatory preferences by holding over a school board the threat of withdrawal from the public schools.[174] The court need not and does not assume these students all seek escape from Dunbar because of racial prejudice; rather, the court agrees that Negro ghetto schools like Dunbar are inherently unequal educationally, and assumes that many white students want out for this very reason. But, needless to say, that hardly secures their right to discriminatory treatment.

B. *Teacher and Principal Segregation.*

1. *Teachers.*

If the question was ever beclouded by genuine doubt, the Supreme Court dispelled doubts two terms ago in holding that *de jure* teacher segregation is an affront to the constitutional rights of teachers [175] and students alike. Bradley v. School Board, 382 U.S. 103, 86 S.Ct. 224 (1965); Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965). Teacher assignment in Washington on a Division I/II basis in the separate-but-equal regime before *Bolling* and *Brown* was, of course, a classic example of this unconstitutional practice. And the Board's policy decision in the aftermath of *Bolling* to let all teachers remain in the schools to which they had been racially assigned before 1954 is a classic illustration of unconstitutional segregation perpetuated.

Clearly, this policy could have been enjoined by an equity court bent on remedying *past* segregation by extirpating all its persevering influences.[176] Moreover, because the policy, detrimental to Negro students in that it shut them in with segregated faculties, capitalized on a factual setting itself the product of unconstitutional action, it was a continuing

173. Western, one of the options in each of the high school zones, is an integrated school (the only such high school in the city) the white enrollment at which has slumped all the way from 73% to 41% since 1962. Defendants do *not* say that the design of these zones is to infuse white students into a school in danger of losing its integrated character. Any argument that this purpose underlies the zones would shipwreck on the fact that two years ago, the very time when the danger at Western was first materializing, the Roosevelt-Western zone was amended to include an option to attend *Wilson* High School, which is predominantly white.

174. *See* the cases establishing the crucial First Amendment doctrine that the dangerous or violent reactions of listeners is no reason for curbing the speaker's right to free expression. *E. g.*, Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). There is a difference, of course: while the police may restrain or arrest the unruly onlookers, they cannot halt the emigration by white families from the city, or bar them from

enrolling their children in private schools. Pierce v. Society of the Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). But while the end of *de jure* segregation in the South has led to massive withdrawals of white students in some school districts, this has never been thought to provide a legal defense against desegregation, nor has white withdrawal ever been advanced as a justification for neighborhood gerrymandering, which optional zoning closely resembles.

175. Carolyn Stewart, the only teacher plaintiff, advised the court the day trial began that, while she would remain nominally a party, she disclaimed all "financial, legal, or moral responsibility" for counsel, his conduct and his arguments.

176. *See* Louisiana v. United States, 380 U.S. 145, 154–155, 85 S.Ct. 817, 13 L.Ed. 2d 709 (1965) (voting registration qualifications "frozen" as remedy for past registration discrimination); Ross v. Dyer, 5 Cir., 312 F.2d 191, 194 (1962); Miller v. School Dist., D.S.C., 256 F.Supp. 370, 378 (1966) (calling for elimination of "all vestiges" of teacher segregation).

violation of the students' constitutional rights.[177]

■ Moreover, the court has found that, despite the decision in *Bolling*, intentional teacher segregation in the District still goes on, not only separating white from Negro teachers but assigning them respectively to schools with predominantly white and Negro student bodies; under these circumstances the strength of the *Rogers* ruling redoubles. The fact that in many schools the equivalent of token integration has been carried out is of no legal moment; the Constitution is not appeased by tokenism. Therefore, this persisting segregation is plainly defective, constitutionally.

This is certainly true to the extent it is attributable to the segregatory teacher assignment practices of assistant superintendents and school principals. In its findings, the court has gone on to question whether a share of the blame should not be charged to teachers, the racial preferences of a few of whom the assistant superintendents may have heeded in issuing assignments. Teacher segregation so resulting, it could be argued, does not offend the constitutional rights of the teachers, who were in effect awarded a kind of freedom of choice.

■ But if any truth is axiomatic, it is that the Negro *students'* equal protection rights to an integrated faculty cannot be undermined or thwarted by the racially induced preferences

of the teachers, who after all are minor public officials whose actions must therefore pass constitutional muster.[178] *Rogers* unquestionably extends to every situation in which teacher segregation results from the deliberately segregatory decision of any public officer, or from a pattern of such decisions. Ultimate authority for teacher assignment under the law is vested in the Board of Education. It cannot avoid constitutional responsibility when the public officers, including teachers, to whom it delegates the actual assignment power govern themselves according to illicit racial criteria.

One other question concerning teacher segregation and relevant to the *de facto* issue in this case is the effect teacher segregation has on a neighborhood school policy. The practical consequence of teacher segregation has been accurately described by several Southern courts.

"* * * [T]he presence of all Negro teachers in a school attended solely by Negro pupils in the past denotes that school as a 'colored' school just as clearly as if the words were printed across the entrance in six-inch letters." [179]

Correlatively, they rightly say, by appointing all white teachers and principals to other schools, school boards identify those schools as intended for white students.[180]

The context in which Southern courts have confronted this fact of teacher seg-

---

177. *See* United States v. Logue, 5 Cir., 344 F.2d 290 (1965), where a voting registration qualification that the applicant be "sponsored" by a registered voter was held unconstitutional as applied to Negroes, since past voting discrimination was the cause of the absence of registered voters who were Negro and therefore willing to serve as sponsors for other Negroes. *See also* Meredith v. Fair, 5 Cir., 298 F.2d 696 (1962) *(semble)*. And see Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915) (invalidating Oklahoma's "grandfather" clause).

178. *Compare* Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961);

United States v. Classic, 313 U.S. 299 (1941); Matter of Skipwith, 14 Misc.2d 325, 344, 180 N.Y.S.2d 852, 871 (Dom.Rel. Ct.1958). For a teacher to flunk one of his students because the student was a Negro, for example, plainly would be government action proscribed by the Constitution.

179. Kelley v. Altheimer, Ark. Pub. School Dist., 8 Cir., 378 F.2d 483, 491 (April 12, 1967) ; Brown v. County School Board, W.D.Va., 245 F.Supp. 549 (1965).

180. Kelley v. Altheimer, *supra* Note 179, 378 F,2d at 491; United States v. Jefferson County Bd. of Educ., 5 Cir., 372 F.2d 836, 883–886 (1966), *reaffirmed en banc*, 380 F.2d 385 (March 29, 1967).

regation is freedom of choice—the strategy which Southern communities are increasingly turning to as a device for, some say for evasion of, desegregation. If anything, the racial identification resulting from teacher segregation becomes all the stronger in the context of a neighborhood school policy, since under that regime, unlike free choice, Negro students in overwhelming numbers are actually assigned without their consent to, and compelled to attend, these schools defined by Negro faculties. The race of the student body in effect serves as the predicate for an official decision—assignment of a teacher—which in turn confirms and solidifies the school's racial character.

What is very interesting is that the conclusion these courts are drawing in the circumstances of their litigation is that teacher segregation not only is a self-contained legal wrong but also ruins the constitutionality of the free choice plan, since it casts an untoward racial influence on the students' choice of schools.[181] The relation of teacher segregation to the neighborhood school policy has been little touched on [182]; but it is this court's conviction that that teacher segregation, where it is allowed to reinforce pupil segregation, may well be a malignancy in itself destructive of the constitutional health of a neighborhood school system, inasmuch as it effectively invites the entire community, including the Negro children themselves, to regard the school which is predominantly attended by Negro students as an officially Negro school, *compare* Anderson v. Martin, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430 (1964), this being the kind of community attitude which can wreak havoc on the school's spirit. Certainly it is a circumstance driving the *de facto* pupil segregation that much

closer to unconstitutionality. *See* pp. 505, 506, *infra.*

2. *Principals.*

Principal segregation, the court has found, is a result of the inbreeding of principals within the white schools. That is, when a principal in one of these schools retires, the position is filled by appointing someone already teaching in one of the white schools, or by transferring in a principal from another such school, on the theory that these candidates have had years of experience with the middle class problems which arise in these schools.

■■■ Because, however, both before and subsequent to *Bolling* teachers have been assigned to these white schools on a racial basis, the process of principal selection has its foundation in a pattern of teacher assignment marred by illegality. This selection process thereby infects the assignment of principals with the identical unconstitutionality.[183]

## V. DE FACTO SEGREGATION

■■■ One of the court's findings of fact is that elements in the school administration, though not necessarily on the Board, are affirmatively satisfied with the segregation which the local neighborhood school policy spawns. (Findings, I–F–5.) But this finding falls somewhat short of showing the kind of actual intent needed if the policy is to be censured under *de jure* principles. Therefore the court approaches the more generalized question of whether the *de facto* or adventitious segregation in Washington is itself unconstitutional. In Washington, as in other Northern cities, this question arises in the context of a neighborhood policy which, superimposed on segregated urban housing, effectively separates white from Negro in the public schools.

---

181. *E. g.*, Kier v. County School Board, W. D.Va., 249 F.Supp. 239, 247, 249 (1966); Wright v. County School Board, E.D.Va., 252 F.Supp. 378, 383–384 (1966).

182. *See* Downs v. Board of Educ., 10 Cir., 336 F.2d 988, 997 (1964), *cert. denied,*

380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965).

183. *See* the cases cited in Notes 176 and 177, *supra.*

It would be wrong to ignore or belittle the real social values which neighborhood schools doubtlessly promote.[184] But due appreciation of these values must not obscure the fact that the price society pays for neighborhood schools, in Washington and other urban centers, is in racially segregated public education. As the court's Findings (I–G) indicate, school segregation, whatever its genesis, typically imposes a twofold disadvantage.

One, the Negro schools provide their Negro students with an education inferior to that which others, white and Negro alike, receive in integrated or predominantly white education settings. This the court finds from the evidence adduced at trial. This finding is confirmed by the Supreme Court in *Brown* I, which, besides noting that "separate" schools are inherently unequal and psychologically harmful to Negro school children, approved the finding entered by the lower court explicitly stating that even unmandated segregation has a "detrimental effect" on Negroes.[185] The court can judicially note that corroborating views can also be found in the conclusions of the federal agency commissioned by Congress to investigate racial questions;[186] in the decisions of federal courts,[187] and of state legislatures and education officers and committees;[188] and in the experienced judgments of American educators and psychologists expert in race relations,[189] who make it clear that the damage segregation causes stems from the sense of confinement it imparts, together with the low esteem which the predominantly Negro school naturally draws from the white[189a] as well as the Negro community.

In addition, segregation in the schools precludes the kind of social encounter between Negroes and whites which is an indispensable attribute of education for mature citizenship in an interracial and democratic society. Segregation "per-

184. *See* Findings of Fact I–B–2; Deal v. Cincinnati Board of Educ., 6 Cir., 369 F.2d 55, 60 (1966); Springfield School Comm. v. Barksdale, 1 Cir., 348 F.2d 261, 264 (1965).

185. This finding reads: "Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of law. * * *" 347 U.S. 483, at 494, 74 S.Ct. 686, at 691, 98 L.Ed. 873.

186. 1 U. S. Comm'n on Civil Rights, Racial Isolation in the Public Schools ch. 3 (1967). The Commission's statistical methods have been criticized. Bowles & Levin, *Equality of Educational Opportunity: A Critical Appraisal* (1967) (unpublished).

187. Barksdale v. Springfield, D.Mass., 237 F.Supp. 543, 546, *rev'd on other grounds*, 1 Cir., 348 F.2d 261 (1965); Blocker. v. Board of Education, E.D.N.Y., 226 F.Supp. 208, 227–229 (1964).

188. *E. g.*, Mass.Gen.Laws ch. 71, § 37C–37D; ch. 15, §§ 1I–1K (1965); *Memorandum of New York State Commissioner of Education*, 8 Race Rel.L.Rep. 738 (1963); *see Resolution of Baltimore City Board of School Commissioners*, *id.* at 1226-1227. The *Report of the Advisory Committee on Racial Imbalance and Education to the Massachusetts Board of Education* has been published as Because It Is Right—Educationally (1965).

189. Pettigrew & Pajonas, *Social Psychological Considerations of Racially-Balanced Schools*; Seaholes, *Impact of Racial Imbalance and Balance*, both appendices to Because It Is Right—Educationally, *supra* Note 188; Fischer, *Race and Reconciliation: The Role of the School*, in The Negro American 491 (K. Clark & T. Parsons ed. 1966). *See also* the reports of the testimony of Professor Pettigrew in Barksdale v. Springfield School Comm., D.Mass., 237 F.Supp. 543, 546, *rev'd on other grounds*, 1 Cir., 348 F.2d 261 (1965) ("[R]acially imbalanced schools are not conducive to learning"), of Dr. Kenneth B. Clark in Matter of Skipwith, 14 Misc.2d 325, 337–338, 180 N.Y.S.2d 852, 855–866 (Northern segregated conditions "depress the ability of children to learn"), and of professors of education and sociology in Deal v. Cincinnati Board of Education, S.D.Ohio, 244 F.Supp. 572, 580–581 (1965), *aff'd*, 6 Cir., 369 F.2d 55 (1966) ("[A] racially unbalanced school seriously affects a child's ability to learn").

189a. The record in this case affirmatively shows that predominantly Negro schools are held in very low repute by white teachers and parents. See Findings I–G–2.

petuates the barriers between the races; stereotypes, misunderstandings, hatred, and the inability to communicate are all intensified." [190] Education, which everyone agrees should include the opportunity for biracial experiences, carries on, of course, in the home and neighborhood as well at school.[191] In this respect residential segregation, by ruling out meaningful experiences of this type outside of school, intensifies, not eliminates, the need for integration within school.

It is in this light that defendants' appropriation of Horace Mann as the supposed architect of today's neighborhood school policy (Tr. 5032) is singularly unjust. For Mann believed that public schools were at the source of the democratic enterprise; his faith, like that of his fellow reformers, was that the public school, by drawing into the close association of the classroom students from every social, economic and cultural background, would serve as an object lesson in equality and brotherhood and undermine the social class divisions which he and his colleagues felt were inimical to democracy.[192] If there is a characteristically American philosophy of public school education, this is its apparent substance.

The democratizing relevance of public school education, so intense a concern for the founders of our public schools, has lost none of its urgency in the intervening century, if only because society now is finally beginning to contemplate the assimilation of the Negro, hitherto systematically excluded from participation in our political life and from the abundance of our economy.[193] This relevance was pointedly articulated by a committee of law professors as *amicus* in the law school segregation case, Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, (1950). Their brief read, in part, as follows:

> " * * * [P]roper teaching of the principle of equality of opportunity requires more than mere inculcation of the democratic ideal. What is essential is the opportunity, at least in the school, to practice it. This requires that the *school make possible continuous actual experience of harmonious cooperation between members of various ethnic and religious groups and thus produce attitudes of tolerance and mutual sharing that will continue in later life.* In the segregated school, this desirable environment does not exist. The most important instrument for teaching democracy to all people is thus rendered impotent." [194]

We have it, further, on the authority of the Supreme Court, in McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S. Ct. 851, 94 L.Ed. 1149 (1950), the companion of Sweatt v. Painter, *supra,* and the last of the cases before *Brown,* that to share experiences with the other race remains an integral aspect of educational opportunity.

190. Fiss, *Racial Imbalance in the Schools*: *The Constitutional Concepts,* 77 HARV.L. REV. 564, 570 (1965).

191. *See* B. BAILYN, EDUCATION IN THE FORMING OF AMERICAN SOCIETY 9, 15 (1960) ; S. KIMBALL & J. McCLELLAN, EDUCATION AND THE NEW AMERICA 39–40 (1962), for the primacy of the school as the institution which mediates between a *child's family and neighborhood and the* adult outside world.

192. *See* H. MANN, THE REPUBLIC AND THE SCHOOL 8, 32–33 (L. Cremin ed. 1957) ; L. CREMIN, THE AMERICAN COMMON SCHOOL: AN HISTORIC CONCEPTION 55–62 (1951).

To align Mann, therefore, with those who currently applaud "neighborhood" schools which isolate Negro from white, impoverished from affluent, and one ethnic group clustered in one corner of a city from all other citizens is inadequate educational history. Since in Mann's time the age of the motor car lay far beyond the horizon, schools within walking distance from home were simply an imperative; and, given his contemporary housing patterns, the multiple integration Mann insisted on could be achieved within the neighborhood school's frame.

193. *See* N. GLAZER & D. MOYNIHAN, BEYOND THE MELTING POT ch. 1 (1963).

194. *Brief for the Committee of Law Teachers Against Segregation in Legal Education,* 34 MINN.L.REV. 289, 319–320 (1950). The authors included Thomas I. Emerson, John P. Frank, Erwin N. Griswold and Edward Levi.

In the District, moreover, *de facto* segregation results in even additional harm to Negro students, for here the neighborhood policy enters into alliance with deliberate teacher segregation, with optional zones manifesting the school administration's unwillingness to make white students attend Negro schools, and with the objective inequalities between white and Negro schools recapitulated in Section III *supra*.[195] *Brown* I reported that *de jure* segregation "generates a feeling of inferiority as to their status in the community that may affect [Negro students'] hearts and minds." This court, though unwilling to assume that Negro schoolchildren can readily perceive the sharp difference between *de jure* and *de facto* situations which lawyers note, does not doubt that the personal harm which segregation imparts may, in some circumstances, be somewhat less in the *de facto* situation. What, however, can we expect the Negro children to think and feel when almost all the adult faces they see at their predominantly Negro schools are black, by virtue of a process of deliberate selection which identifies their schools as intended for Negroes, when their own sense of confinement is reinforced by their observation that white students are allowed to desert Negro neighborhood schools for predominantly white schools miles away, when—among other comparative indignities—their own school is jammed with students, though they are aware that schools across the Park have classroom space to spare. These circumstances, the court is convinced, in the context of the local *de facto* segregation conspire to inflict the entire emotional hurt crippling to academic motivation set out in *Brown*.

█ *De facto* segregation in the District, in sum, redounds to the academic detriment of Negro students and seriously sets back the working out of racial prejudices. These facts, however, do not conclusively determine its unconstitutionality, for with every inequality-producing classification there remains the question of justification. Indeed, ordinary statutory classifications resulting in inequalities economic in nature are traditionally upheld whenever the reviewing court can imagine a reasonable or rational basis supporting the classification.[196]

But the Supreme Court has been vigilant in erecting a firm justification principle against every legal rule which isolates for differential treatment a disadvantaged minority, whether defined by alienage, Takahashi v. Fish & Game Comm'n, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); nationality, Oyama v. State of California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948); or race, Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). While entitled before they succumb to judicial invalidation to a hearing on the justification

---

195. The other side of the coin is the situation to the west of the Park. There the neighborhood policy produces student bodies which, in the northern half, are all 85–100% white and, in the south, are more than two-thirds white in each of the elementary schools. No other school anywhere in the District is currently so much as 67% white. And these white student bodies combine with the segregatory assignment of white teachers, the inbreeding of white principals, a depth of trained, experienced teachers, and a luxury of extra space. The upshot is a cluster of schools, physically set apart by the Park, primarily white and objectively superior, essentially constituting a school system unto itself.

196. *E. g.*, McGowan v. State of Maryland, 366 U.S. 420, 425–429, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959). This, in essence, seems to be the test borrowed by the four Courts of Appeals which have ruled that *de facto* segregation is not unconstitutional. Deal v. Cincinnati Bd. of Educ., 6 Cir., 369 F.2d 55 (1966); Gilliam v. School Bd., 4 Cir., 345 F.2d 325, *vacated*, Bradley v. School Board, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); Downs v. Board of Educ., 10 Cir., 336 F.2d 988 (1964), *cert. denied*, 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965); Bell v. School City of Gary, 7 Cir., 324 F.2d 209 (1963), *cert. denied*, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed. 2d 216 (1964).

question, these classifications come freighted with "a heavy burden of justification." McLaughlin v. State of Florida, 379 U.S. 184, 196, 85 S.Ct. 283, 13 L.Ed.2d 222 (1965). That is, the objectives they further must be unattainable by narrower or less offensive legislative courses; and even if so, those objectives must be of sufficient magnitude to override, in the court's judgment, the evil of the inequality which the legislation engenders. These rules are allowed to relax not even when the right at stake is one which the law itself disfavors. *E. g.*, *McLaughlin, supra* (out-of-wedlock cohabitation).

Next—to shift the focus—regardless of the identity of the injured party, when it is a critical personal right which the classification invades, that law too must must be remitted to the gauntlet of a judicial review searching for adequate justification. Skinner v. State of Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (right not to be sterilized); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (right to vote). *Cf.* Kotch v. Board of River Port Pilot Comm'rs, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1947).

This need for investigating justification is strengthened when the practice, though not explicitly singling out for special treatment any of the groups for which the Constitution has a special solicitude, operates in such a way that one such group is harshly and disproportionately disadvantaged. *See* Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585 (1956), and its progeny, all involving the right to appeal in criminal cases, where practices directed specifically at those who *do* not pay certain fees were held invalid because of the injury they inflicted on those who *cannot* pay them. *See also* Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (poverty and the poll tax).[197]

The explanation for this additional scrutiny of practices which, although not directly discriminatory, nevertheless fall harshly on such groups relates to the judicial attitude toward legislative and administrative judgments. Judicial deference to these judgments is predicated in the confidence courts have that they are just resolutions of conflicting interests. This confidence is often misplaced when the vital interests of the poor and of racial minorities are involved. For these groups are not always assured of a full and fair hearing through the ordinary political processes, not so much because of the chance of outright bias, but because of the abiding danger that the power structure—a term which need

---

197. The cases listed in the above paragraphs, while not all written in exactly these terms, have long been understood as reasoning in the direction indicated. *See* Horowitz, *Unseparate But Unequal —The Emerging Fourteenth Amendment Issue in Public Education*, 13 U.C.L.A. L.Rev. 1147, 1155–1159 (1966); Van Alstyne, *Student Academic Freedom and the Rule-Making Powers of Public Universities: Some Constitutional Considerations*, 2 Law in Trans.Q. 28 (1965); McKay, *Political Thickets and Crazy Quilts, Reapportionment and Equal Protection*, 61 Mich.L.Rev. 645, 664–676 (1963); Comment, *Equal Protection and the Indigent Defendant: Griffin and Its Progeny*, 16 Stan.L.Rev. 394, 397–405 (1964); Casenotes, 80 Harv.L.Rev. 176 (1966), 70 Harv.L.Rev. 126 (1956). *And see Harper, supra*, 383 U.S. at 680– 686, 86 S.Ct. 1079 (Harlan, J., dissenting).

That the equal protection standards to be applied in cases dealing with racial classifications and laws infringing fundamental rights are thus similar does no offense to the assumption that the former are the far more uniformly unconstitutional. This difference comes, however, less from the governing standards themselves than from the pattern of results of the standards as applied. Not until another national emergency arises, *see* Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193 (1944), will outright racial discriminations be backed by a legitimate, let alone overriding, governmental purpose; but such purposes may frequently be discoverable in the case of evenhanded laws which, unavoidably, touch vital personal interests.

carry no disparaging or abusive overtones—may incline to pay little heed to even the deserving interests of a politically voiceless and invisible minority.[198] These considerations impel a closer judicial surveillance and review of administrative judgments adversely affecting racial minorities, and the poor, than would otherwise be necessary.

This reasoning, as applied to *de facto* segregation, leads the court to conclude that it must hazard a diligent judicial search for justification. If the situation were one involving racial imbalance but in some facility other than the public schools, or unequal educational opportunity but without any Negro or poverty aspects (*e. g.*, unequal schools all within an economically homogeneous white suburb), it might be pardonable to uphold the practice on a minimal showing of rational basis. But the fusion of these two elements in *de facto* segregation in public schools irresistibly calls for additional justification. What supports this call is our horror at inflicting any further injury on the Negro, the degree to which the poor and the Negro must rely on the public schools in rescuing themselves from their depressed cultural and economic condition, and also our common need for the schools to serve as the public agency for neutralizing and normalizing race relations in this country. With these interests at stake, the court must ask whether the virtues stemming from the Board of Education's pupil assignment policy (here the neighborhood policy) are compelling or adequate justification for the considerable evils of *de facto* segregation which adherence to this policy breeds.[199]

This view of the law is one already endorsed by one federal court. The neighborhood school, stated Chief Judge Zavatt in Blocker v. Board of Educ., E.D. N.Y., 226 F.Supp. 208 (1964), is not "devoid of rationality," a judgment which cannot very successfully be questioned. But mere thin rationality, the court continued, is less than enough: "A closer scrutiny and stronger justification than that are required." *Id.*, at 225, quoting language from Poe v. Ullman, 367 U.S. 497, 554, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting). In line with *Blocker* is the stance assumed by the Fifth Circuit, which just recently indicated *en banc*, after reviewing the developing *de facto* law, that "integration is an educational goal to be given a high, high priority among the various considerations involved in the proper administration of a system beset with de facto segregated schools." United States v. Jefferson County, 5 Cir., 372 F.2d 836, 875 (1966), *reaffirmed en banc*, March 29, 1967, 380 F.2d 385.

In their application, these principles require the illumination of concrete expedients or alternatives, the ques-

198. While in the District it is whites who are the minority, Negroes are unable to translate their superior numbers into political power, for the obvious reason that citizens in the District are disenfranchised with respect to local government. Ultimate responsibility for the District's schools is lodged in the Congress and its District Committees; immediate responsibility in a Board of Education on which until last week Negroes had only a minority vote, and only a one-third vote when the basic decisions on desegregation were reached in 1954. And since they are neither elected nor re-elected, but appointed by the judges of the District Court, Negro Board members are neither responsive nor responsible to the public will of the local, largely poor Negro community.

*Compare* Fiss, *supra* Note 190, at 610–611.

199. The court does not object to the primary conclusion of the Seventh Circuit in Bell v. School City of Gary, 324 F.2d 209 (1963), *cert. denied*, 377 U.S. 924, 84 S.Ct. 1223 (1963), that curing segregation is not so automatically paramount an interest that "little, if any, consideration need to be given to the safety of the children, convenience of pupils and their parents, and costs of the operation of the school system." *Id.* at 212. On the contrary, these factors should be carefully assessed; but integration must also be given its due and considerable weight. *See also* Evans v. Buchanan, D.Del., 207 F.Supp. 820, 824 (1962), which uses a weighing approach; Fiss, *supra* Note 190, at 598–612.

tion being whether in view of these alternatives the Board's obeisance to its neighborhood school policy can be justified. One such alternative which cannot fail to arrest the school official eager to explore ways of reducing segregation in the schools would be to transfer and transport volunteering Negro students stuck in overcrowded elementary schools in their neighborhoods into the partly empty white schools west of the Park.[200] From the vantage point of conquering the evils of *de facto* segregation this proposal has much appeal. It is capable of achieving an integrated educational experience for as many as a thousand Negro students—and, it should not be forgotten, for more than two thousand white students. It does so under circumstances which will leave the white students in a clear but not overwhelming majority in the schools, since the typical school in the west has a present enrollment of 200 or 225 against a capacity of 300; many educators feel these are optimal conditions for the success of an integration project.[201]

Arrayed against these social and educational virtues are very few countervailing arguments of any merit. True, the volunteering Negro students would themselves forsake the advantages of the neighborhood schools; but who can doubt that these advantages are susceptible to waiver by Negro parents and students who deem that school integration is of greater value. It may be accurate that the school itself gleans some benefit from its proximity to the homes of its students; even if so, this certainly is a clear case in which the school's slight interest in preserving the status quo is transcended by the student's right to obtain an integrated educational experience. Moreover, this transportation remedy clearly entails no depression of the valid interests of the white students west of the Park. They will remain in the schools in their neighborhoods. These schools will give up only the volume of superfluous space which assuredly they have little real need for presently. And, indeed, the white students will themselves number among those profiting from the access to integrated schooling.

■ Additional objections to the proposal can be found in Dr. Hansen's reply to the Board arguing against adoption of an equivalent recommendation advanced by the Urban League. These objections, upon review, fail in cogency. Nothing inherent in the transportation provision need halt or impede the construction of school buildings where needed. And the court can assure the school administration that thoughtful, sensible policies for

200. It is clear that a transfer policy which does not encompass provision of transportation would be a very weak instrument for achieving integration. It is illuminating that under the school system's open transfer policy, designed to relieve overcrowding, only 200 elementary school students, many of them white, have availed themselves of the transfer option (they are included in the figures below). For most elementary school students a transfer policy without transportation is a right without substance.

Here are the student capacities and 1966–67 enrollments of the elementary schools west of the Park. The figures in parentheses are the numbers of Negroes enrolled in each school.

| School | Capacity | Enrollment |
|---|---|---|
| Eaton | 510 | 419 (51) |
| Fillmore | 270 | 116 (20) |
| Jackson | 270 | 93 (21) |
| Janney | 600 | 514 (25) |
| Hardy | 330 | 201 (60) |
| Hearst | 300 | 285 (34) |
| Hyde | 240 | 138 (30) |
| Key | 300 | 206 (42) |
| Lafayette | 690 | 731 (17) |
| Mann | 300 | 228 (13) |
| Murch | 690 | 601 (18) |
| Oyster | 270 | 315 (40) |
| Stoddert | 300 | 200 (24) |

Eleven of these 13 schools are underutilized. Given the 1966–67 enrollments, 662 Negroes could be imported into these 11 even if no school is allowed to become more than 40% Negro; 833 Negroes, 50%; 1109 Negroes if all places are filled.

201. *E. g.*, Pettigrew & Pajonas, *supra* Note 189, at 104. This remedy also serves as a temporary measure for the relief of the disparate overcrowding in the Negro schools. *See* Section III, *supra*. In gauging its advisability, the court balances against its costs its cumulative power to improve two unconstitutional conditions.

mitigating *de facto* segregation and its attendant iniquities fall under no constitutional ban.[202]

█ The only respectable demerit to the transportation plan is its cost in the purely budgetary sense. The court notes Dr. Hansen's own argument that public transportation at low fares is available to students, and that the expenses entailed in busing would become "excessive" only if the program is very greatly enlarged; it also is impressed that Baltimore introduced a busing plan of apparently equal ambition when the only end sought was the extenuation of overcrowding. Even if transportation costs do climb to moderate levels, the court cannot conclude that they cancel out the wisdom of a policy so abundant in its integrating potential.

For at least this one alternative, therefore, the resulting social gains far exceed the costs of any and every kind. This confirms that the Board's generally strict adherence to the neighborhood policy is beyond justification in this one instance, which supports the assumption that other proposals can also be framed the net advantages of which in integration terms will also be clear. In light of this great likelihood, the court has decided to in effect remand these proceedings to the Board of Education for its formulation of an integration "plan" which carefully assesses the virtues and costs of the spectrum of integration strategies,[203] as they could be carried out here in the District. The primary focus, of course, should be on junior and senior high schools, which the court's present injunctive order does not affect.

It is not inappropriate to suggest that in the course of its inquiry the Board should reinvestigate the alterations of the Wilson-Coolidge (high schools) and Paul-Deal (junior high) zones recommended by the Urban League. It will plainly be a shame, moreover, if the lines of the new Lincoln Junior High on the edge of Mount Pleasant are not drawn with the goal in mind of opening Lincoln this fall as an integrated school.

Additionally, as Dr. Hansen himself testified at trial, the division of the District from its Maryland and Virginia suburbs is, in terms of education, "artificial." (Tr. 190.) This truth is underlined by the fact that many of the families living in the white suburban "noose" are emigres from the District whose flight may have been prompted in part by their dissatisfaction with the District's school system, for whatever reasons. In many urban areas in the East urban school officials are studying or launching steps which move in the direction of metropolitanizing educational systems.[204] As defendants argue, not more than a minority of Washington's Negroes can be afforded access to integrated education within the present constraints of the District's schools, with their diminished white enrollment. Yet, despite this, there is no evidence that the school administration has devoted more than very minor efforts to contacting the schools in these surrounding suburbs. (*See* Tr. 614. The court need not here even remotely consider what the provisions ought to be of any metropolitan school alliance; indeed, the court disavows any power to dictate those terms, or even compel the suburbs to come to the conference table. But none of this alters the fact that the Board of Education seems to have everything to gain (*see*

---

**202.** Wanner v. County School Bd., 4 Cir., 357 F.2d 452, 457 & n. 7 (1966); Springfield School Comm. v. Barksdale, 1 Cir., 348 F.2d 261 (1965).

Another of Dr. Hansen's arguments pertained to the Urban League's recommendation that Negro students be bused involuntarily. The court's order includes no such provision and therefore this argument does not apply.

**203.** *See* 1 U. S. COMMISSION ON CIVIL RIGHTS, RACIAL ISOLATION IN THE PUBLIC SCHOOLS ch. 4 (1967); Levenson, *Educational Implications of De Facto School Segregation*, 16 W.RES.L.REV. 545 (1965).

**204.** *See* REPORT OF THE WHITE HOUSE CONFERENCE, TO FULFILL THESE RIGHTS 77 (1966); HARVARD GRADUATE SCHOOL OF EDUCATION, EDUCATION FOR PITTSBURGH (1966).

Tr. 5094, 6002) and nothing to lose in seeking to initiate negotiations.

 Until it receives and has the chance to study the integration plan it is asking the Board to prepare, the court itself will take no action respecting these and the range of other integration tactics. The exception is the transportation of Negro students into elementary schools west of the Park, which the court here orders should begin this fall. The reason for this exception is that there are two considerations recommending that the court stay its hand until after submission of the plan, and with respect to this remedy neither of these two applies. The first is that if a choice presents itself between more than one integration tactic, ordinarily that choice is committed to the Board. But, for purposes of the immediate future, there seemingly is *no* other practical way of integrating any nontrivial number of elementary school students; and equality, as the civil rights movement rightly reminds us, is now. Of course, if the Board comes into court with a substitute proposal for integrating these elementary schoolchildren, say by construction of an educational park in Rock Creek Park or elsewhere, the court will doubtless accept that substitute and release the Board from the specific transportation policy here endorsed.

 The other reason usually favoring judicial delay until after submission of a school board plan is that the courts seek and need school boards' detailed judgments on whether each specific remedial alternative is circumstantially feasible and within the public interest before issuing any order. But Dr. Hansen's elaborated argument in his submission to the Board on the subject of busing for relief of overcrowding and segregation, on the basis of which the Board turned down the Urban League's recommendation, is about as complete and rounded a report as this court can expect on the school administration's attitude on this question. And the equities favoring

the transportation remedy seemingly are unimpeachably clear. Any major considerations the court has inadvertently overlooked or greatly underrated can be brought to the court's attention in a motion for amendment of the decree. But it should here be made explicit that, while courts will be enlightened by school boards' judgments as to which considerations are controlling, this enlightenment will not be encouraged to slump into complacent or uncritical acquiescence; to do so would run counter to the principles of judicial review recognized above.

## VI. THE TRACK SYSTEM

Plaintiffs' attack on the track system, Superintendent Hansen's special form of ability grouping, touches yet another phase of the District's administration of the public schools, here the concern being specifically the kind of educational opportunities existing within the classroom. The evidence amassed by both parties with regard to the track system has been reviewed in detail in Part IV of the Findings, where the court has already had occasion to note the critical infirmities of that system. The sum result of those infirmities, when tested by the principles of equal protection and due process, is to deprive the poor and a majority of the Negro students in the District of Columbia of their constitutional right to equal educational opportunities.

At the outset it should be made clear that what is at issue here is not whether defendants are entitled to provide different kinds of students with different kinds of education. Although the equal protection clause is, of course, concerned with classifications which result in disparity of treatment, not all classifications resulting in disparity are unconstitutional. If classification is reasonably related to the purposes of the governmental activity involved and is rationally carried out, the fact that persons are thereby treated differently does not necessarily offend.[205]

---

205. *See* Justice Burton's opinion for the Court and Justice Frankfurter's dissent in Morey v. Doud, 354 U.S. 457, 77 S.Ct.

1344, 1 L.Ed.2d 1485 (1957); Quaker City Cab Co. v. Commonwealth of Pennsylvania, 277 U.S. 389, 405–406, 48 S.Ct.

Ability grouping is by definition a classification intended to discriminate among students, the basis of that discrimination being a student's capacity to learn.[206] Different kinds of educational opportunities are thus made available to students of differing abilities. Whatever may be said of the concept of ability grouping in general, it has been assumed here that such grouping can be reasonably related to the purposes of public education. Plaintiffs have eschewed taking any position to the contrary.[207] Rather the substance of plaintiffs' complaint is that in practice, if not by design,[208] the track system—as administered in the District of Columbia public schools—has become a system of discrimination founded on socio-economic and racial status rather than ability, resulting in the undereducation of many District students.

As the court's findings have shown, the track system is undeniably an extreme form of ability grouping. Students are early in elementary school sorted into homogeneous groups or tracks (and often into subgroups within a track), thereby being physically separated into different classrooms. Not only is there homogeneity, in terms of supposed levels of ability [209]—the intended result—but as a

practical matter there is a distinct sameness in terms of socio-economic status as well. More importantly, each track offers a substantially different kind of education, both in pace of learning and in scope of subject matter. At the bottom there is the slow-paced, basic (and eventually almost purely low-skill vocational) Special Academic Track; at the top is the intense and challenging Honors program for the gifted student. For a student locked into one of the lower tracks, physical separation from those in other tracks is of course complete insofar as classroom relationships are concerned; and the limits on his academic progress, and ultimately the kind of life work he can hope to attain after graduation, are set by the orientation of the lower curricula. Thus those in the lower tracks are, for the most part, molded for various levels of vocational assignments; those in the upper tracks, on the other hand, are given the opportunity to prepare for the higher ranking jobs and, most significantly, for college.

In theory, since tracking is supposed to be kept flexible, relatively few students should actually ever be locked into a single track or curriculum. Yet, in violation of one of its principal tenets, the track system is not flexible at all. Not

---

553, 72 L.Ed. 927 (1928) (Brandeis, J., dissenting) (state's power to classify for taxation purposes). A rational basis will not suffice to validate all classifications, however. *See* pp. 506–508, *supra.*

206. "Capacity to learn"—rather than "ability"—is a more precise description of the trait looked to in ability grouping. Although present ability is one element considered, the concept of ability grouping is to provide students with an education designed to help them realize their maximum potential—*i. e.*, to progress as fast and as far as possible according to their innate capacity to learn. *See* Findings IV–B.

207. Plaintiffs' Reply Memorandum, p. 2. Thus defendants' argument that ability grouping wins implicit support from its common usage in the United States, from various broad policy statements in Acts of Congress (*e. g.*, the National Defense Education Act of 1958, 20 U.S.C. § 401 *et seq.*), and even from a strained reading of

a phrase in Brown v. Board of Education, 347 U.S. 483, 494, 74 S.Ct. 686, 691 (1954) ("To separate them from others of similar age and qualifications solely because of their race * * * [is unconstitutional]"), is irrelevant. Defendants' Brief pp. 42–45.

208. Although plaintiffs have alleged that in origin and in present administration defendants through the track system were and are intentionally discriminating against the Negro students contrary to the mandate of Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693 (1954), the evidence does not sustain them. *See* Finding IV–A.

Of course, the track system is not insulated from constitutional infirmity simply because its motivation is not one of intended racial discrimination. *See* Note 167 *supra* and accompanying text.

209. Abilities that, as it turns out, are not real at all. *See* pp. 513–514, *infra.*

only are assignments permanent for 90% or more of the students but the vast majority do not even take courses outside their own curriculum. Moreover, another significant failure to implement track theory—and in major part responsible for the inflexibility just noted—is the lack of adequate remedial and compensatory education programs for the students assigned to or left in the lower tracks because of cultural handicaps. Although one of the express reasons for placing such students in these tracks is to facilitate remediation, little is being done to accomplish the task. Consequently, the lower track student, rather than obtaining an enriched educational experience, gets what is essentially a limited or watered-down curriculum.

These are, then, the significant features of the track system: separation of students into rigid .curricula, which entails both physical segregation and a disparity of educational opportunity; and, for those consigned to the lower tracks, opportunities decidedly inferior to those available in the higher tracks.

■ A precipitating cause of the constitutional inquiry in this case is the fact that those who are being consigned to the lower tracks are the poor and the Negroes, whereas the upper tracks are the provinces of the more affluent and the whites. Defendants have not, and indeed could not have, denied that the pattern of grouping correlates remarkably with a student's status, although defendants would have it that the equation is to be stated in terms of income, not race. However, as discussed elsewhere, to focus solely on economics is to oversimplify the matter in the District of Columbia where so many of the poor are in fact the Negroes.[210] And even if race could be ruled out, which it cannot,

defendants surely "can no more discriminate on account of poverty than on account of religion, race, or color." Griffin v. People of State of Illinois, 351 U.S. 12,. 17, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1951). As noted before, the law has a special concern for minority groups for whom the judicial branch of government is often the only hope for redressing their legitimate grievances; and a court will not treat lightly a showing that educational opportunities are being allocated according to a pattern that has unmistakable signs of invidious discrimination. Defendants, therefore, have a weighty burden of explaining why the poor and the Negro should be those who populate the lower ranks of the track system.

Since by definition the basis of the track system is to classify students according to their ability to learn, the only explanation defendants can legitimately give for the pattern of classification found in the District schools is that it does reflect students' abilities. If the discriminations being made are founded on anything other than that, then the whole premise of tracking collapses and with it any justification for relegating certain students to curricula designed for those of limited abilities. While government may classify persons and thereby effect disparities in treatment, those included within or excluded from the respective classes should be those for whom the inclusion or exclusion is appropriate; otherwise the classification risks becoming wholly irrational and thus unconstitutionally discriminatory.[211] It is in this regard that the track system is fatally defective, because for many students placement is based on traits other than those on which the classification purports to be based.

---

210. See Findings IV–D & F.

211. See e. g., Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344 (1957); Skinner v. State of Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). See generally Tussman & ten Broek, The Equal Protection of the Laws, 37 CALIF.L. REV. 341 (1949).

Given the nature of the right involved here and the class of persons affected, plaintiffs are entitled to careful judicial scrutiny of defendants' professions that classifications are in fact based on actual ability to learn. See pp. 506–508, supra.

The evidence shows that the method by which track assignments are made depends essentially on standardized aptitude tests which, although given on a system-wide basis, are completely inappropriate for use with a large segment of the student body. Because these tests are standardized primarily on and are relevant to a white middle class group of students, they produce inaccurate and misleading test scores when given to lower class and Negro students. As a result, rather than being classified according to ability to learn, these students are in reality being classified according to their socio-economic or racial status, or—more precisely—according to environmental and psychological factors which have nothing to do with innate ability.[212]

Compounding and reinforcing the inaccuracies inherent in test measurements are a host of circumstances which further obscure the true abilities of the poor and the Negro. For example, teachers acting under false assumptions because of low test scores will treat the disadvantaged student in such a way as to make him conform to their low expectations; this acting out process—the self-fulfilling prophecy—makes it appear that the false assumptions were correct, and the student's real talent is wasted. Moreover, almost cynically, many Negro students are either denied or have limited access to the very kinds of programs the track system makes a virtual necessity: kindergartens; Honors programs for the fast-developing Negro student; and remedial and compensatory education programs that will bring the disadvantaged student back into the mainstream of education. Lacking these facilities, the student continues hampered by his cultural handicaps and continues to appear to be of lower ability than he really is. Finally, the track system as an institution cannot escape blame for the error in placements, for it is tracking that places such an emphasis on defining ability, elevating its importance to the point where the whole of a student's education and future are made to turn on his facility in demonstrating his qualifications for the higher levels of opportunity. Aside from the fact that this makes the consequences of misjudgments so much the worse, it also tends to alienate the disadvantaged student who feels unequal to the task of competing in an ethnocentric school system dominated by white middle class values[213]; and alienated students inevitably do not reveal their true abilities—either in school or on tests.

All of these circumstances, and more, destroy the rationality of the class structure that characterizes the track system. Rather than reflecting classifications according to ability, track assignments are for many students placements based on status. Being, therefore, in violation of its own premise, the track system amounts to an unlawful discrimination against those students whose educational opportunities are being limited on the erroneous assumption that they are capable of accepting no more.

## REMEDY

The remedy to be provided against the discriminatory policies of the defendants' school administration must center primarily on pupil assignment, teacher

---

212. *See generally* Findings IV–F.

Defendants have cited a number of cases for the proposition that courts will not enjoin the classification and assignment of pupils according to abilities as ascertained through the use of aptitude tests. Stell v. Savannah-Chatham County Bd. of Educ., 5 Cir., 333 F.2d 55 (1964); Evans v. Ennis, 3 Cir., 281 F.2d 385 (1960); Borders v. Rippy, 5 Cir., 247 F.2d 268 (1957); Youngblood v. Board of Pub. Instruction, N.D.Fla., 230 F.Supp. 74 (1964); Calhoun v. Members of Bd. of Educ., N.D.Ga., 188 F.Supp. 401 (1959); Jones v. School Bd., E.D.Va., 179 F.Supp. 280 (1959). These cases, however, are completely inapposite here, because in none of them did the courts have occasion to consider whether the tests used were in fact accurate in ascertaining innate ability.

213. *Compare* Weyrauch, *Dual Systems of Family Law: A Comment,* in THE LAW OF THE POOR 457, 463 (1966).

assignment and the track system. The overcrowding in the Negro schools results from pupil assignment and the difference in the per pupil expenditure results in the main from the assignment of the more highly paid teachers to the predominantly white schools. Consequently, corrective measures designed to reduce pupil and teacher racial segregation should also reduce overcrowding in the Negro schools as well as the pupil expenditure differential favoring the white children. Pending the implementation of such measures, the court will require that the defendants provide transportation to volunteering children from the overcrowded schools east of the Park to the underpopulated schools west of the Park.

As to the remedy with respect to the track system, the track system simply must be abolished. In practice, if not in concept, it discriminates against the disadvantaged child, particularly the Negro. Designed in 1955 as a means of protecting the school system against the ill effects of integrating with white children the Negro victims of *de jure* separate but unequal education, it has survived to stigmatize the disadvantaged child of whatever race relegated to its lower tracks—from which tracks the possibility of switching upward, because of the absence of compensatory education, is remote.

Even in concept the track system is undemocratic and discriminatory. Its creator admits it is designed to prepare some children for white-collar, and other children for blue-collar, jobs. Considering the tests used to determine which children should receive the blue-collar special, and which the white, the danger of children completing their education wearing the wrong collar is far too great for this democracy to tolerate. Moreover, any system of ability grouping which, through failure to include and implement the concept of compensatory education for the disadvantaged child or otherwise, fails in fact to bring the great majority of children into the mainstream of public education denies the children excluded equal educational opportunity and thus encounters the constitutional bar.

As has been shown, the defendants' pupil placement policies discriminate unconstitutionally against the Negro and the poor child whether tested by the principles of separate-but-equal, *de jure* or *de facto* segregation. The use by the defendants of the neighborhood school policy, intentionally manipulated in some instances to increase segregation, is the primary cause of the pupil assignment discrimination. Because of the 10 to one ratio of Negro to white children in the public schools of Washington and because the neighborhood policy is accepted and is in general use throughout the United States, the court is not barring its use here at this time.

In preparing the plan to alleviate pupil segregation which the court is ordering the defendants to file, however, the court will require that the defendants consider the advisability of establishing educational parks, particularly at the junior and senior high school levels, school pairing, Princeton and other approaches toward maximum effective integration. Where because of the density of residential segregation or for other reasons children in certain areas, particularly the slums, are denied the benefits of an integrated education, the court will require that the plan include compensatory education sufficient at least to overcome the detriment of segregation and thus provide, as nearly as possible, equal educational opportunity to all schoolchildren. Since segregation resulting from pupil assignment is so intimately related to school location, the court will require the defendants to include in their plan provision for the application of the principles herein announced to their $300,000,000 building program.

The plan, too, should anticipate the possibility that integration may be accomplished through cooperation with school districts in the metropolitan sub-

urbs. There is no reason to conclude that all Washingtonians who make their homes in Virginia or Maryland accept the heresy that segregated public education is socially realistic and furthers the attainment of the goals of a democratic society. Certainly if the jurisdictions comprising the Washington metropolitan area can cooperate in the establishment of a metropolitan transit authority (*see* 1 D.C.CODE §§ 1401–1416 (1961)), the possibility of such cooperation in the field of education should not be denied—at least not without first sounding the pertinent moral and social responsibilities of the parties concerned.

The final question is the remedy this court should forge for curing the illegalities in teacher placement. It is clear, first, that an injunction should be directed against every possibility of willful segregation in the teacher assignment process; if the preferences of principals and teachers are to be relied on at all by the assistant superintendents or any other officer making the assignment, measures must be taken to insure that race does not creep into the expression of preference.

Next, assignment of incoming teachers must proceed on a color-conscious basis to insure substantial and rapid teacher integration in every school. And finally, to the extent that these two measures are unable quickly to achieve sufficient faculty integration in the schools, this court, as it indicated by its discussion above concerning the Board's responsibilities in following up on Bolling v. Sharpe, has no doubt that a substantial reassignment of the present teachers, including tenured staff, will be mandatory. A similar call has been sounded by the Office of Education, whose Title VI guidelines establish that "[e]very school system has a positive duty to make staff assignments and reassignments necessary to eliminate past discriminatory assignment policies." 45 C.F.R. § 181.3(d) (Supp. 1967). *And see*

the discussion and decree in United States v. Jefferson County, 5 Cir., 372 F2d 836, 892–894, 900 (1967). In the South, a few courts in their discretion have exacted less inclusive commitments from school boards, relating merely to non-segregatory future assignments and the encouragement of voluntary transfers [214]; but that does not bind the conscience of other chancellors confronted with other factual situations.

The more complex question is the goal or objective toward which the school system should strive through the various means outlined above. Two federal courts have ordered school systems to proportion Negro and white teachers equally in every school, give or take a small margin of error. Dowell v. School Board, W.D.Okla., 244 F.Supp. 971 (1965), *affirmed,* 10 Cir., 375 F.2d 158, *cert. denied,* 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (May 29, 1967); Kier v. County School Board, W.D. Va., 249 F.Supp. 239 (1966). It is true, however, that in *Dowell* the court assumed the initiative only after the school board defaulted in the obligation assigned it by the court to draw up a faculty desegregation plan, and *Kier* dealt with a school system with only 25 schools, which may make a difference. Still, there is great appeal in the simplicity and thoroughness of such a decree.

These issues of remedy were ignored at trial by counsel for both sides, each intent instead on establishing or refuting the primary constitutional violation. For this reason, and considering the limitations of time, for the 1967–68 school year the court is content to order "substantial" teacher integration in those schools where complete segregation or token integration of faculty has heretofore existed. The court will remit the question of the longer term goal to the Board for first-instance treatment in the plan which the court in its decree will order the Board to prepare. There will be

---

214. Clark v. Board of Educ., 8 Cir., 369 F.2d 661 (1966); Wheeler v. Durham City Bd. of Educ., 4 Cir., 363 F.2d 738 (1966).

an abundance of opportunity later for adversary argument on the merits and demerits of the ends (and means) concerning teacher integration which the Board decides to propose.

## PARTING WORD

█ It is regrettable, of course, that in deciding this case this court must act in an area so alien to its expertise. It would be far better indeed for these great social and political problems to be resolved in the political arena by other branches of government. But these are social and political problems which seem at times to defy such resolution. In such situations, under our system, the judiciary must bear a hand and accept its responsibility to assist in the solution where constitutional rights hang in the balance. So it was in Brown v. Board of Education, Bolling v. Sharpe, and Baker v. Carr. So it is in the South where federal courts are making brave attempts to implement the mandate of *Brown.* So it is here.

The decree is attached to, and made part of, this opinion.

## DECREE

It is ORDERED, ADJUDGED and DECREED that the defendants, their agents, officers, employees and successors, and all those in active concert and participation with them be, and they are hereby, permanently enjoined from discriminating on the basis of racial or economic status in the operation of the District of Columbia public school system.

It is FURTHER ORDERED, ADJUDGED and DECREED that the defendants be, and they are hereby, permanently enjoined from operating the track system in the District of Columbia public schools. It is FURTHER ORDERED that on October 2, 1967, the defendants file in the record in this case a report of their compliance with this order of the court.

It is FURTHER ORDERED, ADJUDGED and DECREED that on October 2, 1967, the defendants herein file in the record in this case for approval by the court a plan of pupil assignment complying with the principles announced in the court's opinion and the instructions contained in the part styled REMEDY thereof.

It is FURTHER ORDERED, ADJUDGED and DECREED that the defendants, beginning with the school year 1967–68, provide transportation for volunteering children in overcrowded school districts east of Rock Creek Park to underpopulated schools west of the Park. It is FURTHER ORDERED that on October 2, 1967, the defendants file in the record in this case a report of their compliance with this order of the court.

It is FURTHER ORDERED, ADJUDGED and DECREED that, beginning with the school year 1967–68, the following optional zones be abolished: Wilson - Western - Roosevelt; Cardozo-Western; Dunbar - Western; Gordon-MacFarland; Gordon - Banneker; Powell-Hearst. It is FURTHER ORDERED that on October 2, 1967, the defendants file in the record in this case a report of their compliance with this order of the court.

It is FURTHER ORDERED, ADJUDGED and DECREED that the defendants, beginning with the school year 1967–68, provide substantial teacher integration in the faculty of each school. It is FURTHER ORDERED that on October 2, 1967, the defendants file in the record in this case a report of their compliance with this order of the court.

It is FURTHER ORDERED, ADJUDGED and DECREED that on October 2, 1967, the defendants file in the record in this case for approval by the court a plan of teacher assignment which will fully integrate the faculty of each school pursuant to the principles announced in the court's opinion and

the instructions contained in the part styled REMEDY thereof.

It is FURTHER ORDERED, ADJUDGED and DECREED that the United States be, and it is hereby, invited to intervene in these proceedings to assist in the implementation of the decree, to suggest amendments to the decree, and to take whatever other steps it deems appropriate in the interest of public education in the District of Columbia. It is FURTHER ORDERED that the United States be served with a copy of this decree in the manner prescribed by Rule 4(d) (4), FEDERAL RULES OF CIVIL PROCEDURE. The parties, of course, may suggest amendments to this decree at any time.

This decree is without costs.

## APPENDIX A

### TABLE T–1

Group tests: types and frequency of testing.

| Grade Given | Name of Test | Aptitude or Achievement | Verbal or Non-verbal |
|---|---|---|---|
| | Mandatory Program | | |
| K | Metro. Readiness (Rev. Form A) | Aptit. (readiness for 1st grade instruction) | * |
| 1 | Metro. Readiness (Rev. Form B) | (see *supra*) | * |
| 2 ** | Metro. Acht. (Prim. II, Form A) | Acht. (reading/spelling) | V |
| 4 | Sequential Tests of Educ. Progress (STEP) (Level 4, Form A) | Acht. (reading/arith./listening/writing) | V |
| | School & College Ability Tests (SCAT) (Level 5, Form A) | Aptit. | V |
| 6 (Genl/Honors) | Stanford Acht. (SAT) (Rev., Partial, Intermed. II, Form W) | Acht. | V |
| | Otis Quick-Scoring Mental Ability, Beta | Aptit. (IQ) | V |
| 6 (Spec. Ac.) | Metro. Reading & Arith. (Elem. Form A) | Acht. | V |
| | Tests of General Ability (TOGA), Grades 4–6 (Form A) | Aptit. | Both |
| 9 (Genl/Honors) | STEP (Level 3, Form B) | Acht. (math/read./listen./writ.) | V |
| | SCAT (Level 3, Form B) | Aptit. | V |

* Instructions are oral, test is pictorial; verbal to extent of comprehending instructions as to what question is asking. (Tr. 3233.)

** One principal testified that this test is optional. (Tr. 4070.)

| Grade Given | Name of Test | Aptitude or Achievement | Verbal or Non-verbal |
|---|---|---|---|
| | **Mandatory Program** | | |
| 9 (Spec. Ac.) | SAT (Intermed., Partial, Form W) | Acht. | V |
| | TOGA, Grades 6–9 | Aptit. | Both |
| 11 (Genl/Reg/ Honors) | STEP (Level 2, Form A) | Acht. (math *et al.*) | V |
| | SCAT (Level 2, Form A) | Aptit. | V |
| 11 (Spec. Ac.) | SAT (Advanced, Partial, Form W) | Acht. | V |
| | **Optional Program \*\*\*** | | |
| 7 | TOGA, Grades 6–9 | Aptit. | Both |
| 9 | Tests of Educ. Ability, Grades 6–9 | Aptit. | V |
| 10/12 | Flanagan Aptit. Classific. Tests | Aptit. | ... |

(Tr. 1680–1689, 3233–3234; Ex. B–10; Exs. 61–73.)

\*\*\* There has been no evidence as to how many students are tested under the optional program.